

EXHIBIT
D
1:17cr153 2/12/2020 tp

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# GALVESTON DIVISION

United States Courts
Southern District of Texas
FILED

MAY 1 4 2014

David J. Bradley, Clerk of Court

| | |
|---|---|
| IN THE MATTER OF THE | § |
| APPLICATION OF THE UNITED | § |
| STATES OF AMERICA FOR AN | § |
| ORDER AUTHORIZING THE | § |
| INTERCEPTION OF WIRE AND | § |
| ELECTRONIC COMMUNICATIONS | § |
| TO AND FROM CELLULAR | § |
| TELEPHONE NUMBER (832) 727-2669, | § |
| ELECTRONIC SERIAL NUMBER | § |
| (ESN) 99000103799259 (Target Device) | § |

MISC. NO.
3:14 MC9

(UNDER SEAL)

## AFFIDAVIT IN SUPPORT OF APPLICATION

## INTRODUCTION

Your Affiant, Scott Wilkins, being duly sworn, depose and state as follows:

1.    I am a Special Agent of the United States Drug Enforcement

Administration within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the

United States who is empowered by law to conduct investigations of, and to make arrests

for offenses enumerated in 18 U.S.C. § 2516.

2.    I have been a Special Agent (SA) for the Drug Enforcement Administration

(DEA) since July 2000.  I received five (5) months of training in narcotics trafficking

investigations and related legal matters at the DEA Training Academy in Quantico,

Virginia.  Prior to becoming a DEA Special Agent, I was a Houston Police Officer with

the city of Houston, Texas, for approximately five years.  Since becoming a narcotics law

enforcement officer, I have participated in numerous complex conspiracy narcotics and

money laundering investigations.

Affidavit-Page 1

TRUE COPY I CERTIFY
ATTEST:
DAVID J. BRADLEY, Clerk of Court
By
Deputy Clerk

3.     Your Affiant has received courses of instruction from the DEA relating to investigative techniques and the conducting of narcotics and financial investigations.   In addition, your Affiant has conducted, in connection with these and other cases, follow-up investigations concerning the concealment of narcotics-produced assets, money, bank records, etc., and the identification of co-conspirators through the use of ledgers, telephone bills and records, and photographs, as related to drug trafficking.

4.     Your Affiant has initiated investigations involving the interception of wire communications and of electronic communications of digital display paging devices. Your Affiant is familiar with the ways in which narcotic traffickers conduct their business, including, but not limited to, their methods of importing and distributing controlled substances, their use of cellular telephones and digital display paging devices, and their use of numerical codes and code words to conduct their transactions.

5-A.   Your Affiant makes this Affidavit in support of an Application for an Order Authorizing the Interception of Wire and Electronic Communications of **Jose RUBIO-Villegas, aka "Scrappy"; Alvaro ROMERO, aka "Varo"; Arturo ELIZONDO, aka "Turo"; Cynthia LOPEZ; Renard SMITH, aka "G-Town", aka "G"; Luisa GARCIA; Jose SALINAS, aka "Fred"; Cesar GARCIA; Andre GOINS, aka "Fat Rat"; Jose CASTILLO; Edward LNU, aka Eddie LNU, aka Eddie ROBINSON; FNU LNU #1, aka "Kike"; FNU LNU #2, aka "Lito"; Johnathan NORWOOD, aka "Snoop"; FNU LNU #3, aka "Gino"; FNU LNU #4, aka "Tito"; Dan LNU, aka "Dan the man"; Juan LNU, aka "Juanillo"; Rob LNU; Lee LNU; and JR Garcia,**

**aka "Junior"** (hereinafter, collectively referred to as, "**Target Subjects**"), and others yet unknown, to and from:

> (a) telephone number (Mobile Identification Number [MIN])[1] 832-727-2669, Electronic Serial Number (ESN)[2] 99000103799259, (hereinafter "**Target Device**).

5-B.    According to Verizon, the **Target Device** is a Pre-paid mobile telephone sold by Page Plus Cellular with no subscriber information.    According to Verizon, the **Target Device** had no subscriber information.    Your Affiant knows, based on his experience with high level drug trafficking organizations (**DTO**), that it is a common practice for drug traffickers to not provide their personal information when purchasing cellular phones in an effort to thwart law enforcement detection.    **Jose RUBIO-Villegas, aka "Scrappy"** (hereinafter referred to as "**RUBIO**") has been identified as using the **Target Device**.    Based on current and past DEA Galveston Resident Office (GRO) wire and electronic intercepts over the cellular phones of **Alvaro ROMERO** (hereinafter referred to as "**ROMERO**"), and **Arturo ELIZONDO** (hereinafter referred to as "**ELIZONDO**"), ROMERO, and **ELIZONDO** have been identified as leaders within a cocaine, and marijuana **DTO**. **RUBIO** has been identified as a multi-kilogram cocaine source of supply.    Identification of **DTO** members have been the result of investigative techniques, which includes Title III intercepted calls, recorded telephone conversations, telephone toll analysis, physical surveillance, confidential source information, undercover purchases of narcotics, and seizures of narcotics.

---

1       A telephone's MIN, in the United States is the telephone's 10-digit telephone number.
2       The Target Device is identified by means of an ESN number. Each ESN number is unique to that subscribers account.
**Affidavit-Page 3**

5-C.   On February 14, 2014, DEA GRO initiated a wire and electronic intercept over the cellular phone used by **ROMERO (ROMERO Target Telephone #1)**, incorporated by reference to **prior affidavit #1**. On February 25, 2014, based on intercepted calls over the **ROMERO Target Telephone #1, Andre GOINS, aka Fat Rat**, was arrested with 18 ounces of cocaine he received from **ROMERO** (see paragraphs 13, and 51). Intercepted calls indicated that **ELIZONDO**, who was using the **ELIZONDO Target Telephone #1**, was the source of the cocaine. On March 21, 2014, DEA GRO initiated the continued wire and electronic intercept over the **ROMERO Target Telephone #1**, and a wire and electronic intercept over the **ELIZONDO Target Telephone #1**, incorporated by reference to **prior affidavit #2**. However, upon activation of the interception over **ROMERO Target Telephone #1, ROMERO** terminated use of that phone. Intercepted calls over the **ELIZONDO Target Telephone #1** indicated that **ROMERO** was now using the **ROMERO Target Telephone #2** to conduct his narcotics business. On April 23, 2014, DEA GRO initiated the continued wire and electronic intercept over the **ELIZONDO Target Telephone #1**, and initiated a wire and electronic intercept over the **ROMERO Target Telephone #2**, incorporated by reference to **prior affidavit #3**. **Prior affidavit #1, prior affidavit #2**, and **prior affidavit #3**, are incorporated by reference, collectively, as **prior affidavits**. Currently, DEA GRO is intercepting the **ELIZONDO Target Telephone #1**, and the **ROMERO Target Telephone #2**. Intercepted calls over the **ELIZONDO Target Telephone #1**, indicate that **RUBIO** is using the **Target Device** to conduct his narcotics business.

6.    Except where otherwise noted, the information set forth in this affidavit has been provided to your Affiant directly or indirectly by agents of the DEA or other law enforcement officers.   Unless otherwise noted, wherever in this affidavit your Affiant asserts that a statement was made, the information was provided by another law enforcement officer (who may have either direct or hearsay knowledge of the statement) to whom your Affiant has spoken to, or whose report your Affiant has read and reviewed. Such statements are among many statements made by others and are stated in substance, unless otherwise indicated.   Similarly, information resulting from surveillance does not necessarily set forth your Affiant's personal observations, except where otherwise indicated, but rather has been provided directly or indirectly by other law enforcement officers who conducted such surveillance.

7.    Your Affiant has participated in the investigation of the above-described offenses and persons, has reviewed written reports concerning the progress of such, and has received and reviewed reports, both written and oral, from other law enforcement officers.   Because this affidavit is being submitted for the limited purpose of securing authorization for the interception of wire and electronic communications to and from the **Target Device,** your Affiant has set forth only the facts which your Affiant believes are necessary to establish probable cause for a court order authorizing the interception of wire and electronic communications.   Your Affiant is familiar with all aspects of this investigation, and on the basis of this familiarity, your Affiant alleges the facts contained herein to show as stated in the following paragraphs.

## SUBJECT OFFENSES

8.    As a result of my personal participation in this investigation and my knowledge from reports and conversations with other law enforcement officers, your Affiant believes the facts contained in this affidavit show that there is probable cause to believe that the **Target Subjects**, and others yet unknown (hereinafter, collectively, **"Subjects"**) have committed, are committing, and will continue to commit the offenses enumerated in 18 U.S.C. § 2516, namely, the illegal importing, receiving, concealing, distributing, buying, selling, or otherwise dealing in controlled substances, conspiracy to do the same, use of a communication facility to facilitate the above offenses, in violation of 21 U.S.C. §§ 841, 843(b), 846, 952, 960, and 963, money laundering and attempts and conspiracies to do the same, in violation of 18 U.S.C. §§ 1956, and 1956(h), and engaging in monetary transactions in criminally derived property, and attempts and conspiracies to do the same, in violation of 18 U.S.C. §§ 1956(h) and 1957.[3]

## OBJECTIVES

9-A.   There is probable cause to believe that the particular wire and electronic communications of the **Target Subjects**, and others yet unknown, to and from the **Target Device**, concerning the aforementioned offenses, including evidence of the identities and roles of other participants in the illegal narcotics activities, the manner in which those activities are conducted, other locations used in furtherance of those activities, and the distribution of controlled substances and monies used in and obtained

---

[3]    Affiant believes probable cause exists that information will be received concerning the **Target Subjects** aiding and abetting the offenses described above, in violation of 18 U.S.C. § 2.
**Affidavit-Page 6**

by the activities, will be obtained through the interception of wire and electronic communications for which authorization is applied herewith.  In particular, it is expected that these wire and electronic communications will involve discussions of the **Target Subjects** and others yet unknown which will reveal the following:

9-B.  the manner, scope, and extent of the criminal enterprise designed to facilitate the possession with intent to distribute, the distribution, and importation of cocaine, and marijuana;

9-C.  the identity and location of resources utilized to operate the criminal enterprise and the proceeds derived from the criminal activities;

9-D.  the identities of persons financing, paying for, and receiving proceeds of the distribution of controlled substances (i.e., cocaine, and marijuana), and conducting agreements to "launder" or otherwise conceal the source or ownership of the proceeds obtained from the drug trafficking activities, including violations of transaction reporting requirements, and the identities of those persons and institutions that are facilitating the concealment of such proceeds;

9-E.  the location and source of stashes of cocaine, and marijuana, and the means, manner, and methods by which the narcotics are transported and distributed;

9-F.  the full nature and identity of the enterprise engaged in or affecting interstate or foreign commerce, which is being conducted through a pattern of drug trafficking;

9-G.  the precise nature and scope of these illegal activities, particularly the

identities and roles of additional co-conspirators who, as of yet, are not identified.

## PRIOR APPLICATIONS

10-A.  Your Affiant has been informed that a review was complete on May 5, 2014 of the electronic surveillances indices of the DEA, FBI, and Immigration Customs Enforcement (ICE).  Based on these reviews, your Affiant has been informed that, other than the following applications, no other applications to intercept the wire, oral or electronic communications of any of the named **Target Subjects**, target facilities or such applications related to this investigation have been made.

10-B.  On November 18, 2013, in the United States District Court for the Southern District of Texas, the Honorable Judge Keith Ellison signed an Order to intercept the wire communications of **ROMERO**.  (**ROMERO** was listed as a "Target Interceptee" on this prior application however **ROMERO** was not the user of the "Target Device," and ultimately, was never intercepted during the period of interception.)

10-C.  On September 9, 2010, in the United States District Court for the Eastern District of Missouri, the Honorable Judge Jean C. Hamilton signed an Order to intercept the wire communications of **Jose SALINAS**.

10-D.  On November 17, 1994, in the United States District Court for the Eastern District of Louisiana, the Honorable Judge Edith Brown Clement signed an Order to intercept the wire communications of **Renard SMITH**.

10-E. On February 14, 2014, in the United States District Court for the Southern District of Texas, the Honorable Judge Gregg J. Costa signed an Order to intercept the

wire communications of **Alvaro ROMERO, Cynthia LOPEZ, Renard SMITH, Luisa GARCIA, Jose SALINAS, FNU LNU #1, and FNU LNU #2.** The interception began on February 14, 2014, and terminated on March 15, 2015. The wire was sealed on March 19, 2014.

10-F. On March 21, 2014, in the United States District Court for the Southern District of Texas, the Honorable Judge Gregg J. Costa signed an Order to intercept the wire communications (**ELIZONDO Target Telephone #1, and ROMERO Target Telephone #1**) of **Alvaro ROMERO, aka "Varo"; Arturo LNU; Cynthia LOPEZ; Renard SMITH, aka "G-Town", aka "G"; Luisa GARCIA; Jose SALINAS, aka "Fred"; Cesar GARCIA; Andre GOINS, aka "Fat Rat"; Jose CASTILLO; Eddie ROBINSON; FNU LNU #1, aka "Kike"; FNU LNU #2, aka "Lito," and Johnathan NORWOOD, aka "Snoop".** The interception began on the same day for **ELIZONDO Target Telephone #1.** No calls were intercepted over the **ROMERO Target Telephone #1** as **ROMERO** had terminated us of his cellular phone just prior to activation of the wire intercept. Interception over **ELIZONDO Target Telephone #1** terminated on April 19, 2014.

10-G. On April 23, 2014, in the United States District Court for the Southern District of Texas, the Honorable Judge Gregg J. Costa signed an Order to intercept the wire and electronic communications (**ELIZONDO Target Telephone #1, and ROMERO Target Telephone #2**) of **Alvaro ROMERO, aka "Varo"; Arturo ELIZONDO, aka "Turo"; Cynthia LOPEZ; Renard SMITH, aka "G-Town", aka**

"G"; Luisa GARCIA; Jose SALINAS, aka "Fred"; Cesar GARCIA; Andre GOINS, aka "Fat Rat"; Jose CASTILLO; Edward LNU, aka Eddie LNU, aka Eddie ROBINSON; FNU LNU #1, aka "Kike"; FNU LNU #2, aka "Lito"; Johnathan NORWOOD, aka "Snoop"; FNU LNU #3, aka "Gino"; FNU LNU #4, aka "Tito"; FNU LNU #5, aka "Scrappy," aka "Scrap"; Dan LNU, aka "Dan the man"; Juan LNU, aka "Juanillo"; Rob LNU; and Lee LNU. The interception began on the same day for ELIZONDO Target Telephone #1, and ROMERO Target Telephone #2. Interception over both phones will terminate on May 22, 2014.

10-H. On May 5, 2014, in the United States District Court for the Southern District of Texas, the Honorable Judge Gregg J. Costa signed an Order to intercept the wire communications of Miguel Gerardo RODRIGUEZ, aka "Chato"; Alvaro ROMERO, aka "Varo"; Edgar Alejandro ONTIVEROS-Guerra; Alexander Cesar ALONSO-Mascorro aka "Guero"; Romeo LNU; Valerio CELEDON-Zapata; and Luis Carlos VILLARREAL. The interception began on May 5, 2014, and will terminate on June 3, 2014.

## IDENTIFICATION OF TARGET SUBJECTS

11-A. As set forth more fully below, the investigation to date, including Confidential Source (CS) intelligence, toll record analysis, and undercover purchases of evidence, have revealed certain facts regarding the **Target Subjects** and their participation in narcotics trafficking and money laundering, as follows:

11-B. **Jose RUBIO-Villegas, aka "Scrappy,"** whose address is believed to be in

a condominium complex located on Leader Street in Houston, Texas, has been identified as a cocaine source of supply for this **DTO**. Intercepted calls over the **ELIZONDO Target Telephone #1** indicate that **RUBIO,** while using the **Target Device,** supplies **ELIZONDO** with cocaine.

11-C. **Alvaro ROMERO,** whose address is 15206 Merritt Lane, Houston, Texas 77060, is a leader within the **DTO** distributing large quantities of cocaine and marijuana in Harris County, and surrounding areas, as well as the state of Louisiana.

11-D. **Cynthia LOPEZ** (hereinafter referred to as **"C. LOPEZ"**), whose address is 16419 Pinon Vista Drive, Houston, Texas 77095, as discussed in **prior affidavits**, is a courier for the **DTO**.

11-E. **Renard Dewayne SMITH** (hereinafter referred to as "**R. SMITH**"), whose address is 15115 Harness Lane, Webster, Texas 77598, as discussed in **prior affidavits**, is a distributor of narcotics for the **DTO**. On September 23, 1993, **R. SMITH** was arrested for Delivery of a Controlled Substance and on May 15, 1995, was sentenced to eight (8) years' probation. On February 15, 1997, **R. SMITH** was arrested for Delivery of a Controlled Substance PG 1 <= 4g < 200g and on October 29, 1997, was sentenced to three (3) years confinement. On April 27, 2005, **R. SMITH** was arrested for Possession of Marijuana and on August 23, 2005, and was fined $200.00. On September 29, 2005, **R. SMITH** was arrested Delivery of a Controlled Substance >= 4g < 200g and for Unlawful Possession of a Firearm by a Felon. On December 20, 2005, **R. SMITH** was indicted federally on the aforementioned charges and on August 25, 2006,

he was convicted to seven (7) years federal confinement and eight (8) years supervised release. **R. SMITH** is currently on federal probation until October 5, 2019.

11-F. **Luisa Ann GARCIA** (hereinafter referred to as, "**L. GARCIA**"), whose address is N Doffing Rd/W 3 ½ Mile, Mission, Texas 78574, as discussed in **prior affidavits**, is believed to be a drug and money courier for the **DTO**.

11-G. **Jose Alfredo SALINAS**, aka "**Fred**" (hereinafter referred to as, "**SALINAS**"), whose address is believed to be 5101 Isidro Circle, Mission, Texas 78574, as discussed in **prior affidavits**, is believed to be a marijuana source of supply for the **DTO**. On August 22, 2008, **SALINAS** was arrested for Possession of Marijuana <= 50 pounds < 5 pounds and on December 18, 2008, was sentenced to five (5) years' probation.

11-H. **Arturo ELIZONDO** is believed to reside in a gated community located in the 6800 block of Turtlewood Drive, Houston, Texas 77072. Intercepted calls over the **ELIZONDO Target Telephone #1** indicate that **ELIZONDO** is a multi-kilogram cocaine distributor, supplied by **RUBIO**.

11-I. **Andre GOINS**, aka "**Fat Rat**," who resides at 3648 Taylor Street, Lake Charles, Louisiana 70607, is a cocaine and marijuana customer to **ROMERO**. Intercepted calls over the **ROMERO Target Telephone #1** indicate that **GOINS** travels from Lake Charles, Louisiana, to the Houston, Texas, area to purchase cocaine and marijuana from **ROMERO**. See paragraphs 13, and 51.

11-J. **Cesar GARCIA**, whose address is unknown, is a drug associate to

ROMERO.  Intercepted calls over the **ROMERO Target Telephone #1** indicate that **GARCIA** is responsible for distributing narcotics for **ROMERO.**

11-K. **Jose CASTILLO,** whose address is unknown, is a drug associate to **ROMERO.**  Intercepted calls over the **ROMERO Target Telephone #1** indicate that **CASTILLO** orders cocaine and marijuana from **ROMERO.**

11-L. **Edward LNU,** aka **Eddie LNU,** aka **Eddie ROBINSON,** whose address is believed to be 500 Airtex Drive, Apt 602, Houston, Texas 77090, is a drug associate to **ELIZONDO** and **ROMERO.**  Intercepted calls over the **ELIZONDO Target Telephone #1** indicate that **Edward LNU** is a facilitator in the drug business for **ELIZONDO.**  Intercepted calls also indicate that **Edward LNU** has his own cocaine customers.  See paragraphs 21-22.

11-M. **FNU LNU #1, aka "Kike,"** is believed to reside in Mission, Texas, which is located on the Texas and Mexico Border.  Intercepted calls over the **ROMERO Target Telephone #1** indicate that **"Kike"** is a marijuana source of supply to **ROMERO.**

11-N. **FNU LNU #2, aka "Lito,"** whose address is unknown, is a marijuana customer to **ROMERO,** based on intercepted calls over the **ROMERO Target Telephone #1.**

11-O. **Johnathan NORWOOD,** whose address is 1401 Kirkman Street, Lake Charles, Louisiana 70601, is a marijuana customer of **ROMERO.**  See paragraphs 14, and 51.

11-P.  **FNU LNU #3, aka "Gino,"** whose address is unknown, is a drug associate to **ELIZONDO**.  Based on a DEA GRO wire intercept over the **ELIZONDO Target Telephone #1, ELIZONDO** and "Gino," were intercepted discussing the price of cocaine.

11-Q.  **FNU LNU #4, aka "Tito,"** whose address is unknown, is a cocaine customer of **ELIZONDO**.  Based on a DEA GRO wire intercept over the **ELIZONDO Target Telephone #1, ELIZONDO** and "Tito," were intercepted discussing the arrival of cocaine to **ELIZONDO** for distribution to "**Tito**."

11-R.  **Juan LNU, aka "Juanillo,"** whose address is unknown, is a cocaine customer of **ELIZONDO**.  Based on a DEA GRO wire intercept over the **ELIZONDO Target Telephone #1, ELIZONDO** and **Juan LNU, aka "Juanillo,"** were intercepted discussing **ELIZONDO** supplying **Juan LNU** with cocaine.

11-S.  **Rob LNU,** whose address is unknown, is a cocaine customer of **ELIZONDO**.  Based on a DEA GRO wire intercept over the **ELIZONDO Target Telephone #1, Rob LNU** was intercepted ordering seven (7) ounces of cocaine from **ELIZONDO**.

11-T.  **Lee LNU,** whose address is unknown, is a cocaine customer of **ELIZONDO**.  Based on a DEA GRO wire intercept over the **ELIZONDO Target Telephone #1, Lee LNU** was intercepted ordering two (2) ounces of cocaine from **ELIZONDO**.

11-U.  **JR GARCIA, aka "Junior,"** whose address is 330 Harvard, Houston,

Texas 77007, is a cocaine distributor for **ELIZONDO**. Intercepted calls over the **ELIZONDO Target Telephone #1**, indicate that **ELIZONDO** supplies **GARCIA** with cocaine, and then he (**GARCIA**) distributes to customers that travel from Austin, Texas. See paragraph 42.

11-V. **Dan LNU, aka "Dan the man,"** whose address is unknown, is a cocaine customer of this **DTO**. Based on a DEA GRO wire and electronic intercept over the **ELIZONDO Target Telephone #1**, **ELIZONDO**, and **Edward LNU**, discussed **Dan LNU** picking up three (3) ounces of cocaine from **Edward LNU**.

## BACKGROUND AND PROBABLE CAUSE

## FACTUAL BASIS FOR THE INTERCEPTION OF THE TARGET DEVICES

12.    As detailed in **prior affidavits**, since December 2013, the DEA GRO has been investigating the **ROMERO DTO** that is based in Harris and Galveston County, Texas. This investigation led to a wire interception which confirmed that this **DTO** is responsible for distributing kilogram quantities of cocaine, and pound quantities marijuana. The **DTO** operates out of Houston, Texas, in the Southern District of Texas, and distributes narcotics within Galveston and Harris counties in the State of Texas, as well as the trafficking of narcotics through the Eastern District of Texas, to Lake Charles, Louisiana, and other locations yet to be identified. While investigating the **DTO**, DEA agents have seized multi-pound quantities of cocaine and marijuana. DEA agents have developed confidential sources who have informed DEA agents that the **DTO** is responsible for the importation and distribution of marijuana and cocaine throughout the

Continental United States (CONUS).   DEA agents have conducted undercover operations for purchases of marijuana.   Agents know that the **DTO** continues to utilize cellular phones to further their criminal enterprise of trafficking narcotics.

13.    On February 25, 2014, intercepted calls over the **ROMERO Target Telephone #1** indicated that **Andre GOINS, aka "Fat Rat,"** would be traveling from Lake Charles, Louisiana, to purchase cocaine from **ROMERO**.   Intercepted calls also indicated that **ELIZONDO**, who was using the **ELIZONDO Target Telephone #1**, would be supplying the cocaine.   At approximately 12:36 p.m., intercepted calls indicated that **ROMERO** had arrived at **ELIZONDO**'s stash house where **ELIZONDO**'s drug associate, **Edward LNU, aka Eddie LNU, aka Eddie ROBINSON**, would distribute the cocaine, as **ELIZONDO** was not at the location.   A GPS Tracking Order on the **ROMERO Target Telephone #1** indicated that he was in a neighborhood located in the 6800 block of Turtlewood, Houston, Texas.   Surveillance agents could not enter the neighborhood at the time of the cocaine transaction because it was a gated community controlled by access card.   Surveillance was then established at a location used by **ROMERO** to hide and distribute narcotics (stash house).   At approximately 2:00 p.m., agents observed **ROMERO** arrive at the stash house.   At approximately 2:15 p.m., agents observed **GOINS,** who was driving a green Chevrolet Monte Carlo, bearing a Louisiana license plate, arrive at the stash house and exit the vehicle.   At approximately 2:45 p.m., **GOINS** entered the Monte Carlo, where he was followed by surveillance agents.   **GOINS** traveled eastbound on US Hwy. 90, where a Jefferson County Sheriff's

Office (JCSO) deputy conducted a traffic stop on him in Beaumont, Texas, which is located in the Eastern District of Texas. **GOINS** denied a consent search of the vehicle. A K-9 officer arrived at the scene, at which time the K-9 alerted positively to the vehicle. Approximately 18 ounces of cocaine was found inside a hidden, hydraulic compartment in the rear seat of the vehicle.

14.     On March 5, 2014, a JCSO deputy conducted a traffic stop on a grey Chevrolet Monte Carlo, bearing a Louisiana license plate, which was being driven by **Johnathan NORWOOD, aka "Snoop"**. The traffic stop was conducted in Beaumont, Texas, which is located in the Eastern District of Texas. The JCSO deputy smelled an odor of marijuana and asked **NORWOOD** for consent to search the vehicle. **NORWOOD** gave consent. The JCSO deputy located approximately $12,000, which was found in a hidden compartment in the rear backseat of the vehicle. **NORWOOD** was arrested on state charges of money laundering. Prior to the traffic stop, and with no knowledge of JCSO's traffic stop, DEA GRO, based on intercepted calls over the **ROMERO Target Telephone #1**, had established surveillance in the vicinity of **ROMERO**'s stash location in an attempt to intercept **NORWOOD**. Intercepted calls indicated that **NORWOOD** was en route from Lake Charles, Louisiana, to purchase 50 pounds of marijuana from **ROMERO**.

15.     On March 21, 2014, DEA GRO initiated a wire and electronic intercept over the **ROMERO Target Telephone #1**, and the **ELIZONDO Target Telephone #1**. However, upon activation of the interception over **ROMERO Target Telephone #1**,

ROMERO terminated use of that phone. Intercepted calls over the **ELIZONDO Target Telephone #1** indicated that **ROMERO** was now using the **ROMERO Target Telephone #2** to conduct his narcotics business. Intercepted calls over the **ELIZONDO Target Telephone #1** indicated that **RUBIO**, while utilizing the **Target Device**, supplies **ELIZONDO** with cocaine.

### PRECISE LOCATION INFORMATION DATA FOR THE TARGET DEVICE

16.   Your Affiant expects **RUBIO,** and others to continue to traffic drugs during the period of interception. Authorization for precise location information data of the **Target Devices** will assist investigators in identifying these unknown persons, discovering the locations where the drugs are stored, identifying shipments of drugs being smuggled into the area, fully identify other co-conspirators, surveilling these drug traffickers, and seizing cocaine, and marijuana, and/or other drugs. Without this authorization, it is unlikely that many of the participants in this conspiracy will be fully identified. Drug dealers go to great lengths to conceal their identity, even from their co-conspirators. If drugs are seized by law enforcement or anyone in the organization is arrested before they are fully identified, it is very likely that they will flee the area, possibly to Mexico, and make positive identification much more difficult if not impossible. Based on the foregoing, there is probable cause to believe that the precise location information data will lead to additional evidence of the aforementioned offenses, as well as assist in the identification of individuals who are engaged in the commission of these offenses and related crimes.

## PERTINENT TELEPHONE CONVERSATIONS

17.   As set forth below, your Affiant has provided a synopsis of pertinent telephone conversations of **RUBIO**, and pertinent electronic messages from **RUBIO**, who is using **Target Device**.   The conversations support your Affiant's assertion that there is probable cause to believe that the **Target Device** is a vital organizational tool used in the furtherance of narcotics trafficking.   Your Affiant further asserts that the **Target Device** has been used, is being used, and will continue to be used by **RUBIO**, and members of the organization, as command and control telecommunication devices to relay orders, to discuss pertinent drug-related information, and to schedule appointments in furtherance of the narcotics trafficking/money laundering organization.   Your Affiant believes that further investigation of the individuals identified in the Houston, Texas, and surrounding areas, to include the interception of wire and electronic communications requested in this order, will reveal information and evidence that will not be gained by the investigations in cities yet to be determined.   By investigating the individuals operating in the Houston, Texas, and surrounding areas, your Affiant believes it will be possible to identify storage locations and transportation facilities used by the organization, additional sources of the controlled substances, shipments of controlled substances and members or associates of the organization who operate in the Houston, Texas, and surrounding areas and other cities yet to be determined, with the ultimate goal of locating the international source of supply.

18.   Without the interception of wire communications over the **Target Device**,

law enforcement agents will never be privy to all of the details needed to understand all aspects of this large scale, drug trafficking enterprise, nor will they be able to identify the ultimate Mexican source of supply to the **DTO**.  The following paragraphs provide a synopsis of the calls intercepted over the **Target Device**:

## TARGET DEVICE

19.     On March 24, 2014, at approximately 11:11 a.m., based on a DEA GRO wire intercept over the **ELIZONDO Target Telephone #1**, **ELIZONDO**, placed a call to **RUBIO**, who was using the Target Device.  The following is a partial transcript from this call:

**ELIZONDO** HEY, UH... I NEED A SLIT, DUDE.

**RUBIO:**     ALL RIGHT.

**ELIZONDO** BUT AT... BUT AT MY PAD, DUDE.

**RUBIO:**     ALL RIGHT. AT WHAT TIME?

**ELIZONDO** LIKE AS SOON AS YOU CAN.

**RUBIO:**     OKAY. [U/I]...

[VOICES OVERLAP]

**ELIZONDO:**LI-LIKE HOW LONG YOU THINK?

**RUBIO:**     UH, LET ME GET IT READY, BRO'.

**ELIZONDO:**OKAY, OKAY, CALL ME WHEN YOU LEAVING THEN.

**RUBIO:**     ALL RIGHT, BRO'.

**ELIZONDO:**ALL RIGHT.

20.     Based on your Affiant's training and experience with this investigation and

discussions your Affiant has had with other agents, investigators and analysts involved in

this case, your Affiant believes that in the aforementioned conversation, **RUBIO** and

**ELIZONDO** discussed **RUBIO** supplying one half kilogram of cocaine to **ELIZONDO**.

**ELIZONDO** said, "Hey, uh...I need a split, dude.  Your Affiant knows, based on his

experience in this investigation and knowledge of the code words used by this **DTO,** that

**ELIZONDO** used "split" to refer to one half (1/2) kilogram of cocaine.  **RUBIO**

confirmed the cocaine order.  **RUBIO** and **ELIZONDO** then discussed the location and

time frame as to when the cocaine will be delivered to **ELIZONDO**.

     21.    On April 5, 2014, at approximately 10:53 p.m., based on a DEA GRO wire

intercept over the **ELIZONDO Target Telephone #1, ELIZONDO**, received a call

from **RUBIO**, who was using the **Target Device**.  The following is a partial transcript

from this call:

**ELIZONDO:**THAT SCRAPPIN.

**RUBIO:**    WHAT'S UP, BRO?

**ELIZONDO:**[U/I]

              [VOICES OVERLAP]

**RUBIO:**    I TOOK... I TOOK ALL FUCKING DAY ALREADY. [U/I]

**ELIZONDO:**[LAUGHS]

**RUBIO:**    IT'S [STAMMERS] YOUR NIECE'S FAULT, YOUR COUSIN AND
            SISTER OVER THERE.

**ELIZONDO:**[LAUGHS] DAMN.

**RUBIO:**    YOU WANT ME TO COME THROUGH OR WHAT?  OR

Affidavit-Page 21

[STAMMERS] YOU ALREADY GOT SOME?  YOU ALREADY STRAIGHT?

[VOICES OVERLAP]

**ELIZONDO:**NAH. [STAMMERS] I WAS... NAH, I WAS JUST... I WASN'T EVEN IN NO RUSH, BUT [STAMMERS] I'M ONLY GOING TO NEED THE... [STAMMERS] I WANTED THE NINE (9) EARLIER, BUT MY HOMEBOY... HE [U/I].

[VOICES OVERLAP]

**RUBIO:**   IT'S NO PROBLEM.  THE SPLIT?

**ELIZONDO:**RIGHT, DUDE.

**RUBIO:**   DO I TAKE IT TO YOU OR WHAT?

**ELIZONDO:**YEAH.  RIGHT NOW... LET ME CALL **EDDY** REAL QUICK, FOOL. I'LL CALL YOU IN A LITTLE BIT.  LET ME MAKE SURE HE'S THERE.

**RUBIO:**   OKAY, CALL ME SO IF NOT, SO...SO...

[VOICES OVERLAP]

**ELIZONDO:**[STAMMERS] ALL RIGHT.  I'LL CALL YOU IN A LITTLE BIT, DUDE.

**RUBIO:**   ALL RIGHT, BRO.

22.    Based on your Affiant's training and experience with this investigation and discussions your Affiant has had with other agents, investigators and analysts involved in this case, your Affiant believes that in the aforementioned conversation, **RUBIO** and **ELIZONDO** discussed **RUBIO** supplying one half (1/2) kilogram of cocaine to

**ELIZONDO. ELIZONDO** said, "…I wanted the nine (9) earlier, but my homeboy…he [U/I]." Your Affiant believes **ELIZONDO** first wanted nine (9) ounces of cocaine, but then wanted a half (1/2) kilogram. **RUBIO** said, "It's no problem. The split?" **ELIZONDO** confirmed. As discussed in paragraph 20, your Affiant knows that this **DTO** uses "split" to refer to one half (1/2) kilogram of cocaine, and that, in this conversation, **ELIZONDO** ordered a "split" from **RUBIO. ELIZONDO** said, "Let me call **Eddy** real quick…Let me make sure he's there." Your Affiant believes **ELIZONDO** was going to call **Edward LNU** to see if he (**Edward LNU**) is at a location **ELIZONDO** uses to store and distribute narcotics so **Edward LNU** can receive the cocaine.

23.     On April 9, 2014, at 12:05 p.m., **RUBIO**, who was using the **Target Device**, received a text message from **ELIZONDO,** who was using the **ELIZONDO Target Telephone #1**. The following is a transcript of the electronic message:

**ELIZONDO**: "Ok I jeed two splits.let mw onow whejbu finna come cuz ik at the gym."

24.     Based on your Affiant's training and experience with this investigation and discussions your Affiant has had with other agents, investigators and analysts involved in this case, your Affiant believes that in the aforementioned text message **RUBIO** received an order for two (2) half kilograms of cocaine from **ELIZONDO.** Your Affiant believes that **ELIZONDO** used "split" to refer to one half (1/2) kilogram of cocaine. **ELIZONDO** ordered two (2) "splits" for a total of one (1) kilogram of cocaine from **RUBIO.**

25. On April 9, 2014, at 1:07 p.m., **RUBIO,** who was using the **Target Device,** sent a text message to **ELIZONDO,** who was using the **ELIZONDO Target Telephone #1.** The following is a transcript of the electronic message:

**RUBIO**: "On d way."

26. Based on your Affiant's training and experience with this investigation and discussions your Affiant has had with other agents, investigators and analysts involved in this case, your Affiant believes that in the aforementioned text message **RUBIO** advised that he **(RUBIO)** was on his way to deliver the two (2) "splits" of cocaine, as discussed in paragraphs 23-24.

27. On April 26, 2014, at approximately 12:10 p.m., based on a DEA GRO wire intercept over the **ELIZONDO Target Telephone #1, ELIZONDO,** received a call from **RUBIO,** who was using the **Target Device.** The following is a partial transcript from this call:

**RUBIO:** YEAH.

**ELIZONDO:** WHAT UP?

**RUBIO:** YOU WERE SAYING BOSS?

**ELIZONDO:** UH, I GOT A HOMEBOY THAT NEEDS A... A "MICHA" (HALF)

DUDE. I WANTED TO SEE IF YOU WANTED TO DO IT AND SHIT.

**RUBIO:** YEAH. BUT I'LL GIVE YOU THE WHOLE THING, RIGHT?

**ELIZONDO:** YEAH, YEAH, YEAH. WELL HE... MY HOMEBOY NEEDS THE...

AND THEN I GOT ONE (1) THAT WOULD ALSO BE NEEDING THE

SPLIT, DUDE.

**RUBIO:**   YEAH, I GOT YOU. I'M FIXING TO BE IN MY WAY IN ABOUT TWENTY (20), THIRTY (30) MINUTES BRO.

28.   Based on your Affiant's training and experience with this investigation and discussions your Affiant has had with other agents, investigators and analysts involved in this case, your Affiant believes that in the aforementioned conversation, **RUBIO** and **ELIZONDO** discussed **RUBIO** supplying one half (1/2) kilogram of cocaine to **ELIZONDO**.  **ELIZONDO** said, "Uh, I got a homeboy that needs a…a "micha" dude…" Your Affiant knows that the English translation for "micha," is "half." Your Affiant believes **ELIZONDO**'s "homeboy" needs a half kilogram of cocaine.  **RUBIO** then said, "Yeah.  But I'll give you the whole thing, right?" Your Affiant believes **RUBIO** used "whole" to refer to one (1) kilogram of cocaine, and that he (**RUBIO**) asked **ELIZONDO** if he (**RUBIO**) should give him (**ELIZONDO**) the one (1) kilogram of cocaine.  **ELIZONDO** said, "Yeah, yeah, yeah.  Well he…my homeboy needs the…[U/I] and then I got one (1) that would also be needing the split, dude." Your Affiant believes **ELIZONDO** advised that he would take the one (1) kilogram of cocaine because his "homeboy" needed half a kilo, and an unknown customer also needs a "split." Your Affiant knows, based on his experience with this investigation, that **ELIZONDO** uses the code word, "split," to refer to one half (1/2) kilogram of cocaine.

## PEN REGISTER AND TOLL ANALYSIS OF THE TARGET DEVICE

29-A.   As part of this investigation, based on phone toll records, your Affiant has

message between this number and the **Target Device** occurred on May 9, 2014.  See paragraphs 11-L, and 21-22.

On March 23, 2014, at approximately 7:17 p.m., **ELIZONDO**, who was using the **ELIZONDO Target Telephone #1**, received a call from **Edward LNU, aka Eddie LNU, aka Eddie ROBINSON**, who was using (713) 494-2813.  The following is a partial transcript from this call:

**ELIZONDO:**[ASIDE: [U/I].] [BACKGROUND: UF: [U/I]...] WHAT'S GOING ON, **EDWARD**?

**EDWARD:**  [U/I], OKAY. THAT'S FINE. NO, I JUST CALLED, UH, UH-UH... UH, DAN...

[VOICES OVERLAP]

**ELIZONDO:**DAN?

**EDWARD:**  UH, YEAH, DAN THE MAN. HE'S GONNA COME AND GRAB THREE (3) REAL QUICK.

**ELIZONDO:**OH, YEAH? IS **SCRAPPY** STILL THERE?

**EDWARD:**  YEAH, YEAH, HE'S STILL RIGHT HERE. [U/I]...

[VOICES OVERLAP]

**ELIZONDO:**OH, OKAY. HOW'S THE WORK LOOK?

**EDWARD:**  IT LOOKS GOOD, LOOKS GOOD, IT'S SHINY AND EVERYTHING.

Based on your Affiant's training and experience with this investigation, and discussions your Affiant has had with other agents, investigators and analysts involved in this case, your Affiant believes that in the aforementioned call, **ELIZONDO** and **Edward LNU** discussed a three (3) ounce cocaine deal.  **Edward LNU** said, "Uh, yeah,

**Affidavit-Page 27**

dan the man.  He's gonna come and grab three (3) real quick.  Your Affiant knows that **Edward LNU** is a facilitator of cocaine for **ELIZONDO**, and also has his (**Edward LNU**) own cocaine customers.  Your Affiant believes **Dan LNU, aka "Dan the man,"** is going to pick up three (3) ounces of cocaine from **Edward LNU**.  **ELIZONDO** asked, "…is **Scrappy** still there?"  **Edward LNU** confirmed.  Your Affiant believes **RUBIO** was the source of the three ounces of cocaine.  **ELIZONDO** then asked, "Oh, okay. How's the work look?"  Your Affiant believes **ELIZONDO** used "work" to refer to cocaine, and inquired about the quality of the cocaine.  **Edward LNU** said, "It looks good, looks good, it's shiny and everything."  Your Affiant believes **Edward LNU** was describing the cocaine that he (**Edward LNU**) had in his possession.  Your Affiant knows that drug traffickers commonly describe cocaine as "shiny."

## NEED FOR INTERCEPTION

30.     The requested authorization for the wire intercept over the **Target Device**, is necessary because normal investigative procedures have been employed, but have failed in achieving the goals of the investigation.  This narcotics organization is a large scale drug trafficking and money laundering organization, based in Houston, Texas, and surrounding areas.   The organization has numerous drug cells operating in cities throughout the United States, many of which have yet to be determined.   It is this investigation's goal to identify the distribution routes for this **DTO**, as well as other distribution points throughout the United States, and to identify the ultimate source of supply located in the Republic of Mexico.   Your Affiant also believes that further

investigation of the organization will assist law enforcement in discovering additional members of the organization, not only in the Houston, Texas, and surrounding areas, but in other areas throughout the United States, as well as the Republic of Mexico.

31.     As stated above, the immediate goal of this investigation is to dismantle the Houston, Texas, and surrounding areas, cell of the organization, and to identify the ultimate source of supply.  Information obtained from the seizures, as discussed in paragraphs 13-14, have not yet permitted investigating agents to identify all the co-conspirators involved in this organization, the locations where the drugs are stored, the drug proceeds, and records of illicit activities can be found, nor the exact manner and means by which drugs are imported, transported, concealed or delivered or money transported or stored.  The full scope of the drug trafficking and money laundering activities of this large scale narcotics trafficking organization have not yet been revealed nor has court room quality evidence been found sufficient to charge the **Target Subjects**. It is your Affiant's belief that **RUBIO,** and other high ranking members of this **DTO,** are responsible for distributing shipments of cocaine, and marijuana transported from the Southwest Border into Houston, Texas, and surrounding areas.  To successfully identify and ultimately dismantle the entire organization, and to identify the source of supply, it is essential to intercept the wire and electronic communications of the **Target Device**.

32.     Your Affiant believes that the interception of conversations to and from the **Target Device** is necessary to meet the goals of this investigation.  Based upon your Affiant's training, experience, knowledge of this case, and conversations with other

agents and investigators, your Affiant believes the information gleaned through court authorized intercepted conversations will demonstrate that the **Target Device** has been used, is being used, and will likely to continue to be used to orchestrate the smuggling, transportation, and distribution of narcotics to various locations in the United States. Your Affiant believes that the interception of conversations will ultimately lead to the source of supply located in the Republic of Mexico. Your Affiant believes when these smuggling, transportation, and distribution ventures are successful, the **Target Device** will be utilized to arrange for the proceeds derived from the sale of the drugs, to be collected, concealed, and transported from the United States to the Republic of Mexico.

33.     Your Affiant submits that the interception of wire and electronic communications to and from the **Target Device** would permit agents to ascertain the more finite details concerning the illicit activities of this **DTO**. Based upon your Affiant's training and experience, your Affiant expects that the interception of wire and electronic communications to and from the **Target Device** will reveal the methods and routes used by the **RUBIO**, when distributing drugs throughout the Houston, Texas and surrounding areas, as well as other cities in the United States. The interception of the conversations over the **Target Device** will provide a more complete picture of the inner-workings of the **DTO**'s distribution and trafficking efforts and facilitate the gathering of evidence sufficient to prove, beyond a reasonable doubt, the illegal nature of **RUBIO's** activities. Furthermore, the interception of conversations over the **Target Device** will provide a more complete picture of the source of supply, believed to be located in the

Republic of Mexico. Based upon your Affiant's training and experience, your Affiant expects that the interception of wire and electronic communications over the **Target Device** will also enable agents to further identify the individuals who actually transport, store, and distribute the drugs and the cash proceeds, and also to locate the drugs, currency, and storage locations.

34. Without authorization to intercept the wire the electronic communications to and from the **Target Device**, your Affiant believes it is highly improbable that agents would be able to make seizures, identify and arrest key members of this drug trafficking and money laundering enterprise, nor determine the respective roles and relationships of individuals in this enterprise. Also, it would be improbable that agents could identify all the individuals who oversee this operation and those who carry out the day to day activities for this **DTO,** and other coconspirators, to import, receive, conceal, buy, sell or otherwise deal in drugs and facilitate the laundering of drug proceeds. Without the requested authorization, it would also be improbable that agents would be able to identify all the methods employed by this enterprise to import, transport, and distribute its narcotics proceeds.

## UNAVAILABILITY OF ALTERNATIVE INVESTIGATIVE TECHNIQUES

35. Numerous investigative techniques usually employed in an investigation of this nature have been tried and have failed, reasonably appear unlikely to succeed if they are tried, or are too dangerous to employ. These techniques are described below.

### Physical Surveillance

36.     During January through April 2014, DEA Galveston Resident Office Special Agents and Task Force Officers have conducted surveillance on members of this **DTO**, to include **ELIZONDO**, and/or **ROMERO**.  On January 8, 2014, surveillance was initiated on **ROMERO**, based on a three (3) pound controlled marijuana buy (see paragraph 46) between **ROMERO** and **CS #1**.  After the narcotic transaction, agents attempted to follow **ROMERO**, to identify other co-conspirators and/or locations utilized by the **DTO**.  **ROMERO** was observed continuously changing speeds and changing lanes of travel while looking in his mirrors for vehicles that may be following.  Agents lost sight of **ROMERO** after he made an erratic turn, in what was believed to be a "heat run."  A "heat run" is a method used by drug traffickers to drive erratically and unpredictably in an attempt to observe or identify any law enforcement officers.

37.     On January 23, 2013, agents conducted surveillance on **ROMERO** prior to and after a controlled buy of marijuana (see paragraph 46) between **ROMERO** and **CS #1**.  During surveillance, agents observed a Hispanic male arrive at **ROMERO**'s stash house, located at 558 Dale Street, Houston, Texas 77060.  Agents observed the Hispanic male exit his vehicle and remain in the driveway of the stash house and did not appear to be using the phone.  Agents observed the Hispanic male continue standing in the driveway, nervously looking up and down Dale Street, appearing to conduct counter surveillance.  CS #1 later stated he/she was advised by **ROMERO** that the Hispanic male was one of his workers.

38.     On February 25, 2014, surveillance was conducted on **ELIZONDO**, in

connection with his supplying cocaine to **ROMERO**.  Surveillance was difficult because **ELIZONDO** is believed to live in a gated community where entry and exit is with an access card.  Furthermore, when the cocaine deal was taking place, intercepted calls indicated that **ELIZONDO** was not at the location when the cocaine was being distributed.

39.   On March 3, 2014, surveillance was established at a Houston, Texas, location known to be used by **ROMERO** to conduct narcotics business.  As has been **ROMERO**'s pattern, he would drive in a manner consisting of trying to elude and/or detect law enforcement.  **ROMERO** would drive at slow speeds in which he appeared to be looking at vehicles.  He was also observed driving around the block, in what is commonly referred to as "squaring the block," in an effort to observe law enforcement.

40.   On March 27, 2014, based on intercepted calls over the **ELIZONDO Target Telephone #1**, surveillance was established at a Houston, Texas, location believed to be used by **ELIZONDO** to store and distribute cocaine.  **ELIZONDO** provided an address, 9226 Wilcrest, Houston, Texas, to a security camera company as a location where he (**ELIZONDO**) wanted surveillance cameras installed.  Surveillance agents observed **ELIZONDO** speaking with an unknown male that drove a pickup truck that had a security company name on the truck's door.    Your Affiant believes **ELIZONDO** was having surveillance cameras installed in an effort to thwart law enforcement detection and/or to prevent being robbed, or this location burglarized.  Your affiant believes this residence is not occupied, but only used to store and distribute

cocaine.  In addition to the difficulty of being observed by surveillance cameras, this location is very difficult to observe due to the physical location.  The location is a very small condominium complex, with entrance by a garage and a front door.  The front door entrance has a single lane road with no sidewalks or parking lots in which to view anyone approaching this door.  The garage entrance has no areas to covertly park to view who enters that area.

41.    On April 1, 2014, based on intercepted calls over the **ELIZONDO Target Telephone #1**, surveillance was established at 9226 Wilcrest, Houston, Texas, a location believed to be used by **ELIZONDO** to store and distribute cocaine.  As discussed in the previous paragraph, surveillance is very difficult due to the physical location, as well as the possibility of detection by surveillance cameras.   Surveillance was established because **RUBIO** was going to supply **ELIZONDO** with cocaine.  Due to the incoming and outgoing traffic, and the physical location of the residence, **RUBIO** was never able to be seen delivering the cocaine.   Again on April 9, 2014, surveillance was established at this same location, based on an intercepted text message over the **ELIZONDO Target Telephone #1**, which indicated that **RUBIO** was enroute to deliver cocaine.  Surveillance observed a Hispanic male, later identified as **RUBIO**, who was driving a gray BMW, enter the parking lot, and then drive out of sight.  An intercepted text message indicated that **RUBIO** was at the location.  **RUBIO** was later seen walking away from the 9226 Wilcrest garage area.  Mobile surveillance was conducted on **RUBIO**.  **RUBIO** was observed driving in a manner consistent with trying to detect law enforcement.   On

multiple instances, he would turn on his right turn indicator, and then turn left, and vice versa. Agents eventually lost sight of **RUBIO** in a condominium complex in Houston, Texas, where **RUBIO** is believed to reside.

42.    On April 19, 2014, based on intercepted calls over the **ELIZONDO Target Telephone #1**, surveillance was established at 9226 Wilcrest, Houston, Texas. Intercepted calls indicated that **RUBIO** would be supplying **ELIZONDO** with one half (1/2) kilogram of cocaine. Intercepted calls indicated that once **ELIZONDO** received the cocaine, he would distribute it to **JR GARCIA**. **GARCIA** would then distribute to an unknown customer that was traveling from Austin, Texas to pick up the cocaine. **GARCIA** was observed entering the parking lot of 9226 Wilcrest. Mobile surveillance was established on **GARCIA** in an attempt to seize the cocaine once it was distributed to the unknown Austin customer. However, during the surveillance, **GARCIA** placed calls to **ELIZONDO** and advised him that he was being followed. **GARCIA** told **ELIZONDO** that two vehicles fitting the description and color of two surveillance units were following him. Surveillance then lost sight of **GARCIA** when they increased the surveillance distance.

43.    Based on your Affiant's training, and experience, and knowledge your Affiant has of this investigation, your Affiant believes that attempts to conduct regular and/or frequent physical surveillance on **RUBIO**, and/or his co-conspirators, is likely to result in possible detection of law enforcement through their own counter-surveillance efforts and would adversely affect the investigation. Physical surveillance, if not used in

conjunction with other investigative techniques, including the interception of wire and electronic communications over targeted telephones, is of limited value. Even if highly successful, physical surveillance does not always succeed in gathering evidence of the criminal activity under investigation. It is an investigative technique used to confirm meetings between alleged co-conspirators and often only leaves investigators to speculate as to the purpose of the meetings. It is also a technique used to corroborate information obtained from cooperating individuals. Further, physical surveillance of alleged co-conspirators will not establish, conclusively, the elements of subjects' violations and has not, and most likely will not, establish conclusively the identities of various co-conspirators. Prolonged or regular physical surveillance of the targets would most likely be noticed causing the targets to become more cautious in their illegal activities, to flee to avoid further investigation and prosecution, to cause a threat to the safety of any potential cooperating individuals and/or undercover agents, or otherwise to compromise the investigation.

### Undercover Police Officers And Agents

44.   Undercover police officers or agents have not been used in this investigation due to **ROMERO** advising CS #1 that he (**ROMERO**) does not want to meet anyone that he (**ROMERO**) does not know. Also, no undercover officers have been able to be introduced to **RUBIO** or **ELIZONDO**. Due to this **DTO** limiting outsiders into their inner circle, like most high level drug trafficking organizations, it is impossible for an undercover officer or agent to infiltrate the organization. Based on

your Affiant's training and experience, your Affiant knows that most high-level drug

trafficking organizations are extremely selective in choosing the persons with whom they

will conduct, or even discuss, illegal narcotics activities.  Due to the close and secretive

nature of narcotics trafficking organizations, it is both highly unlikely and very dangerous

for an undercover officer or agent to attempt to infiltrate the upper echelons of such an

organization.  Your Affiant believes that the utilization of undercover officers or agents

is, at best, of limited value.  Your Affiant reasonably believes that if an undercover

officer or agent were successfully inserted within this **DTO**, they would only be privy to

limited information because of the degree to which the organization maintains the

division between and among its members and their respective duties and assignments.

Undercover officers or agents would not obtain information regarding the full scope of

the organization's illegal activities or names and identities of its members.  Your Affiant

believes that **RUBIO**, and other members of this organization are unlikely to associate

with individuals other than their long-time associates, and if contact occurred between

and among the undercover agents, such contact will unlikely produce evidence of the full

scope of the organization's criminal activity to the extent necessary to meet the objectives

and goals of this investigation.

### Cooperating Informants

45.    Agents have been able to utilize two (1) cooperating sources to obtain

information and to make controlled purchases of narcotics from **ROMERO**.  CS #1 has

been proven credible and reliable in providing information regarding this investigation's

targets, methods of operation, and associates. CS #1's information has been verified based on recorded conversations, debriefings, pen register/toll record analysis, surveillance, and prior reports and intelligence. CS #1 is currently out on bond and is working with agents for consideration of a lesser sentence on his federal charge of Conspiracy to Possess with Intent to Distribute Cocaine. No future indictment of CS #1 is pending.

46. CS #1 has been able to make two (2) controlled purchases for a total of six (6) pounds of marijuana from **ROMERO**. During each purchase, CS #1 has had to tell **ROMERO** that each purchase was only a sample for another customer. This is due to **ROMERO** typically not selling small quantities of marijuana, which in both circumstances, was three (3) pounds of marijuana. CS #1 advised **ROMERO** usually sells one-hundred (100) pound quantities of marijuana. While the controlled purchases have helped extend this investigation, it has not allowed agents to fully identify the scope of this **DTO** and identify other co-conspirators or the source of supply. While CS #1 still remains useful, your Affiant believes that further controlled purchases will not result in anymore evidentiary value against **ROMERO** or this **DTO**, nor will it fully accomplish the goals of this investigation which have already been stated.

47. CS #2 has been proven credible and reliable in providing information regarding this investigation's targets, methods of operation, and associates. CS #2's information has been verified based on debriefings, pen register/toll record analysis, surveillance, and prior reports and intelligence. CS #2 does not have any pending

charges or indictments.  CS #2 is working with agents for monetary purposes only.  CS #2 has only been able to provide information on **SMITH** and cannot actively infiltrate the **DTO**.

48.   During the interception period, no CS's have been able to be introduced to **RUBIO**.

49.   Given these circumstances, the need to employ alternative investigative techniques, such as the interception of wire and electronic communications to and from the **Target Device**, becomes all the more imperative.   Without the requested authorization to intercept wire and electronic communications to and from the **Target Device**, it is highly unlikely that agents and investigators will be able to identify additional co-conspirators, locations of stash houses, or other aspects of this organization's illicit operation, especially the Mexican source of supply.  Your Affiant further believes that the present investigation would not, without the evidence available through the requested authorization for wire interception, result in a successful prosecution of all participants of this enterprise.

### Use Of Grand Jury Subpoenas

50.   Based on your Affiant's training and experience with Grand Jury Subpoena's, these types of records provide limited information concerning one of many facets of this investigation.  Your Affiant believes the issuance of grand jury subpoenas to persons believed to be involved in this conspiracy and compelling them to testify before a federal grand jury would most likely be unsuccessful in achieving the stated

goals of this investigation. If the targets of this investigation, their co-conspirators, and other participants be called to testify before a federal grand jury, they would likely be uncooperative and invoke their Fifth Amendment privilege not to testify. Further, granting such persons immunity from prosecution would likely prevent prosecution of the most culpable members of this organization and could not ensure that such immunized witnesses would provide truthful testimony before the grand jury. Additionally, the serving of grand jury subpoenas upon the targets and/or their co-conspirators would only further alert the targets and/or their co-conspirators to the existence of this investigation, thereby causing them to become even more cautious and circumspect in their activities, to flee to avoid further investigation or prosecution, or to otherwise compromise this investigation.

### Interviews Of Subjects And Associates

51.    On February 25, 2014, as discussed in paragraph 13, **Andre GOINS**, aka "**Fat Rat**," was found with one half kilogram of cocaine that he received from **ROMERO**. GOINS denied that he was the owner of the cocaine, and did not provide any information in connection with the cocaine. **GOINS** was released, pending future indictment. On March 5, 2014, as discussed in paragraph 14, **Johnathan NORWOOD, aka "Snoop,"** was found with approximately $12,000.00 USC that was to be used to purchase marijuana. **NORWOOD** denied any knowledge of the cash. **NORWOOD** was arrested on state charges of money laundering. **NORWOOD** was released after he posted a bond, and is awaiting judicial proceedings. Based on your Affiant's training and

experience, your Affiant believes that interviews of subjects or their known associates would produce insufficient information concerning the identities of individuals involved in the conspiracy, the source of the drugs, financing, the location of records, drugs, drug proceeds, or other pertinent information regarding the subject crimes under investigation. Your Affiant also believes that any responses to the interviews would contain a significant number of half-truths and untruths diverting the investigation with false leads or otherwise frustrating the investigation or be of limited value. Additionally, such interviews would likely result in non-targeted interviewees alerting the members of this **DTO**, thereby compromising the investigation and resulting in the possible concealment, movement or destruction of relevant documents, narcotics, drug proceeds and/or other evidence

### Pen Register/Toll Record Analysis

52.    The use of pen registers and toll record analysis have been of some assistance in this investigation to identify some co-conspirators and secure the telephone numbers and addresses of others believed to be associated with the **Target Subjects**. However, the mere fact that the **Target Subjects** and their associates are known to communicate over certain telephones provides neither complete evidence of the crimes under investigation nor the content and purpose of such communications. Without authorization to intercept the wire and electronic communications to and from the **Target Devices**, strides toward obtaining evidence regarding the full scope and activities of **RUBIO**, and this **DTO** cannot be made. Interception of wire and electronic

communications is necessary in this case to obtain the content of telephone conversations your Affiant believes are occurring, based on the volume of calls made to persons whose phones are not currently being intercepted.

## GPS CELLULAR TRACKING ORDERS

53.     Often times an investigation is hindered because agents are not able to locate members of the **DTO** while a drug transaction is taking place.  GPS tracking orders have been used throughout this investigation to locate the targets of this investigation during drug transactions, to identify co-conspirators, and to confirm the identity of the users of the **Target Device**.  However, often times, as was described in paragraph 13, the main target of the investigation, i.e., **ELIZONDO**, may not be at the location where the drug transaction is taking place.  While the tracking orders are helpful, often times they are unreliable.  For example, the exact locations of the cellular phones are not always provided.  Often times the result is a "failure" indicating no location is provided.  Other times, only the cell site/tower is provided.  As with most large **DTO**'s, the higher level members of the organization rarely handle the narcotics or drug proceeds, leaving those functions to the lower level members of the **DTO**.  While tracking orders may be on, for instance, **RUBIO**, they may order a subordinate, who we do not have a tracking order on, to deliver the drugs or pick up the drug proceeds.  A tracking order may not be installed on the cellular phone of the subordinate.

## Search Warrants

54.     The use of search warrants as an investigative tool often provides good evidence of the crimes being committed and enables agents to identify the perpetrators of the crime and obtain evidence to use in a prosecution.  However, in this investigation,

agents have not as yet been able to identify and locate all of the members of this organization in the Houston, Texas, and surrounding areas. Even if agents identified key locations or residences used by members of this organization, your Affiant believes that enforcement actions, such as the execution of search warrants, at the homes or businesses of one or more members of the organization will adversely affect the investigation's focus on other members of the organization. Specifically, your Affiant does not believe that executing a search warrant at the residence of **RUBIO,** or other locations that have been identified in this investigation, would result in the seizure of drugs or other evidence without specific information that evidence is being stored at that location at the specific time of the executing the search warrant. Based on your Affiant's training and experience, your Affiant knows that leaders of a narcotics organization rarely store narcotics at their residences or business, and seldom frequent the locations where narcotics are stored.

55.    Additionally, the execution of a search warrant would jeopardize the goal of dismantling the entire cell of this organization including identifying the source of drugs distributed by this organization. Based on your Affiant's training and experience, your Affiant knows that once the residence or business location of one member of the organization is searched, other members of the organization are likely to destroy evidence located within their own residences or businesses or move evidence to unknown locations, or in an effort to avoid apprehension and prosecution, would flee the jurisdiction. Your Affiant believes that executing a search warrant at the suspected stash

**Affidavit-Page 43**

locations at 558 Dale Street, and 9226 Wilcrest, Houston, Texas, would not lead to the arrest of key members of this **DTO**, nor dismantle this **DTO**, and would adversely affect the progress that has already been made in this investigation.  Therefore, to successfully identify the members of and dismantle the organization, it is preferable to delay any search warrants until agents are prepared to arrest all of the key members of the organization.  Moreover, while search warrants may be used in this investigation should circumstances require immediate action, the execution of search warrants alone are unlikely to provide evidence of the entire scope of this criminal enterprise.

### Examination Of Abandoned/Discarded Materials Or Refuse -- 'Trash Runs'

56.     No trash has been acquired from the residence of **RUBIO** because he lives in a condominium complex that has a trash receptacle used by all the residents.  No trash has been acquired at neither **ROMERO** or **ELIZONDO**'s residences.  As discussed in **prior affidavits**, an older man was seen burning trash at **ROMERO**'s stash house.  Your Affiant believes **ROMERO** does not leave trash out at this location in an effort to thwart law enforcement detection.  **ELIZONDO** is believed to reside in a gated community where entry and exit is through use of an access card.  No trash has been able to be acquired at this location because agents have yet to determine the exact house, due to access difficulty.  No trash has been able to be acquired at a location used by **ELIZONDO** to store and hide cocaine and/or drug proceeds, because the location is a condominium complex with a trash receptacle used by all residents.  Acquiring and examining discarded trash from targets' and subjects' residences and/or businesses is

frequently conducted by criminal investigators to develop corroborative information or investigative leads. At this point in the investigation, no evidence has been acquired that could be beneficial to the furtherance of this investigation. Further, based on your Affiant's training and experience, your Affiant believes the evidence gained from 'trash runs' is rarely of sufficient weight or significance by itself, i.e., if not used in conjunction with the interception of wire and electronic communications, to support a conviction for the commission of the violations under investigation.

### Financial Investigation

57.    A financial investigation is being conducted on this **DTO**, worked jointly with DEA Financial Investigation Team and the Internal Revenue Service (IRS) Criminal Investigations Division. During this interception period, a bank account number has been discovered via intercepted phone calls. This bank account number was provided to **ROMERO** so he could wire transfer funds, believed to be drug proceeds, to. This financial investigation is still on-going and while the identification of further assets is beneficial to this investigation, it is only one of many facets and does not achieve the overall goals of identifying the source of supply or dismantling this **DTO**.

### MAIL COVERS

58.    At this point, no mail covers have been used or attempted in this investigation. Since there is no indication that the co-conspirators communicate through the mail, the only other benefit from a mail cover would generally be to discover financial information, including which financial institutions are being used to deposit the

drug proceeds. Multiple bank accounts have been identified via the interception over the **ELIZONDO Target Telephone #1**, and the **ROMERO Target Telephone #2**. Intercepts indicate that the targets of this investigation transport the proceeds from their narcotics sales to Mexico by vehicle and may not totally use financial institutions to deposit their proceeds. Moreover, the information gained from viewing who the mail is going to or coming from, may not provide useful information which could provide evidentiary value to the prosecution in this case.

## PRIOR TITLE III's

59.    During past interception periods, one half kilogram of cocaine was seized in the vehicle that **GOINS** was using to travel back to Lake Charles, Louisiana (see paragraph 13). Also, approximately $12,000.00 USC was seized in a vehicle that **NORWOOD** was traveling from Lake Charles, Louisiana, to purchase marijuana from **ROMERO** (see paragraph 14). Your Affiant was able to identify two co-conspirators (**GOINS,** and **NORWOOD**) that were traveling from Louisiana, which is through the Eastern District of Texas, to purchase cocaine and marijuana. Intercepted calls over the **ROMERO Target Telephones** indicate that he (**ROMERO**) purchases marijuana from **FNU LNU #1, aka "Kiki."** Upon further identification of "**Kiki**," a Title III wire intercept is anticipated over his ("**Kiki**") cellular phone. Intercepted calls over the **ROMERO Target Telephones** also indicated that **ELIZONDO** was a cocaine source of supply, which led to the interception of wire and electronic communications over the **ELIZONDO Target Telephone #1**. Intercepted calls over **ELIZONDO Target**

**Telephone #1** indicates that **ELIZONDO** purchases marijuana from **ROMERO**. Intercepted calls over the **ELIZONDO Target Telephone #1** also indicated that **RUBIO**, who was using the **Target Device**, supplies cocaine to **ELIZONDO**. During the next thirty (30) day interception period, agents expect to identify **RUBIO**'s source of supply, believed to be the connection to the ultimate Mexican source (s) of supply, as well as locations used by this **DTO** to store narcotics and drug proceeds. Agents also expect to identify additional co-conspirators, as well as methods used to hide drug proceeds.

### Minimization

60.    All interceptions will be minimized in accordance with the minimization requirements of Chapter 119 of Title 18, United States Code, and all interceptions conducted pursuant to this Court's Order will terminate upon attainment of the authorized objectives or, in any event, at the end of thirty (30) days beginning the date on which law enforcement agents commence monitoring an interception or ten (10) days from the date of the Court's Order, whichever is earlier. Monitoring of communications will terminate immediately if it is determined that the conversation is unrelated to communications subject to interception under Chapter 119 of Title 18, United States Code. Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the **Target Subjects** or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal

in nature.  Spot monitoring of non-criminal conversations will be done to ensure that those conversations have not turned criminal in nature.  In the event conversations occur in a language other than English, it is expected that an expert or person otherwise fluent in that language will be available to monitor and to translate during the interception whenever possible.  In the event the translator/expert is not a federal agent, the translator, whether a language trained support employee or someone under contract with the Government, will be under the direct supervision of a federal agent.  If, however, such a translator is not reasonably available, the following after-the-fact minimization procedures have been established pursuant to Title 18, United States Code, Section 2518 (5): (1) All such foreign language conversations will be intercepted and recorded in their entirety; and (2) As soon as practicable after such interception, these conversations will be minimized by a translator under the guidance of a federal agent.  I believe this procedure, which provides for after-the-fact minimization where codes or foreign languages are used by the **Target Subjects**, and when there is no expert reasonably available to translate the conversation, complies with Title 18, United States Code, Section 2518 (5), and its provisions for specialized minimization procedures, when intercepting foreign-language or coded conversations.

61.    It is anticipated that some of the communications will be spoken in the foreign language.  Conversations will be minimized in accordance with Chapter 119 of Title 18, United States Code.  These interceptions will also be minimized when it is determined, through voice identification, physical surveillance or otherwise, that neither

the **Target Subjects**, nor their associates, when identified, are participants in the
conversation unless it is determined during the portion of the conversation already
overheard that the conversation is criminal in nature. Even if one or more associates,
when identified, is a participant in the conversation, monitoring will be minimized if the
conversation is not criminal in nature or otherwise related to the offenses under
investigation. It is understood that the agents will be permitted to spot check minimized
conversations to determine whether the conversation has turned criminal in nature, and
therefore, subject to interception.

62.    All monitoring of electronic communications will be conducted in
accordance with Chapter 119 of Title 18, United States Code. Each text message will be
reviewed over a secure system, and based on the identities of the sender and recipient and
the content of the message, monitoring personnel will determine as soon as practicable
after interception whether the text message appears to be relevant to the investigation or
otherwise criminal in nature. If the message is not criminal in nature, the message will be
marked "minimized" and not accessed by other members of the investigative team. If the
message appears to be privileged, it will be marked "privileged" and secured from access
by other members of the investigative team. If a text message appears to be relevant to
the investigation or otherwise criminal in nature, it will be marked "non-minimized"
and may be shared with the other agents and monitors involved in the investigation. If a
text message is marked "minimized" or "privileged," it will not be disseminated to
members of the investigative team. All intercepted text messages will be sealed

with the court upon the expiration of the court's order authorizing the interception. It is anticipated that the monitoring location will not be staffed at all times, but will be staffed at regular hours, at which time intercepted communications will be monitored and read (including those intercepted at hours when the location was not staffed). However, even when unmanned, the monitoring location will be kept secured with access limited to only authorized monitoring personnel and their supervising agents.

## PERIOD OF INTERCEPTION

63. It is believed that the facts stated herein establish probable cause to believe that the **Target Subjects**, and others yet unknown are engaged in an ongoing criminal enterprise, and that the evidence sought will be intercepted on a continuing basis following the first receipt of the particular communications that are the object of this request. Therefore, it is requested that the Court order that the interception need not terminate when the communications described herein are first intercepted, but may continue until the full scope of the enterprise is developed, including the identities of all participants, their places and methods of operation, and the various activities in which they are engaged in furtherance of the enterprise, or for a period not to exceed thirty (30) days beginning at the date of this Court's order for the **Target Device**.

## AUTHORIZATION REQUESTED

64. Therefore, your Affiant submits that probable cause exists to believe that the **Target Device** has been used, is currently being used, and will continue to be used in furtherance of the commission of the offenses enumerated in 18 U.S.C. § 2516, namely,

the illegal importing, receiving, concealing, distributing, buying, selling, or otherwise dealing in controlled substances, attempts and conspiracy to do the same, use of a communication facility to facilitate the above offenses, in violation of 21 U.S.C. §§ 841, 843(b), 846, 952, 960, and 963, money laundering and attempts and conspiracies to do the same, in violation of 18 U.S.C. §§ 1956 and 1956(h), and engaging in monetary transactions in criminally derived property, and attempts and conspiracies to do the same, in violation of 18 U.S.C. §§ 1956(h) and 1957.

65.    IT IS HEREBY REQUESTED that the Order authorizing the interception of wire and electronic communications over the **Target Device** is intended to apply not only to the target telephone number listed above, but also to any other telephone number subsequently assigned to or used by the instrument bearing the same electronic serial number used by the target telephone, within the thirty-day period. The authorization is also intended to apply to the target telephone number referenced above regardless of service provider, and to background conversations intercepted in the vicinity of the target telephone while the telephone is off the hook or otherwise in use.

66.    IT IS FURTHER REQUESTED that, in the event that the service provider changes during the course of the interception, interception may continue with the new service provider without further order of this Court. The United States will advise the Court of the change of service provider in the periodic progress reports submitted to this Court.

67.    IT IS FURTHER REQUESTED/ORDERED that based on the mobility of

cellular telephones, in the event the target phone is used outside the territorial jurisdiction of this court, interceptions may continue in the Southern District of Texas where the **Target Device** is physically located, and communications over the **Target Device** will first be heard, read, and minimized.

68.   IT IS FURTHER REQUESTED that the court order the authorized interception of pertinent background conversations intercepted in the vicinity of the **Target Device** while the instrument(s) is off hook or are otherwise in use; and to communications transmitted via the two way radio feature, referred to as "push to talk", concerning the above described offices.

69.   IT IS FURTHER REQUESTED, pursuant to 18 U.S.C. §§ 2703(c)(1)(B), 2703(c)(2), 2703(d), and 3121-3124, that Verizon, Verizon Wireless, Page Plus Cellular, AT&T Wireless, Sprint/Nextel Communications, Boost Mobile, Cellco Partners dba Verizon Wireless, Cingular Wireless, Vonage, Voicestream Wireless, Vantage, T-Mobile, Southwestern Bell Telephone Company, General Telephone Equipment Company (GTE), American Telephone and Telegraph Company (AT&T), Metrocall, Western Wireless, STPCS Joint Venture, MCI (MCI ONE, MCI Worldcomm), GTE Wireless, Air Touch Mobile, Max Tel Communications, Pacific Bell, Bell Atlantic, Nevada Bell, Verizon of Texas, Alltel Telephone Company, Cricket Communications, and any other person or entity providing electronic communications service in the United States whose assistance may facilitate the execution of the order, be ordered to supply the following subscriber information:

(A)   name;

(B)   address;

(C)   local and long distance telephone connection records, or records of session times and durations;

(D)   length of service (including start date) and types of service utilized;

(E)   telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address; and

(F)   means and source of payment for such service (including any credit card or bank account number) of a subscriber to or customer of a wire communications service or remote computing service, for published, non published or unlisted dialing, routing, addressing or signaling information captured during the wire interception on the **Target Device** upon oral or written demand by agents of DEA and also be ordered to disclose the location of a cell site/sector (physical address) at call origination (for outbound calling), call termination (for incoming calls), and, if reasonably available, during the process of a call for the **Target Device**.

70.   IT IS FURTHER REQUESTED that the Court direct Verizon to provide Special Agents of the DEA a complete listing of all special calling features to the **Target Device**, including, but not limited to:  Call Forwarding, Call Waiting, Caller ID, three-way Calling, Speed Dialing/Calling (with assigned numbers), Identa-Ring (with assigned numbers), Voice Mail or Call Notes, Return Call, Call Block, Call Trace, Priority Call (with assigned numbers), and, upon request, to further provide the unbilled detailed call records to include but not limited to international calls; and cell site information pertaining to the use of the **Target Device**.

71.   IT IS FURTHER REQUESTED that the aforementioned service providers and their agents and employees be directed not to disclose the existence of the investigation or the Court's Order to anyone.

72.    IT IS FURTHER REQUESTED that this affidavit along with the application and any related orders be **sealed** by the Clerk of the Court and remain **sealed** pending further orders by the Court.

_____

Affiant
Scott Wilkins
Special Agent
U.S. Drug Enforcement Administration

SUBSCRIBED AND SWORN TO BEFORE ME this the ___14th___ day of May, 2014.

_____

HON. GREGG COSTA
United States District Judge
Southern District of Texas

Affidavit-Page 54