

EXHIBIT

*B*

1:17cr153  2/12/2020  tp

PENGAD-Bayonne

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### GALVESTON DIVISION

| | |
|---|---|
| IN THE MATTER OF THE §<br>APPLICATION OF THE UNITED §<br>STATES OF AMERICA FOR AN §<br>ORDER AUTHORIZING THE §<br>CONTINUED INTERCEPTION OF §<br>WIRE AND ELECTRONIC §<br>COMMUNICATIONS TO AND FROM §<br>CELLULAR TELEPHONE NUMBER §<br>(281) 889-4897, INTERNATIONAL §<br>MOBILE SUBSCRIBER IDENTITY §<br>(IMSI) 310150800352713 §<br>(Target Device #1) § | MISC. NO.<br><br>3:14 mc 5 |

------------------------------------------------

| | |
|---|---|
| IN THE MATTER OF THE §<br>APPLICATION OF THE UNITED §<br>STATES OF AMERICA FOR AN §<br>ORDER AUTHORIZING THE §<br>INTERCEPTION OF WIRE AND §<br>ELECTRONIC COMMUNICATIONS §<br>TO AND FROM CELLULAR §<br>TELEPHONE NUMBER (409) 273-0566, §<br>INTERNATIONAL MOBILE §<br>SUBCRIBER IDENTITY (IMSI) §<br>310150800316525 (Target Device #2) § | UNDER SEAL |

**Sealed**
Public and unofficial staff access
to this instrument are
prohibited by court order.

## AFFIDAVIT IN SUPPORT OF APPLICATION

### INTRODUCTION

Your Affiant, Scott Wilkins, being duly sworn, depose and state as follows:

1.       I am a Special Agent of the United States Drug Enforcement

Administration within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the

United States who is empowered by law to conduct investigations of, and to make arrests

for offenses enumerated in 18 U.S.C. § 2516.

**Affidavit-Page 1**

TRUE COPY I CERTIFY
ATTEST:
DAVID J. BRADLEY, Clerk of Court
By _____
                        Deputy Clerk

2.      I have been a Special Agent (SA) for the Drug Enforcement Administration (DEA) since July 2000.  I received five (5) months of training in narcotics trafficking investigations and related legal matters at the DEA Training Academy in Quantico, Virginia.  Prior to becoming a DEA Special Agent, I was a Houston Police Officer with the city of Houston, Texas, for approximately five years.  Since becoming a narcotics law enforcement officer, I have participated in numerous complex conspiracy narcotics and money laundering investigations.

3.      Your Affiant has received courses of instruction from the DEA relating to investigative techniques and the conducting of narcotics and financial investigations.  In addition, your Affiant has conducted, in connection with these and other cases, follow-up investigations concerning the concealment of narcotics-produced assets, money, bank records, etc., and the identification of co-conspirators through the use of ledgers, telephone bills and records, and photographs, as related to drug trafficking.

4.      Your Affiant has initiated investigations involving the interception of wire communications and of electronic communications of digital display paging devices. Your Affiant is familiar with the ways in which narcotic traffickers conduct their business, including, but not limited to, their methods of importing and distributing controlled substances, their use of cellular telephones and digital display paging devices, and their use of numerical codes and code words to conduct their transactions.

5-A.   Your Affiant makes this Affidavit in support of an Application for an Order Authorizing the Continued Interception of Wire and Electronic Communications of

Affidavit-Page 2

**Alvaro ROMERO, aka "Varo"; Arturo LNU; Cynthia LOPEZ; Renard SMITH,**

**aka "G-Town", aka "G"; Luisa GARCIA; Jose SALINAS, aka "Fred"; Cesar**

**GARCIA; Andre GOINS, aka "Fat Rat"; Jose CASTILLO; Eddie ROBINSON;**

**FNU LNU #1, aka "Kike";  FNU LNU #2, aka "Lito," and Johnathan NORWOOD,**

**aka "Snoop"** (hereinafter, collectively referred to as, "**Target Subjects**"), and others yet

unknown, to and from:

> (a) telephone number (Mobile Identification Number [MIN])[1] 281-889-4897, International Mobile Subscriber Identity Number (IMSI)[2] 310150800352713, (hereinafter "**Target Device #1**"); and
>
> (b) telephone number (Mobile Identification Number [MIN]) 409-273-0566, International Mobile Subscriber Identity Number (IMSI) 310150800316525, (hereinafter "**Target Device #2**");

5-B.   According to AT&T, **Target Device #1** is a mobile telephone which is

subscribed to Juan Perez, 3133 Cornerstone Park Dr., Houston, Texas 77014.  On March

5, 2014, **ROMERO** changed service providers of the **Target Device #1**, from Sprint to

AT&T Wireless.  According to AT&T, **Target Device #2** is a mobile phone subscribed to

Michael Perez, 2808 Highway 6 South, Houston, Texas 77082.  **Alvaro ROMERO**

(hereinafter referred to as, "**ROMERO**") has been identified as using **Target Device #1**.

**ROMERO** has also been identified as using **Target Device #2**.  Additionally, **Arturo**

**LNU** has been identified as using the **Target Device #2**. **ROMERO**, and **Arturo LNU** have

been identified as leaders within a cocaine, and marijuana trafficking organization

(hereinafter referred to as, "**DTO**"), based on a current Drug Enforcement Administration

---

1       A telephone's MIN, in the United States is the telephone's 10-digit telephone number.

2       The Target Devices are identified by means of an IMSI number. Each IMSI number is unique to that subscribers account.

**Affidavit-Page 3**

(hereinafter referred to as, "DEA") Galveston Resident Office investigation which includes Title III intercepted calls, recorded telephone conversations, telephone toll analysis, physical surveillance, confidential source information, undercover purchases of narcotics, and seizures of narcotics.

5-C.   On February 14, 2014, DEA GRO initiated a wire intercept over the cellular phone used by **ROMERO (Target Device #1)**, incorporated by reference to **prior affidavit #1**. On February 25, 2014, based on intercepted calls over the **Target Device #1, Andre GOINS, aka Fat Rat**, was arrested with 18 ounces of cocaine he received from **ROMERO** (see paragraphs 13, 18-19, 24-27, 50-53). Intercepted calls indicated that **Arturo LNU**, who was using the **Target Device #2**, was the source of the cocaine (see paragraphs 50-53).

6.   Except where otherwise noted, the information set forth in this affidavit has been provided to your Affiant directly or indirectly by agents of the DEA or other law enforcement officers. Unless otherwise noted, wherever in this affidavit your Affiant asserts that a statement was made, the information was provided by another law enforcement officer (who may have either direct or hearsay knowledge of the statement) to whom your Affiant has spoken to, or whose report your Affiant has read and reviewed. Such statements are among many statements made by others and are stated in substance, unless otherwise indicated. Similarly, information resulting from surveillance does not necessarily set forth your Affiant's personal observations, except where otherwise indicated, but rather has been provided directly or indirectly by other law enforcement

officers who conducted such surveillance.

7.     Your Affiant has participated in the investigation of the above-described offenses and persons, has reviewed written reports concerning the progress of such, and has received and reviewed reports, both written and oral, from other law enforcement officers. Because this affidavit is being submitted for the limited purpose of securing authorization for the continued interception of wire communications to and from **Target Device #1,** and the interception of wire communications to and from **Target Device #2,** your Affiant has set forth only the facts which your Affiant believes are necessary to establish probable cause for a court order authorizing the interception of wire and electronic communications. **Target Device #1,** and **Target Device #2**, are hereafter, collectively, referred to as **Target Devices.** Your Affiant is familiar with all aspects of this investigation, and on the basis of this familiarity, your Affiant alleges the facts contained herein to show as stated in the following paragraphs.

## SUBJECT OFFENSES

8.     As a result of my personal participation in this investigation and my knowledge from reports and conversations with other law enforcement officers, your Affiant believes the facts contained in this affidavit show that there is probable cause to believe that the **Target Subjects,** and others yet unknown (hereinafter, collectively, **"Subjects"**) have committed, are committing, and will continue to commit the offenses enumerated in 18 U.S.C. § 2516, namely, the illegal importing, receiving, concealing, distributing, buying, selling, or otherwise dealing in controlled substances, conspiracy to

do the same, use of a communication facility to facilitate the above offenses, in violation of 21 U.S.C. §§ 841, 843(b), 846, 952, 960, and 963, money laundering and attempts and conspiracies to do the same, in violation of 18 U.S.C. §§ 1956, and 1956(h), and engaging in monetary transactions in criminally derived property, and attempts and conspiracies to do the same, in violation of 18 U.S.C. §§ 1956(h) and 1957.[3]

## OBJECTIVES

9-A.   There is probable cause to believe that the particular wire and electronic communications of the **Target Subjects**, and others yet unknown, to and from the **Target Devices**, concerning the aforementioned offenses, including evidence of the identities and roles of other participants in the illegal narcotics activities, the manner in which those activities are conducted, other locations used in furtherance of those activities, and the distribution of controlled substances and monies used in and obtained by the activities, will be obtained through the interception of wire and electronic communications for which authorization is applied herewith.   In particular, it is expected that these wire and electronic communications will involve discussions of the **Target Subjects** and others yet unknown which will reveal the following:

9-B.   the manner, scope, and extent of the criminal enterprise designed to facilitate the possession with intent to distribute, the distribution, and importation of cocaine, and marijuana;

9-C.   the identity and location of resources utilized to operate the criminal

---

3      Affiant believes probable cause exists that information will be received concerning the **Target Subjects** aiding and abetting the offenses described above, in violation of 18 U.S.C. § 2.

**Affidavit-Page 6**

enterprise and the proceeds derived from the criminal activities;

9-D.   the identities of persons financing, paying for, and receiving proceeds of the distribution of controlled substances (i.e., cocaine, and marijuana), and conducting agreements to "launder" or otherwise conceal the source or ownership of the proceeds obtained from the drug trafficking activities, including violations of transaction reporting requirements, and the identities of those persons and institutions that are facilitating the concealment of such proceeds;

9-E.   the location and source of stashes of cocaine, and marijuana, and the means, manner, and methods by which the narcotics are transported and distributed;

9-F.   the full nature and identity of the enterprise engaged in or affecting interstate or foreign commerce, which is being conducted through a pattern of drug trafficking;

9-G.   the precise nature and scope of these illegal activities, particularly the identities and roles of additional co-conspirators who, as of yet, are not identified.

## PRIOR APPLICATIONS

10-A.   Your Affiant has been informed that a review was complete on March 17, 2014 of the electronic surveillances indices of the DEA, FBI, and Immigration Customs Enforcement (ICE).   Based on these reviews, your Affiant has been informed that, other than the following applications, no other applications to intercept the wire, oral or electronic communications of any of the named **Target Subjects**, target facilities or such applications related to this investigation have been made.

10-B.  On November 18, 2013, in the United States District Court for the Southern District of Texas, the Honorable Judge Keith Ellison signed an Order to intercept the wire communications of **ROMERO**.  (**ROMERO** was listed as a "Target Interceptee" on this prior application however **ROMERO** was not the user of the "Target Device," and ultimately, was never intercepted during the period of interception.)

10-C.  On September 9, 2010, in the United States District Court for the Eastern District of Missouri, the Honorable Judge Jean C. Hamilton signed an Order to intercept the wire communications of **Jose SALINAS**.

10-D.  On November 17, 1994, in the United States District Court for the Eastern District of Louisiana, the Honorable Judge Edith Brown Clement signed an Order to intercept the wire communications of **Renard SMITH**.

10-E.  On February 14, 2014, in the United States District Court for the Southern District of Texas, the Honorable Judge Gregg J. Costa signed an Order to intercept the wire communications of **Alvaro ROMERO, Cynthia LOPEZ, Renard SMITH, Luisa GARCIA, Jose SALINAS, FNU LNU #1, and FNU LNU #2**.  The interception began on February 14, 2014, and terminated on March 15, 2015.  The wire was ordered sealed on March 17, 2014.

## IDENTIFICATION OF TARGET SUBJECTS

11-A.  As set forth more fully below, the investigation to date, including Confidential Source (CS) intelligence, toll record analysis, and undercover purchases of evidence, have revealed certain facts regarding the **Target Subjects** and their

participation in narcotics trafficking and money laundering, as follows:

11-B.  **Alvaro ROMERO**, whose address is 15206 Merritt Lane, Houston, Texas 77060, is a leader within the **DTO** distributing large quantities of cocaine and marijuana in Harris County, and surrounding areas, as well as the state of Louisiana.

11-C.  **Cynthia LOPEZ** (hereinafter referred to as "**C. LOPEZ**"), whose address is 16419 Pinon Vista Drive, Houston, Texas 77095, as discussed in **prior affidavit #1**, is a courier for the **DTO**.  See paragraph 36-37.

11-D.  **Renard Dewayne SMITH** (hereinafter referred to as "**R. SMITH**"), whose address is 15115 Harness Lane, Webster, Texas 77598, as discussed in **prior affidavit #1**, is a distributor of narcotics for the **DTO**.  On September 23, 1993, **R. SMITH** was arrested for Delivery of a Controlled Substance and on May 15, 1995, was sentenced to eight (8) years' probation.  On February 15, 1997, **R. SMITH** was arrested for Delivery of a Controlled Substance PG 1 <= 4g < 200g and on October 29, 1997, was sentenced to three (3) years confinement.   On April 27, 2005, **R. SMITH** was arrested for Possession of Marijuana and on August 23, 2005, and was fined $200.00.   On September 29, 2005, **R. SMITH** was arrested Delivery of a Controlled Substance >= 4g < 200g and for Unlawful Possession of a Firearm by a Felon.  On December 20, 2005, **R. SMITH** was indicted federally on the aforementioned charges and on August 25, 2006, he was convicted to seven (7) years federal confinement and eight (8) years supervised release.  **R. SMITH** is currently on federal probation until October 5, 2019.   See paragraphs 34-35, 42-43, and 46-47.

11-E. **Luisa Ann GARCIA** (hereinafter referred to as, "**L. GARCIA**"), whose address is N Doffing Rd/W 3 ½ Mile, Mission, Texas 78574, is believed to be a drug and money courier for the **DTO**. See paragraph 44-45.

11-F. **Jose Alfredo SALINAS, aka "Fred"** (hereinafter referred to as, "**SALINAS**"), whose address is believed to be 5101 Isidro Circle, Mission, Texas 78574, is believed to be a marijuana source of supply for the **DTO**. On August 22, 2008, **SALINAS** was arrested for Possession of Marijuana <= 50 pounds < 5 pounds and on December 18, 2008, was sentenced to five (5) years' probation. See paragraph 18-19.

11-G. **Arturo LNU** is believed to reside in a gated community located in the 6800 block of Turtlewood Drive, Houston, Texas 77072. A current GPS Tracking Order on **Target Device #2** shows **Arturo LNU** to be in the vicinity of this community during the night time hours when most families are asleep. Intercepted calls over the **Target Device #1** indicate that **Arturo LNU,** who was using the **Target Device #2**, is a cocaine source of supply for **ROMERO**. **Arturo LNU** also purchases marijuana from **ROMERO**. See paragraphs 48-55.

11-H. **Andre GOINS, aka "Fat Rat,"** who resides at 3648 Taylor Street, Lake Charles, Louisiana 70607, is a cocaine and marijuana customer to **ROMERO**. Intercepted calls over the **Target Device #1** indicate that **GOINS** travels from Lake Charles, Louisiana, to the Houston, Texas, area to purchase cocaine and marijuana from **ROMERO**. See paragraphs 13, 18-19, 24-27, 50-53.

11-I. **Cesar GARCIA**, whose address is unknown, is a drug associate to

**ROMERO**.   Intercepted calls over the **Target Device #1** indicate that **GARCIA** is responsible for distributing narcotics for **ROMERO**.   See paragraphs 28-31.

11-J.  **Jose CASTILLO,** whose address is unknown, is a drug associate to **ROMERO**.   Intercepted calls over the **Target Device #1** indicate that **CASTILLO** orders cocaine and marijuana from **ROMERO**.   See paragraphs 22-23.

11-K.  **Eddie ROBINSON**, whose address is believed to be 500 Airtex Drive, Apt 602, Houston, Texas 77090, is a drug associate to **Arturo LNU** and **ROMERO**. Intercepted calls over the **Target Device #1** indicated that **ROBINSON** distributed cocaine to **ROMERO** (see paragraphs 52-53).  On August 22, 2991, **ROBINSON** was convicted of Possession of Cocaine and sentenced to 25 years confinement.  On September 2, 1999, **ROBINSON** was convicted of Man/Del of a Controlled Substance PG 1 >=400g, and sentenced to 35 years confinement.  On November 8, 2007, ROBINSON received early parole, and is on parole until September 1, 2034.

11-L.  **FNU LNU #1, aka "Kike,"** is believed to reside in Mission, Texas, which is located on the Texas and Mexico Border.  Intercepted calls over the **Target Device #1** indicate that **"Kike"** is a marijuana source of supply to **ROMERO**.  See paragraphs 20-21).

11-M. **FNU LNU #2, aka "Lito,"** whose address is unknown, is a marijuana customer to **ROMERO**, based on intercepted calls over the **Target Device #2**.  See paragraphs 32-33, and 40-41.

11-N. **Johnathan NORWOOD**, whose address is 1401 Kirkman Street, Lake

Charles, Louisiana 70601, is a marijuana customer of **ROMERO**. See paragraphs 14, 38-39, and 44-45.

## BACKGROUND AND PROBABLE CAUSE

## FACTUAL BASIS FOR THE INTERCEPTION OF THE TARGET DEVICES

12.    As detailed in **prior affidavit #1**, since December 2013, the DEA GRO has been investigating the **ROMERO DTO** that is based in Harris and Galveston County, Texas.  This investigation led to a wire interception which confirmed that this **DTO** is responsible for distributing kilogram quantities of cocaine, and pound quantities marijuana.  The **DTO** operates out of Houston, Texas, in the Southern District of Texas, and distributes narcotics within Galveston and Harris counties in the State of Texas, as well as the trafficking of narcotics through the Eastern District of Texas, to Lake Charles, Louisiana, and other locations yet to be identified.  While investigating the **DTO**, DEA agents have seized multi-pound quantities of cocaine and marijuana.  DEA agents have developed confidential sources who have informed DEA agents that the **DTO** is responsible for the importation and distribution of marijuana and cocaine throughout the Continental United States (CONUS).  DEA agents have conducted undercover operations for purchases of marijuana.  Agents know that the **DTO** continues to utilize cellular phones to further their criminal enterprise of trafficking narcotics.

13.    On February 25, 2014, intercepted calls over the **Target Device #1** indicated that **Andre GOINS, aka "Fat Rat,"** would be traveling from Lake Charles, Louisiana, to purchase cocaine from **ROMERO** (see paragraphs 24-27).  Intercepted

calls also indicated that **Arturo LNU**, who was using the **Target Device #2**, would be supplying the cocaine. At approximately 12:36 p.m., intercepted calls indicated that **ROMERO** had arrived at **Arturo LNU**'s stash house (see paragraphs 52-53) where **Arturo LNU**'s drug associate, **Eddie ROBINSON**, would distribute the cocaine, as **Arturo LNU** was not at the location. A GPS Tracking Order on the **Target Device #1** indicated that he was in a neighborhood located in the 6800 block of Turtlewood, Houston, Texas. Surveillance agents could not enter the neighborhood at the time of the cocaine transaction because it was a gated community controlled by access card. Surveillance was then established at a location used by **ROMERO** to hide and distribute narcotics (stash house). At approximately 2:00 p.m., agents observed **ROMERO** arrive at the stash house. At approximately 2:15 p.m., agents observed **GOINS**, who was driving a green Chevrolet Monte Carlo, bearing a Louisiana license plate, arrive at the stash house and exit the vehicle. At approximately 2:45 p.m., **GOINS** entered the Monte Carlo, where he was followed by surveillance agents. **GOINS** traveled eastbound on US Hwy. 90, where a Jefferson County Sheriff's Office (JCSO) deputy conducted a traffic stop on him in Beaumont, Texas, which is located in the Eastern District of Texas. **GOINS** denied a consent search of the vehicle. A K-9 officer arrived at the scene, at which time the K-9 alerted positively to the vehicle. Approximately 18 ounces of cocaine was found inside a hidden, hydraulic compartment in the rear seat of the vehicle.

14. On March 5, 2014, a JCSO deputy conducted a traffic stop on a grey Chevrolet Monte Carlo, bearing a Louisiana license plate, which was being driven by

**Johnathan NORWOOD, aka "Snoop".**   The traffic stop was conducted in Beaumont, Texas, which is located in the Eastern District of Texas.  The JCSO deputy smelled an odor of marijuana and asked **NORWOOD** for consent to search the vehicle. **NORWOOD** gave consent.  The JCSO deputy located approximately $12,000, which was found in a hidden compartment in the rear backseat of the vehicle.  **NORWOOD** was arrested on state charges of money laundering.  Prior to the traffic stop, and with no knowledge of JCSO's traffic stop, DEA GRO, based on intercepted calls over the **Target Device #1**, had established surveillance in the vicinity of **ROMERO**'s stash location in an attempt to intercept **NORWOOD**.  Intercepted calls indicated that **NORWOOD** was en route from Lake Charles, Louisiana, to purchase 50 pounds of marijuana from **ROMERO** (see paragraphs 38-39, and 44-45).

## PRECISE LOCATION INFORMATION DATA FOR THE TARGET DEVICE

15.    Your Affiant expects **ROMERO, Arturo LNU,** and others to continue to traffic drugs during the period of interception.   Authorization for precise location information data of the **Target Devices** will assist investigators in identifying these unknown persons, discovering the locations where the drugs are stored, identifying shipments of drugs being smuggled into the area, fully identify other co-conspirators, surveilling these drug traffickers, and seizing cocaine, and marijuana, and/or other drugs. Without this authorization, it is unlikely that many of the participants in this conspiracy will be fully identified.  Drug dealers go to great lengths to conceal their identity, even from their co-conspirators.  If drugs are seized by law enforcement or anyone in the

organization is arrested before they are fully identified, it is very likely that they will flee the area, possibly to Mexico, and make positive identification much more difficult if not impossible. Based on the foregoing, there is probable cause to believe that the precise location information data will lead to additional evidence of the aforementioned offenses, as well as assist in the identification of individuals who are engaged in the commission of these offenses and related crimes.

### PERTINENT TELEPHONE CONVERSATIONS

16.    As set forth below, your Affiant has provided a synopsis of pertinent telephone conversations of **ROMERO**, and **Arturo LNU**, and pertinent electronic messages from **ROMERO**, who is using **Target Device #1** and **#2,** and **Arturo LNU**, who is using the **Target Device #2**. While **Target Device #2** is at the early stages of identification, your Affiant will provide toll analysis of **Target Device #2**, which will reflect the same calling patterns as **Target Device #1**. The conversations support your Affiant's assertion that there is probable cause to believe that the **Target Devices** are a vital organizational tool used in the furtherance of narcotics trafficking. Your Affiant further asserts that the **Target Devices** have been used, are being used, and will continue to be used by **ROMERO, Arturo LNU**, and members of the organization, as command and control telecommunication devices to relay orders, to discuss pertinent drug-related information, and to schedule appointments in furtherance of the narcotics trafficking/money laundering organization.    Your Affiant believes that further investigation of the individuals identified in the Houston, Texas, and surrounding areas,

to include the interception of wire and electronic communications requested in this order, will reveal information and evidence that will not be gained by the investigations in cities yet to be determined. By investigating the individuals operating in the Houston, Texas, and surrounding areas, your Affiant believes it will be possible to identify storage locations and transportation facilities used by the organization, additional sources of the controlled substances, shipments of controlled substances and members or associates of the organization who operate in the Houston, Texas, and surrounding areas and other cities yet to be determined, with the ultimate goal of locating the international source of supply.

17. Without the continued interception of wire communications over the **Target Device #1**, and the interception of wire communications over **Target Devices #2**, law enforcement agents will never be privy to all of the details needed to understand all aspects of this large scale, drug trafficking enterprise, nor will they be able to identify the ultimate Mexican source of supply to the **DTO**. The following paragraphs provide a synopsis of the calls intercepted over the **Target Devices**:

### TARGET DEVICE #1

18. On February 23, 2014, at approximately 3:24 p.m., based on a DEA GRO wire intercept over the **Target Device #1**, ROMERO placed a call to **Jose SALINAS, aka "Fred,"** who was using (956) 280-0287. The following is a partial transcript from this call:

**SALINAS:** HELLO.

**ROMERO:**   WHAT'S UP, **FREDDY**?

**SALINAS:**   WHAT'S UP, **VARO**?

**ROMERO:**   YEAH. I GOT BABY MOMMA TAKEN CARE OF IT. SHE'S ON HER WAY BACK. OKAY?

[VOICES OVERLAP]

**SALINAS:**   OH, OKAY. THAT'S FINE.

[VOICES OVERLAP]

**ROMERO:**   UH... THE THING TOO. I, I GOT SOME CHANGE HERE SO THAT... MY, MY PEOPLE IS GONNA BE OVER THERE IN THE MORNING OVER THERE. ALL RIGHT?

**SALINAS:**   ALL RIGHT. THAT'S FINE, **VARO.** IT'S NOT A PROBLEM.

**ROMERO:**   HEY, BUT I NEED ANOTHER CAR, **FRED**.

**SALINAS:**   ALL RIGHT. THAT'S FINE. BY WHEN? MONDAY TUESDAY?

**ROMERO:**   I NEED IT FOR TOMORROW. **ARTURO** IS ASKING ME FOR SOME. I'M BEING ASKED... **FAT RAT** NEEDS ANOTHER CAR.

**SALINAS:**   OH, OKAY. THAT'S FINE.

[VOICES OVERLAP]

**ROMERO:**   OH, MAN. [SIGHS] IT'S NOT... [CHUCKLES] HE NEEDS ANOTHER...

[VOICES OVERLAP]

**SALINAS:**   THAT'S FINE.

**ROMERO:**   ... CAR. UH... MY PEOPLE HERE TOO. SO I, I HAVE A CHECK FOR YOU TOO AND THEN **FAT RAT'S**. ALL RIGHT? SO...

**SALINAS:**   THAT'S FINE.

[VOICES OVERLAP]

**ROMERO:**   ... SO, COME ON.

[VOICES OVERLAP]

**SALINAS:** THAT'S FINE. [STAMMERS]...

[VOICES OVERLAP]

**ROMERO:** I NEED...

**SALINAS:** ... AS SOON AS I GET OUT OF HERE. I'M HERE, HERE AT THE HARDWARE. AS SOON AS I GET OUT OF HERE I'LL CALL YOU.

**ROMERO:** YEAH. ALL RIGHT.

**SALINAS:** ALL RIGHT, ALL RIGHT.

19. Based on your Affiant's training and experience with this investigation and discussions your Affiant has had with other agents, investigators and analysts involved in this case, your Affiant believes that in the aforementioned conversation, **ROMERO** and **SALINAS** discussed a marijuana load supplied by **SALINAS**. **ROMERO** said, "I got baby momma taken care of it. She's on her way back. Okay?" Your Affiant believes one of **ROMERO's** drug couriers, "baby momma," believed to be **Cynthia LOPEZ**, was traveling to the Southwest Border to pick up a load of marijuana from "**Fred.**" "**Fred**" said, "Oh, okay. That's fine." **ROMERO** said, "...I got some change here so that...my, my people is gonna be over there in the morning over there. All right?" Your Affiant believes **ROMERO** used "change" to refer to money that he (**ROMERO**) had to purchase more marijuana. **SALINAS** answered, "...That's fine, **Varo**. It's not a problem." **ROMERO** said, "Hey, but I need another car, **Fred**." Your Affiant believes **ROMERO** used "car" to refer to another load of marijuana. **SALINAS** confirmed, and asked when **ROMERO** wanted the marijuana load when he (**SALINAS**) said, "All right.

Affidavit-Page 18

That's fine. By when? Monday Tuesday?" **ROMERO** answered, "I need it for

tomorrow. **Arturo** is asking me for some. I'm being asked. **Fat Rat** needs another car.

Your Affiant believes **ROMERO** needed the marijuana load the following day because

two of his marijuana customers (**Arturo LNU**, and **GOINS**) needed more marijuana.

**SALINAS** said, "Oh, okay. That's fine."

    20.    On February 23, 2014, at approximately 9:09 p.m., based on a DEA GRO

wire intercept over the **Target Device #1**, **ROMERO** placed a call to **FNU LNU #1, aka**

**"Kike,"** who was using (956) 862-7563. The following is a partial transcript from this

call:

**KIKE:**      HELLO.

**ROMERO:** WHAT'S GOING ON, **KIKE**?

**KIKE:**      WHAT'S THE WORD, **KIKE**?

**ROMERO:** HEY, UH... MY FAMILY SHOULD NOT TAKE LONG TO ARRIVE
OVER THERE. DO YOU KNOW? THEY'RE GOING TO ARRIVE
EARLY.

**KIKE:**      OH, OKAY.

**ROMERO:** NOT EARLY. THEY'RE GOING TO ARRIVE THERE AROUND TEN,
THIRTY (10:30)... ELEVEN (11:00).

**KIKE:**      ALL RIGHT, ALL RIGHT. UH... THAT'S FINE. NO, THAT'S FINE.
WE'RE GIVING IT OUR BEST HERE RIGHT NOW.

**ROMERO:** MEET THEM AROUND THERE... I THINK CLOSE BY WHERE GABY
PICKED THEM UP THE OTHER TIME, RIGHT? [U/I]

                [VOICES OVERLAP]

**KIKE:**      YES, IT WAS GABY.

**ROMERO:** OKAY.

Affidavit-Page 19

**KIKE:**        AND UH...

**ROMERO:**  I'LL CALL YOU.

**KIKE:**        OKAY.  ANYWAY, WE'RE GOING, WE'RE GOING TO... I GOT
                 EIGHTY (80).

**ROMERO:**  OKAY.  THAT'S FINE.  NO PROBLEM.

**KIKE:**        OKAY?

**ROMERO:**  OKAY.

**KIKE:**        OKAY.  ALL RIGHT.  ALL RIGHT.  BYE.

      21.    Based on your Affiant's training and experience with this investigation and

discussions your Affiant has had with other agents, investigators and analysts involved in

this case, your Affiant believes that in the aforementioned conversation, **ROMERO** and

**FNU LNU #1, aka "Kike"** discussed a marijuana load.  Your Affiant believes that the

marijuana is the same marijuana discussed in paragraphs 18-19.  Your Affiant believes

"**Kike**" and **SALINAS** work together in the drug business.  **ROMERO** said, "My family

should not take long to arrive over there.  Do you know?  They're going to arrive early."

Your Affiant believes that **ROMERO** used "family" to refer to "baby momma" as

discussed in paragraphs 18-19, who was arriving to pick up the load of marijuana.

"**Kike**" acknowledged, "Oh, okay."  **ROMERO** and "**Kike**" then discussed the time of

arrival, "...around ten, thirty (10:30)...eleven (11:00), which your Affiant believes was in

the morning.  **ROMERO** and "**Kike**" then discussed the meet location, which, your

Affiant believes, was the location of a past drug deal, when he (**ROMERO**) said, "Meet

them around there...I think by where Gaby picked them up the other time, right?"

"**Kike**" said, "Okay. Anyway, we're going, we're going to...I got eighty (80)." Your

Affiant believes "**Kike**" used eighty (80) to refer to eighty (80) pounds of marijuana that

was to be supplied to **ROMERO**. **ROMERO** then confirmed the amount of the

marijuana.

      22.    On February 24, 2014, at approximately12:08 p.m., based on a DEA GRO

wire intercept over the **Target Device #1, ROMERO** received a call from **Jose**

**CASTILLO**, who was using (832) 602-9241. The following is a partial transcript from

this call:

**ROMERO:**  WHAT'S GOOD, BRO'?

              [BACKGROUND: U/I VOICES]

**CASTILLO:** HEY, WHAT'S THE DEAL, BRO'? YOU STILL GOT THAT, THAT
              BABY?

**ROMERO:**  YEAH. I'M RIGHT HERE AT THE HOUSE WAITING ON YOU,
              BRO'.

              [BACKGROUND: U/I NOISE]

**CASTILLO:** ALL RIGHT. YOU GOT SOME PLATES IN ALREADY?

**ROMERO:**  NO, THE PLATES WILL BE IN TOMORROW, BRO'.

**CASTILLO:** BY TOMORROW?

**ROMERO:**  YEAH. I THOUGHT IT WAS GONNA COME IN TODAY BUT THEY
              GONNA... THEY GONNA HOLD OFF FOR TOMORROW. YEAH.

**CASTILLO:** ALL RIGHT. WELL, UH... YEAH. BEFORE I STOP BY THERAPY
              I'LL STOP BY YOU.

**ROMERO:**  I COULD BARELY HEAR YOU, BRO'. WHAT'S THAT?

**CASTILLO:** BEFORE I GO TO THERAPY I'MMA STOP BY YOU.

**ROMERO:** OKAY. ALL RIGHT.

**CASTILLO:** ALL RIGHT.

23.     Based on your Affiant's training and experience with this investigation and discussions your Affiant has had with other agents, investigators and analysts involved in this case, your Affiant believes that in the aforementioned conversation, **ROMERO** and **CASTILLO** discussed cocaine that **ROMERO** would be supplying **CASTILLO**. **CASTILLO** said, "...You still got that, that baby?" Your Affiant believes, based on experience and knowledge of the coded language this **DTO** uses, that **CASTILLO** used "baby" to refer to one quarter kilogram of cocaine. Your Affiant knows that drug traffickers often times use coded language in an effort to thwart law enforcement detection. **ROMERO** answered, "Yeah. I'm right here at the house waiting on you, bro'." Your Affiant believes **ROMERO** had the cocaine with him. **CASTILLO** then asked, "...You got some plates in already?" Your Affiant believes **CASTILLO** used "plates" to refer to marijuana. **ROMERO** answered, "No, the plates will be in tomorrow, bro'...I thought it was gonna come in today but they gonna...they gonna hold off for tomorrow." Your Affiant knows, based on paragraphs 18-19, that a load of marijuana was being picked up by **ROMERO**'s "baby momma."

24.     On February 25, 2014, at approximately 10:12 a.m., based on a DEA GRO wire intercept over the **Target Device #1**, **ROMERO** received a call from **Andre GOINS**, aka "**Fat Rat**," who was using (337) 707-3252. The following is a partial transcript from this call:

**ROMERO:** WHAT'S UP, **FAT RAT**?

**GOINS:** HEY, WHAT'S UP, **VARO**?  HEY, UH... YOU THINK YOU GONNA BE TO YOUR HOUSE IN ABOUT... ABOUT AN HOUR OR TWO (2)?

**ROMERO:** YEAH, YEAH.  MY DAD WILL BE THERE, **FAT RAT**.  I GOTTA TAKE CARE OF SOME STUFF BUT I'LL BE THERE... I'LL TRY TO BE THERE AS SOON.  BUT YEAH, I GOT THAT SPLIT.  CHECK IT OUT.

[VOICES OVERLAP]

**GOINS:** OH.

**ROMERO:** ALL RIGHT?

**GOINS:** OKAY.  OKAY.  YEAH, I, I, I GOT YOU.  UH... SHIT, I'LL... I'LL BE THERE PROBABLY ABOUT... MAN, PROBABLY ABOUT A COUPLE HOURS, MAN.

**ROMERO:** ALL RIGHT.  THAT'S COOL.  JUST GIVE ME A CALL [STAMMERS] SO I CAN HAVE THEM... YOU KNOW?  ALL RIGHT?

[VOICES OVERLAP]

**GOINS:** ALL RIGHT.  ALL RIGHT.

25.    Based on your Affiant's training and experience with this investigation and discussions your Affiant has had with other agents, investigators and analysts involved in this case, your Affiant believes that in the aforementioned conversation, **ROMERO** and **GOINS** discussed a cocaine deal taking place that day.  **GOINS** asked, "You think you gonna be to your house in about...about an hour or two?"   Your Affiant believes **GOINS** was traveling from Lake Charles, Louisiana, to purchase cocaine from **ROMERO**, and that he (**GOINS**) would be arriving in one to two hours at his (**ROMERO**) house used to distribute and hide narcotics.  **ROMERO** advised that his (**ROMERO**) dad would be at the location.  **ROMERO** also said, "...but yeah, I got that split. Check it out."  Your

Affiant believes **ROMERO** used "split" to refer to one half kilogram or 18 ounces of cocaine. **ROMERO** and **GOINS** then agreed that they would meet in a couple hours. As discussed in paragraph 13, surveillance was established at a location known to be used by **ROMERO** to distribute narcotics. **GOINS** was eventually followed from this location. Deputies from Jefferson County Sheriff's Office conducted a traffic stop on **GOINS** and found 18 ounces of cocaine in a hidden compartment in the vehicle **GOINS** was driving.

26.     On February 25, 2014, at approximately 1:38 p.m., based on a DEA GRO wire intercept over the **Target Device #1**, **ROMERO** received a call from **Andre GOINS**, aka "**Fat Rat**," who was using (337) 707-3252. The following is a partial transcript from this call:

**GOINS:**     …HEY, HEY, YOU GOING TO UH…CALL YOU UP. HEY [U/I], I'M GONNA BE THERE LIKE IN TWENTY (20) MINUTES, MAN.

**ROMERO:** YEAH. I'MMA BE THERE RIGHT THERE TOO ALSO RIGHT NOW, FAT

RAT. ALL RIGHT? I'LL BE THERE.

**GOINS:**     ALL RIGHT. ALL RIGHT.

27.     Based on your Affiant's training and experience with this investigation and discussions your Affiant has had with other agents, investigators and analysts involved in this case, your Affiant believes that in the aforementioned conversation, **GOINS** advised that he (**GOINS**) would be arriving from Lake Charles, Louisiana, to pick up 18 ounces of cocaine (see paragraphs 24-25) from **ROMERO**. As discussed in paragraph 13,

Jefferson County Sheriff's Office deputies seized 18 ounces of cocaine from **GOINS**.

28.     On February 25, 2014, at approximately 7:56 p.m., based on a DEA GRO wire intercept over the **Target Device #1**, **ROMERO** placed a call to **Cesar GARCIA**, who was using (832) 371-0962.  The following is a partial transcript from this call:

**GARCIA:**   WHAT'S GOING ON?

**ROMERO:**   HEY, BRO'.

**GARCIA:**   YEAH.

**ROMERO:**   I'M GONNA NEED A FIVE (5)... [AUDIO INTERRUPTS]

[PAUSE]

**GARCIA:**   COME AGAIN.

[VOICES OVERLAP]

**ROMERO:**   A... A FIVE (5) PIECE.  AND THE DRIVER'S...

[VOICES OVERLAP]

**GARCIA:**   YEAH.

**ROMERO:**   GONNA GO PICK IT UP.  OKAY?

**GARCIA:**   AND WHO IS GONNA DROP... AND WHO, WHO IS GONNA PICK IT UP?

**ROMERO:**   ONE OF THE DRIVERS.

**GARCIA:**   OKAY, OKAY.  HE'S GONNA TAKE IT BACK?

**ROMERO:**   YEAH.  HE'S GONNA TAKE IT SO HE CAN SHOW IT TO SOMEBODY ELSE AROUND HERE, 'CAUSE I AIN'T GONNA FUCK WITH IT.  YOU KNOW?

**GARCIA:**   OKAY, OKAY.

**ROMERO:**   BYE.

**GARCIA:**   I'M AT, I'M AT FIESTA RIGHT NOW.  JUST GIVE ME, GIVE ME A MINUTE TO GET THERE.

**ROMERO:**   HELLO.

**GARCIA:**   YEAH, I'M AT FIESTA JUST GIVE ME A MINUTE TO GET THERE.

**ROMERO:**   ALL RIGHT.  BYE.

29.     Based on your Affiant's training and experience with this investigation and discussions your Affiant has had with other agents, investigators and analysts involved in this case, your Affiant believes that in the aforementioned conversation, **ROMERO** directs his drug associate, **Cesar GARCIA,** to get five (5) pounds of marijuana ready for an unknown customer.  **ROMERO** said, "I'm gonna need a five (5)..."  I believe **ROMERO** used five (5) to refer to five (5) pounds of marijuana.  Your Affiant knows that drug traffickers often times use coded language, such as numbers, to refer to the amount of a particular narcotic.  **ROMERO** said, "...And the driver's...Gonna go pick it up.  Okay?"  Your Affiant believes **ROMERO** used "driver's," to refer to a drug courier, and that the drug courier was going to pick up the five (5) pounds of marijuana from **GARCIA.  GARCIA** then asked, "And who is gonna drop...and who, who is gonna pick it up?"  Your Affiant believes **GARCIA** used "it" to refer to the five (5) pounds of marijuana.  **ROMERO** answered, "One of the drivers."  **ROMERO** further said, "He's gonna take it so he can show it to somebody else around here..."  Your Affiant believes **ROMERO** advised that the drug courier was going to transport the five (5) pounds of marijuana and show it to the marijuana customer.  **ROMERO** also advised that he would not transport the marijuana when he said, "cause I ain't gonna fuck with it.  You know?"

Your Affiant knows, based on his training and experience, that leaders of a drug

organization rarely physically handle the narcotics and direct drug couriers to transport

the drugs, in an effort to avoid arrest and prosecution.

30.    On February 25, 2014, at approximately 8:19 p.m., based on a DEA GRO

wire intercept over the **Target Device #1**, ROMERO placed a call to **Cesar GARCIA**,

who was using (832) 371-0962. The following is a partial transcript from this call:

**GARCIA:**   WHAT'S GOING ON?

**ROMERO:**   HEY, BRO', HE'S OUTSIDE.  GIVE IT TO HIM.

**GARCIA:**   OKAY, OKAY.

31.    Based on your Affiant's training and experience with this investigation and

discussions your Affiant has had with other agents, investigators and analysts involved in

this case, your Affiant believes that in the aforementioned conversation, **ROMERO**

directs his drug associate, **Cesar GARCIA,** to give five (5) pounds of marijuana to

**ROMERO**'s drug courier, as discussed in paragraphs 28-29.  Your Affiant believes

**ROMERO** used, "He's," to refer to the drug courier.  I also believe **ROMERO** used "it"

to refer to the five (5) pounds of marijuana.  **GARCIA** then confirmed **ROMERO**'s

order to give the five (5) pounds of marijuana to the drug courier.

32.    On March 1, 2014, at approximately 1:13 p.m., based on a DEA GRO wire

intercept over the **Target Device #1**, ROMERO received a call from **FNU LNU #3, aka**

**"Lito,"** who was using (832) 614-2152.  The following is a partial transcript from this

call:

**ROMERO:**  WHAT'S UP, BRO'?

Affidavit-Page 27

**LITO:**      WHAT'S UP, MAN?

**ROMERO:**  HERE, HERE.  CHILLIN', CHILLIN'.  WHAT'S GOING ON?

**LITO:**      YOU ALREADY HAVE THERE... [STAMMERS] YOU GOT SOMETHING NOW?

**ROMERO:**  NO, NOT RIGHT... NO MATERIAL RIGHT NOW, BRO', NONE.

**LITO:**      NOTHING?  DAMN.

**ROMERO:**  WE GET MAYBE, MAYBE 'TIL TUESDAY.

**LITO:**      TUESDAY?

**ROMERO:**  LIKE TUESDAY OR MONDAY.

                    [BACKGROUND: U/I MALE VOICE]

**LITO:**      OKAY.

**ROMERO:**  SO I'LL [U/I]...

                         [VOICES OVERLAP]

**LITO:**      IF YOU GET SOME...

**ROMERO:**  WHAT ARE YOU TRYING TO GET?

                         [VOICES OVERLAP]

**LITO:**      ABOUT... ABOUT FIVE (5).

**ROMERO:**  ALL RIGHT.  WELL, JUST GIVE ME 'TIL MONDAY, BRO', AND THEN WHEN I GET, [STAMMERS] WHEN IT ROLLS UP I'LL LET YOU... I'LL GIVE YOU A CALL.  ALL RIGHT?

**LITO:**      ALL RIGHT.

   33.    Based on your Affiant's training and experience with this investigation and

discussions your Affiant has had with other agents, investigators and analysts involved in

this case, your Affiant believes that in the aforementioned conversation, **ROMERO** and

**FNU LNU #3, aka "Lito"** discussed a future marijuana deal.  **"Lito"** said, "You already

Affidavit-Page 28

have there…[stammers] You got something now?" Your Affiant believes that **"Lito"**

asked **ROMERO** if he (**ROMERO**) had any marijuana at his (**ROMERO**) location.

Your affiant believes **"Lito"** used "something" to refer to marijuana. This is confirmed

when **ROMERO** answered, "No, not right…no material right now, bro', none…We get

maybe, maybe 'til Tuesday." Your Affiant believes, based on your affiant's experience

in this investigation, that **ROMERO** used "material" to refer to marijuana, and that he

(**ROMERO**) would have some on Tuesday. Your affiant also knows that drug traffickers

commonly use "material" to refer to marijuana. **ROMERO** further asked, "What are you

trying to get?" **"Lito"** answered, "…about five (5)." Your Affiant believes **"Lito"**

wanted to order five (5) pounds of marijuana from **ROMERO**. **ROMERO** said, "Well,

just give me 'til Monday, bro', and then when I get, [stammers] when it rolls up I'll let

you…I'll give you a call. All right? Your Affiant believes **ROMERO** advised **"Lito"**

that when the marijuana arrived on Monday, that he (**ROMERO**) would call **"Lito."**

**"Lito"** acknowledged, "All right."

      34.    On March 2, 2014, at approximately 11:05 a.m., based on a DEA GRO

wire intercept over the **Target Device #1**, **ROMERO** placed a call to **Renard SMITH**,

who was using (281) 889-4897. The following is a partial transcript from this call:

**SMITH:**     HEY.

**ROMERO:**  WHAT'S UP, **G-TOWN**?

**SMITH:**     HEY, WHAT'S GOING ON, BRO'?

**ROMERO:**  OH, ADAM JUST TEXT ME SAYING THAT YOU NEED SOME
            MATERIAL. [CHUCKLES].

**SMITH:** SHE SAID I NEED SOME MATERIAL?

**ROMERO:** YEAH, "G NEEDS SOME MATERIAL."

**SMITH:** OH, YOU TALKING ABOUT MY LITTLE BROTHER. ME AND MY LITTLE BROTHER AIN'T BEEN FUCKING AROUND.

**ROMERO:** OH, YOU AND YOUR BROTHER AIN'T BEEN WORKING?

**SMITH:** YEAH. NAH, THIS IS BY MY SELF. I AIN'T FUCKING WITH MY BROTHER 'CAUSE HE'S BEEN ON SOME BULLSHIT SO I AIN'T BEEN FUCKING WITH HIM.

**ROMERO:** OH, OKAY, OKAY, OKAY, OKAY.

**SMITH:** YEAH. SO THEY, THEY, THEY DEFINITELY SAYING MY BROTHER 'CAUSE MY BROTHER...

[VOICES OVERLAP]

**ROMERO:** OH.

**SMITH:** ... MY BROTHER TEXT ME ASKING WHAT'S ADAM'S NUMBER.

**ROMERO:** OH, OKAY, OKAY.

**SMITH:** SO I JUST CHUNCKED HIM OUT A NUMBER. YOU KNOW WHAT I'M SAYING? SO...

**ROMERO:** YEAH.

**SMITH:** ... THAT WAS DEFINITELY... I SENT HIM ADAM'S NUMBER YESTERDAY.

**ROMERO:** YEAH, YEAH. OKAY. YEAH, HE WAS CALLING...

[VOICES OVERLAP]

**SMITH:** OKAY.

**ROMERO:** ... HE'S BEEN CALLING ME FOR THE PAST TWO (2) DAYS. BUT I'M ALREADY COMING IN. UH... WE SHOULD BE HAVING SOME MATERIAL TOMORROW. ALL RIGHT?

[VOICES OVERLAP]

**SMITH:**   ALL RIGHT.  UH... I'LL, I'LL GET WITH YOU.

**ROMERO:**   ALL RIGHT, **G-TOWN**.

**SMITH:**   ALL RIGHT.

**ROMERO:**   YEAH.

35.   Based on your Affiant's training and experience with this investigation and discussions your Affiant has had with other agents, investigators and analysts involved in this case, your Affiant believes that in the aforementioned conversation, **ROMERO** and **Renard SMITH** discussed **ROMERO** supplying **SMITH** with marijuana.  **ROMERO** said, "Oh, Adam just text me saying that you need some material."  Your Affiant believes **ROMERO** used "material" to refer to marijuana.  Your Affiant knows that drug traffickers commonly use the coded word "material" to refer to marijuana.  **SMITH** answered, "She said I need some material?"  **ROMERO** said, "Yeah, "G needs some material."  **SMITH** said, "Oh, you talking about my little brother.  Me and my little brother ain't been fucking around."  Your Affiant believes **SMITH** advised that he (**SMITH**) and his (**SMITH**) little brother do not work in the drug business together. **ROMERO** then asked, "Oh, you and your brother ain't been working?"  Your Affiant knows that drug traffickers commonly use "working" to refer to conducting narcotics business.  **SMITH** then confirmed that he does not work with his brother, but rather "by myself."  **ROMERO** said, "...he's been calling me for the past two (2) days.  But I'm already coming in.  Uh...we should be having some material tomorrow.  All right?" Your Affiant believes that **SMITH**'s brother has been calling him (**ROMERO**) for the "past two (2) days" to purchase marijuana.  **ROMERO** advised that he would get

**Affidavit-Page 31**

marijuana the following day.  **SMITH** answered, "All right.  Uh…I'll get with you," which your Affiant believes was to purchase marijuana from **ROMERO**.

36.     On March 2, 2014, at approximately 12:48 p.m., based on a DEA GRO wire intercept over the **Target Device #1**, **ROMERO** placed a call to **Cynthia LOPEZ,** who was using (832) 596-5877.  The following is a partial transcript from this call:

LOPEZ:      HELLO.

ROMERO:   HEY, UH... THAT'S WHAT I WAS ASKING.  I FORGOT TO... WHAT
            ELSE DID THEY TELL YOU AT THE CHECKPOINT?  DID THEY
            ASK YOU WHERE YOU GOING? WHAT YOU DO OVER HERE... IN
            THE VALLEY?

LOPEZ:      YEAH.  I, I TOLD YOU THEY ASKED ME UH... "WHERE AM I
            GOING?" I SAID, "HOUSTON." "YOU'RE... YOU AMERICAN
            CITIZEN'S?" I TOLD HIM YES.  AND HE JUST SAID, "ARE YOU
            TRYING TO GET BACK HOME?" AND I SAID, "YES." AND THAT'S
            IT.

ROMERO:   OH, YOU'RE TRYING TO GET... OKAY.  NAH, THEY DID US
            DIFFERENT.  THEY SAID UH... "US CITIZEN?" "YEAH." MY DAD
            TO [U/I]." "WHAT WERE YOU'LL DOING DOWN HERE?"

                        [VOICES OVERLAP]

LOPEZ:      HUH?

ROMERO:   WE TOLD 'EM WE WERE IN MCALLEN.  "WE CAME TO VISIT
            FAMILY." HE GOES, "WELL, OH, OKAY.  SO YOU'LL GOING
            BACK?" BUT THE DOG WASN'T BEING REAL... THEY HAVEN'T
            EVEN... THE GUY WASN'T EVEN... HE WAS PLAYING WITH THE
            DOG, HUH?  [PAUSE]  DID HE, DID HE PUT THE DOG TO YOU?

LOPEZ:      YEAH, HE PUT THE DOG ALL AROUND.

ROMERO:   OH, ALL THE WAY AROUND?

LOPEZ:      WELL, YEAH BECAUSE THAT WAS... THERE WAS NOBODY
            BEHIND ME.

**ROMERO:** THERE WAS NOBODY THERE, HUH? ME EITHER. WHEN I [U/I] THERE WAS NOBODY THERE.

[VOICES OVERLAP]

**LOPEZ:** JUST TWO (2) CARS, JUST THE CAR IN FRONT OF ME AND THEN THAT ONE WAS TAKING FOREVER. I GUESS HE WAS ASKING HER QUESTIONS AND THEN YOU KNOW? THE DOG WAS COMING TOWARDS ME BUT IT WENT, IT WENT AROUND [DIALING SOUND] YOU KNOW? AND THEN, IT CAME. YOU KNOW? AND I SPED UP AND THEN HE, HE WAS WALKING BACK. BUT YEAH THERE WAS NO ONE BEHIND ME.

**ROMERO:** OKAY.

**LOPEZ:** WHY?

**ROMERO:** NO IT'S JUST... THAT'S WHY I WAS ASKING ABOUT THE DOG BECAUSE THE DOG... HE WAS PLAYING WITH THE DOG. HE WASN'T EVEN... HAD IT NEAR TO THE TRUCK. YOU KNOW?

**LOPEZ:** YEAH.

**ROMERO:** THAT'S WHY. ALL RIGHT.

[VOICES OVERLAP]

**LOPEZ:** [U/I]

**ROMERO:** WELL, THAT'S WHAT I WAS JUST WORRIED ABOUT THAT BECAUSE I PUT DISINFECTING ALL THE WAY AROUND THE CAR.

**LOPEZ:** YOU WHAT?

**ROMERO:** I SPRAYED THAT DISINFECTED ON THE TIRES AND EVERYTHING.

**LOPEZ:** YEAH.

**ROMERO:** AND, AND THE BACK. WELL, THAT'S GOOD. SO THE DOG DIDN'T DO ANYTHING, ANYTHING? OKAY.

[PAUSE]

**LOPEZ:**      I MEAN, IS IT SUPPOSED TO?  I MEAN, YOU'RE SCARING ME.

**ROMERO:**   NO, NO I JUST, JUST I'M ALWAYS... YOU KNOW?  IF I, I CAN'T GO TO SLEEP.  I SAID, "MAN LET'S GET THE CAR READY, LOADED UP GAS."  JUST NEXT TIME, I GUESS WE'LL LEAVE A LITTLE BIT LATER, MAN, 'CAUSE SHIT WE GOT BACK REAL EARLY.  YEAH I GUESS... JUST A LITTLE BIT LATER WHERE THERE'S A LITTLE BIT MORE TRAFFIC. ALL RIGHT.

[VOICES OVERLAP]

**LOPEZ:**      UH-HUH.

**ROMERO:**   NAH, I WAS JUST WORRIED.  JUST SEEING WHAT WAS UP WITH THE DOG.  YOU KNOW?  NAH, THAT'S GOOD, THAT'S GOOD.  I MEAN, THEY SEAL THEM GOOD, **CYNTHIA**.  I DON'T WORRY ABOUT... ALL I WORRY ABOUT... YOU KNOW?  'CAUSE WE PICK UP... WE DELIVER CARPET IN THAT SHIT.  YOU KNOW?

**LOPEZ:**      YEAH.

**ROMERO:**   [CLEARS THROAT] AND, AND YOU... IT DOES... SOMETIMES THE ODOR DOES STAY IN THERE.  YOU KNOW?  [PAUSE] BUT...

[VOICES OVERLAP]

**LOPEZ:**      YEAH.

**ROMERO:**   ... BUT THAT'S, THAT'S WHAT I WORRY ABOUT.  THAT'S WHY I GOT THE DISINFECTING [U/I] AND THE SPEED LIMIT.  YOU KNOW?  [U/I]

[VOICES OVERLAP]

**LOPEZ:**      YEAH, I DON'T SPEED.  I ALWAYS GO THE SPEED LIMIT.

**ROMERO:**   ALL RIGHT.  ALL RIGHT.  THAT'S COOL.  DID YOU LOCK THE CAR? [U/I] ALL RIGHT.  OKAY.  CYNTHIA.  BYE.

[VOICES OVERLAP]

**LOPEZ:**      BYE.

37.     Based on your Affiant's training and experience with this investigation and

discussions your Affiant has had with other agents, investigators and analysts involved in

this case, your Affiant believes that in the aforementioned conversation, **ROMERO** and

**Cynthia LOPEZ** discussed a recent trip from the Southwest Border while transporting

narcotics through a border checkpoint. **ROMERO** and **LOPEZ** discussed being

interviewed by border patrol officers. They also discussed drug detecting dogs. Your

Affiant knows that **LOPEZ** is a drug and money courier for the **DTO**. Your Affiant

knows that leaders of a **DTO** rarely handle, or transport narcotics in an effort to prevent

their arrest and prosecution. However, in this instance, your Affiant believes **ROMERO**

traveled from the Southwest Border to the Houston, transporting marijuana. **ROMERO**

said, after a discussion about drug sniffing dogs, "Well, that's what I was just worried

about that because I put disinfecting all the way around the car...I sprayed that

disinfected on the tires and everything." Your Affiant believes that **ROMERO** sprayed

his vehicle with disinfectant to hide the smell of marijuana. **ROMERO** further said,

"Nah, I was just worried. Just seeing what was up with the dog. You know?" Your

Affiant believes that **ROMERO** was worried that the drug sniffing dog would discover

the marijuana hidden in his (**ROMERO**) car. **ROMERO** then advised that the marijuana

is packaged good, when he said, "Nah, that's good. I mean, they seal them good,

**Cynthia**. I don't worry about...all I worry about...you know? **ROMERO** then

confirmed that he was transporting marijuana when he said, "'Cause we pick up, we

deliver carpet in that shit. You know?" Your Affiant knows that drug traffickers often

times use the code word "carpet" to refer to marijuana. **ROMERO** and **LOPEZ** then

discussed the speed limit, which your Affiant knows drug traffickers are conscientious about obeying when transporting narcotics to avoid traffic stops and the detection of the drugs.

38.     On March 4, 2014, at approximately 10:34 a.m., based on a DEA GRO wire intercept over the **Target Device #1**, **ROMERO** placed a call to **Johnathan NORWOOD, aka "Snoop",** who was using (337) 707-4312.  The following is a partial transcript from this call:

NORWOOD:  HELLO.

[BACKGROUND: MEDIA BROADCASTS THROUGHOUT CALL]

ROMERO:  WHAT YOU SAY **SNOOP**? ARE YOU COMING THIS WAY **SNOOP** OR WHAT?

[VOICES OVERLAP]

NORWOOD:  [U/I] I WANT TO MAN YOU'LL, YOU'LL AIN'T GOT THAT ICE OUT THERE?

ROMERO:  WELL, I MEAN JUST [STAMMERS] THERE... IT'S RAINING, I MEAN IT'S SUPPOSED TO THAW OUT, IT'S NOT NO... IT AIN'T NOTHING TO YOU KNOW IT'S NOT OVER EXAGGERATED BUT THEY'RE JUST OVER EXAGGERATING ON THE T.V. I'M [U/I],  I'M RUNNING AROUND RIGHT NOW. YEAH. [U/I]

NORWOOD:  AND YOU DON'T SEE NO ICE AROUND THERE?

ROMERO:  NAH, I DON'T SEE SHIT. IT WAS PROBABLY EARLIER.

[VOICES OVERLAP]

NORWOOD:  [U/I] WE GOT ICE OUT HERE, MAN.

ROMERO:  OH, OH YOU'LL OKAY.

NORWOOD:  I'MA TRY, I HOPE IT THAW OUT LIKE ABOUT TWELVE O' CLOCK (12:00) NO I'M SAYIN'?

**ROMERO:** YEAH. BECAUSE MY, MY OTHER TRUCK DIDN'T MAKE IT FAT... UH... **SNOOP** MY OTHER TRUCK DID NOT MAKE IT. THEM BOYS DIDN'T MAKE IT.

**NORWOOD:** YEAH.

**ROMERO:** [SIGHS] HERE WE GO WITH THIS BULLSHIT. I JUST LOST ANOTHER TRUCK SUNDAY. [PAUSE] FUCKING UP MAN, IT'S NOT LOOKING GOOD.

**NORWOOD:** DAMN, MAN THAT'S SOME LOW SHIT.

**ROMERO:** SO I ONLY GOT THESE FIFTY (50) RIGHT HERE. THAT IS IT SNOOP UNTIL, 'TIL I GET ANOTHER TRUCK.

**NORWOOD:** MAN, AS SOON AS IT TRY TO THAW OUT MAN I'MA TRY TO COME THAT WAY BUT I DON'T WANNA GET STUCK IN HOUSTON. IF THEY CLOSE THE BRIDGES OUT HERE, NO I'M SAYIN'?

**ROMERO:** OH YOU KNOW WHAT THEY, THEY SAID... THEY DID MENTION SOMETHING 'BOUT BEING CLOSE. YOU'RE RIGHT 'CAUSE I MEAN FIFTY-NINE (59)... YOU DON'T COME DOWN FIFTY-NINE (59) BUT, I'M NOT GONNA... YOU KNOW LET'S SEE WHAT HAPPENS YOU KNOW JUST WAIT 'TIL LATER ON THIS AFTERNOON SEE WHAT IT SAYS ALL RIGHT.

[VOICES OVERLAP]

**NORWOOD:** YEAH. THAT'S WHY I SAY ABOUT TWELVE O' CLOCK (12:00). I'MA UH... SEE SOMETHIN'

**ROMERO:** ALL RIGHT **SNOOP**.

**NORWOOD:** ALL RIGHT.

39.     Based on your Affiant's training and experience with this investigation and discussions your Affiant has had with other agents, investigators and analysts involved in this case, your Affiant believes that in the aforementioned conversation, **ROMERO** and **Johnathan NORWOOD, aka "Snoop"** discussed **NORWOOD** traveling to purchase

50 pounds of marijuana from **ROMERO**. **ROMERO** asked, "What you say **Snoop**? Are you coming this way **Snoop** or what?" Your Affiant believes **ROMERO** asked if **NORWOOD** was traveling from his (**NORWOOD**) home to purchase marijuana from **ROMERO**. **NORWOOD**, who was concerned with the weather conditions, finally said he would travel by 12:00 p.m. **ROMERO** said, "Yeah. Because my, my other truck didn't make it fat…uh…Snoop my other truck did not make it. Them boys didn't make it….I just lost another Sunday…" Your Affiant believes **ROMERO** advised **NORWOOD** that a truck carrying marijuana did not make it to him (**ROMERO**). **ROMERO** then said, "So I only got these fifty (50) right here. That is it Snoop until, 'til I get another truck." Your Affiant believes **ROMERO** advised **NORWOOD** that he (**ROMERO**) only has fifty (50) pounds of marijuana for him (**NORWOOD)** until another truck load of marijuana arrives. **NORWOOD** then advised that he will be en route after the weather improves. See paragraphs 14 in connection with the arrest of **NORWOOD** when he was en route to purchase the fifty (50) pounds of marijuana.

40.     On March 14, 2014, at approximately 11:50 a.m., based on a DEA GRO wire intercept over the **Target Device #1**, **ROMERO** placed a call to **FNU LNU #2, aka "Lito",** who was using (832) 614-2152. The following is a partial transcript from this call:

**ROMERO:**  RIPPIN' AND RUNNING ALL OVER, BRO'.

**LITO:**     YEAH.

[VOICES OVERLAP]

**ROMERO:**   YEAH.  I SOLD A HUNDRED (100) OF THEM THINGS LAST NIGHT, BRO'.

[BACKGROUND: CAR CHIME SOUND]

**LITO:**   DAMN.

**ROMERO:**   YEAH, THEY'RE GOING, BRO'.  THEY'RE GOING ALREADY. FINALLY IT'S PICKING UP.  UH... BUT YEAH, BRO', I GOT YOU THEM THREE (3), BRO'.  LET ME... I'M BARELY GONNA HEAD [U/I].  I GOT HOME REALLY LATE.  UH... BUT YOU WANT THREE (3) OF THEM, RIGHT, AND YOU WANNA SEE HOW THEY ARE? YOU...

**LITO:**   YEAH.

**ROMERO:**   ALL RIGHT.  I GOT YOU, BRO'.  WHERE YOU GONNA WANT TO DO THIS AT?

**LITO:**   OVER THERE.

**ROMERO:**   WHAT?  THE APARTMENT?

[VOICES OVERLAP]

**LITO:**   SAME SPOT.  YEAH.

**ROMERO:**   OKAY.  ALL RIGHT.  JUST GIVE ME... I'M BARELY GONNA HEAD TO MY HOUSE, BRO', AND UH... GIVE ME ABOUT... GIVE ME ABOUT [U/I]... I'M GONNA TAKE A SHOWER AND ALL THAT, BRO', AND I'LL CALL YOU WHEN I'M, WHEN I'M, WHEN I'M READY [U/I].  ALL RIGHT, BRO'?  GIVE ME ABOUT AN HOUR.

[VOICES OVERLAP]

**LITO:**   ALL RIGHT.

41.   Based on your Affiant's training and experience with this investigation and discussions your Affiant has had with other agents, investigators and analysts involved in this case, your Affiant believes that in the aforementioned conversation, **ROMERO** advised that he was conducting a lot of narcotics business when he said, "Rippin' and

running all over, bro'." **ROMERO** said, "I sold a hundred (100) of them things last

night, bro." Your Affiant believes **ROMERO** used, "hundred (100)," to refer to one

hundred pounds of marijuana that he (**ROMERO**) sold the previous night. **ROMERO**

said the marijuana business is increasing in sales, when he (**ROMERO**) said, "…They're

going already. Finally it's picking up…" Your Affiant believes **ROMERO** used

"They're" to refer to marijuana. **ROMERO** then advised that he (**ROMERO)** had three

(3) pounds of marijuana for **"Lito,"** when he (**ROMERO**) said, "…I got you them three

(3), bro'." **ROMERO** then made plans for "Lito" to pick up the marijuana.

42.     On February 15, 2014, at 8:33 a.m., **ROMERO,** who was using the **Target
Device #1,** received a text message from **Renard SMITH**, who was using (409) 996-
9334. The following is a transcript of the electronic message:

**SMITH:**     "U didn't put da cutie pie an da 2 zips in da package."

43.     Based on your Affiant's training and experience with this investigation and

discussions your Affiant has had with other agents, investigators and analysts involved in

this case, your Affiant believes that in the aforementioned text message, **SMITH** used

"cutie pie" to refer to quarter pound of marijuana. **SMITH** also used "zips" to refer to

two (2) ounces of cocaine. Your Affiant knows that drug traffickers commonly use

"cutie pie," and "zips" to refer to the quantity of a particular narcotic, in this case,

marijuana and cocaine, respectively. Your Affiant believes **SMITH** advised **ROMERO**

that he (**ROMERO**) did not include the quarter pound of marijuana, and two ounces of

cocaine in an unknown package that he (**SMITH**) received from **ROMERO**.

44.    On March 5, 2014, at 9:52 a.m., **ROMERO,** who was using the **Target Device #1,** sent a text message to **Luisa GARCIA,** who was using (956) 280-4897. The following is a transcript of the electronic message:

**SMITH:**    "2 only rite now snop is coming today fifyy"

45.    Based on your Affiant's training and experience with this investigation and discussions your Affiant has had with other agents, investigators and analysts involved in this case, your Affiant believes that in the aforementioned text message, **ROMERO** advised **GARCIA** that **NORWOOD** was going to purchase fifty (50) pounds of marijuana. See paragraphs 14, 38-39.

46.    On March 15, 2014, at 9:46 a.m., **ROMERO,** who was using the **Target Device #1,** received a text message from SMITH, who was using (409) 996-9334. The following is a transcript of the electronic message:

**SMITH:**    "Nuthn new bro"

47.    Based on your Affiant's training and experience with this investigation and discussions your Affiant has had with other agents, investigators and analysts involved in this case, your Affiant believes that in the aforementioned text message, **SMITH** was inquiring to see if **ROMERO** had marijuana, when he (**SMITH**) used "new." Your Affiant believes **SMITH** wanted to purchase marijuana if **ROMERO** had some.

## TARGET DEVICE #2

48.    On February 21, 2014, at approximately 1:19 p.m., based on a DEA GRO wire intercept over the **Target Device #1,** ROMERO placed a call to **Arturo LNU,** who

was using the **Target Device #2**. The following is a partial transcript from this call:

**ARTURO:**   VARO.

**ROMERO:**   WHAT'S GOOD, BRO'?

**ARTURO:**   WHAT'S UP, HOMIE?

**ROMERO:**   HERE WAITING. UH...NOTHING ON THE GIRL, BRO'?

**ARTURO:**   [STAMMERS] YEAH. COME ON. I'M GONNA GET IT RIGHT NOW, BRO'.

**ROMERO:**   OKAY. LET ME CALL HIM. BYE.

**ARTURO:**   ALL RIGHT. [PAUSE] HELLO.

**ROMERO:**   [STAMMERS] TO YOUR SPOT, RIGHT? OR, OR WHERE? [PAUSE] HELLO. [PAUSE] [U/I].

49.     Based on your Affiant's training and experience with this investigation and discussions your Affiant has had with other agents, investigators and analysts involved in this case, your Affiant believes that in the aforementioned conversation, **Arturo LNU** and **ROMERO** discussed **Arturo LNU** supplying cocaine to **ROMERO**. **ROMERO** said, "Here waiting. Uh...nothing on the girl, bro?" Your Affiant believes **ROMERO** used "girl" to refer to cocaine. Your Affiant knows that drug traffickers commonly use "girl" to refer to cocaine. Your Affiant also knows that drug traffickers use coded language, such as "girl" to thwart law enforcement detection. Your Affiant believes **ROMERO** was waiting on **Arturo LNU** to deliver cocaine to him (**ROMERO**). **Arturo LNU** then advised that he (**Arturo LNU**) was "gonna get it" and to go to an unidentified location. Your Affiant believes **Arturo LNU** used "it" to refer to cocaine. When **ROMERO** said, "Let me call him..." your Affiant believes that **ROMERO** used

"him" to refer to his (**ROMERO**) drug courier that would be picking up the cocaine from **Arturo LNU**. **Arturo LNU** confirmed. **ROMERO** then asked the location where the drug courier should pick up the cocaine when he (**ROMERO**) said, "…To your spot, right? Or where?"

50.    On February 21, 2014, at approximately 1:40 p.m., based on a DEA GRO wire intercept over the **Target Device #1**, **ROMERO** received a call from **Arturo LNU**, who was using the **Target Device #2**. The following is a partial transcript from this call:

**ROMERO:** HEY, BRO'.

**ARTURO:** WHAT'S UP, DUDE?

**ROMERO:** I'M ON MY WAY, BRO'.

**ARTURO:** OH, OKAY. YOU WERE TRYING TO... WHICH ONE WERE YOU TRYING TO DO, HOMEBOY? THE ROSS OR THE, THE DEUCE?

[VOICES OVERLAP]

**ROMERO:** YEAH. THE NINA, BRO', I NEED THE NINA.

**ARTURO:** OKAY. I GOT YOU.

**ROMERO:** ALL RIGHT. I'M ON MY WAY OVER THERE, BRO'. ALL RIGHT.

[VOICES OVERLAP]

**ARTURO:** ALL RIGHT, COME ON BABY.

51.    Based on your Affiant's training and experience with this investigation and discussions your Affiant has had with other agents, investigators and analysts involved in this case, your Affiant believes that in the aforementioned conversation, **Arturo LNU** and **ROMERO** discussed **Arturo LNU** supplying cocaine to **ROMERO** (see paragraphs 48-49), **ROMERO** said, "I'm on my way, bro'" Your Affiant believes **ROMERO**

Affidavit-Page 43

advised **Arturo LNU** that he **(ROMERO)** was on the way to pick up the cocaine.  While

**ROMERO** stated that he would be on the way, your Affiant knows, from paragraphs 44-

45, that a drug courier would be picking up the cocaine.  **Arturo LNU** asked, "…Which

one were you trying to do homeboy?  The ross or the, the deuce?"  Your affiant believes

that **Arturo LNU** used "ross" and "deuce" to refer to the type of drug that he would be

supplying to **ROMERO**.  **Arturo LNU** confirmed that he **(ROMERO)** wanted cocaine

when he **(ROMERO)** said, "…The nina, bro', I need the nina."  Your affiant knows that

"girl" is a code word commonly used by drug traffickers to refer to cocaine.  "Nina"

means "girl" when translated from Spanish to English.

     52.     On February 25, 2014, at approximately 12:31 p.m., based on a DEA GRO

wire intercept over the **Target Device #1**, **ROMERO** placed a call to **Arturo LNU**, who

was using the **Target Device #2**.  The following is a partial transcript from this call:

**ARTURO:**   WHAT'S UP, HOMIE?

**ROMERO:**  BRO', WHERE DID YOU GO, BRO'?

**ARTURO:**   I CAME, I CAME TO UH... TO PAY SOME OF THESE BILLS, RUNS SOME ERRANDS AND SHIT, BUT **EDDIE** IS THERE, DUDE.

**ROMERO:**  OKAY.  ANOTHER THING.  DID YOU HAVE A BABY, BRO', OR A NINA?

**ARTURO:**   WHO?

**ROMERO:**  NO... YOU.  YOU DON'T HAVE ANYTHING?

[PAUSE]

**ARTURO:**   OH, THE WORK?

**ROMERO:**  YES, YES.  DO YOU HAVE WORK?

**ARTURO:**  YES, DUDE.  I GOT SOME, BRO'.

**ROMERO:**  OKAY.  NAH, IT'S JUST THAT, BRO', EVERYBODY IS BLOWING ME UP, BRO'.  THAT'S WHY I DIDN'T EVEN GET OFF THE TRUCK. [LAUGHS] FUCK.

[VOICES OVERLAP]

**ARTURO:**  OH, OKAY.  NO, WE GOT SOME ISSUE, DUDE.  JUST UH... I'MMA TELL **EDDIE** TO OPEN THE GARAGE FOR YOU.

**ROMERO:**  YES.  I WANT TO...

[VOICES OVERLAP]

**ARTURO:**  YOU WANT ME TO TELL HIM TO OPEN THE GARAGE?

**ROMERO:**  YEAH.  I WANNA GO OUT THROUGH... YEAH, OVER HERE THROUGH THE BACK, BRO'.  I SEEN SOME OLD CROOK... OLD SCHOOL WALKING.  I SAID, "NAH, LET ME GO THROUGH THE BACK."  ALL RIGHT, BRO'.

**ARTURO:**  OKAY, OKAY.  COOL, BRO'.

53.     Based on your Affiant's training and experience with this investigation and discussions your Affiant has had with other agents, investigators and analysts involved in this case, your Affiant believes that in the aforementioned conversation, **Arturo LNU** and **ROMERO** discussed **Arturo LNU** supplying cocaine to **ROMERO**.  **ROMERO** said, "Okay.  Another thing.  Did you have a baby, bro', or a nina?"  Your Affiant believes that **ROMERO** used "baby," and "nina," to refer to cocaine.  Further confirmed when **ROMERO** asked, "Yes, yes.  Do you have work?"  Your Affiant knows that drug traffickers commonly use "work" to refer to narcotics.  **Arturo LNU** confirmed that he had cocaine.  **ROMERO** said, "...everybody is blowing me up, bro'."  Your Affiant believes **ROMERO** advised that multiple cocaine customers are calling him

(**ROMERO**) to purchase cocaine. **Arturo LNU** said, "…I'mma tell **Eddie** to open the garage for you…You want me to tell him to open the garage?" Your Affiant believes "**Eddie**" is **Eddie ROBINSON**, identified as a drug associate of **ROMERO** and **Arturo LNU**. Your Affiant believes, based on experience with this investigation, that **ROBINSON** is responsible for distributing cocaine from a stash location located in Houston, Texas. **ROMERO** answered, "…yeah, over here through the back, bro'. I seen some old crook…old school walking. I said, "Nah, let me go through the back." Your Affiant believes **ROMERO** was carrying cash to pay for the cocaine that he was purchasing from **Arturo LNU**. **ROMERO** was worried about a suspicious person "old crook…old school walking" so he (**ROMERO**) advised that he (**ROMERO**) would enter the stash location "through the back." See paragraphs 13, 18-19, 24-27, and 50-53, in connection with the seizure of 18 ounces of cocaine.

54.     On February 27, 2014, at approximately 11:18 p.m., **ROMERO**, who was using the **Target Device #1**, sent an electronic message (text message) to **Arturo LNU**, who was using the **Target Device #2**. The following is a transcript from the electronic message:

**ROMERO**:   JUST WAKEN UP BRO GOT UR MONEY.

55.     Based on your Affiant's training and experience with this investigation, and discussions your Affiant has had with other agents, investigators and analysts involved in this case, your Affiant believes that in the aforementioned electronic message, **ROMERO** advised **Arturo LNU** that he (**ROMERO**) has money that he (**ROMERO**)

owes **Arturo LNU** for a past drug transaction.

### PEN REGISTER AND TOLL ANALYSIS OF THE TARGET DEVICE #2

56-A.  As part of this investigation, based on phone toll records, your Affiant has conducted telephone toll analysis of the **Target Device #2**.  While at the early stages of identification, this analysis included the telephone numbers dialed from the **Target Device #2,** and the telephone numbers that have dialed the **Target Device #2**, to also include incoming and outgoing text messages.

56-B.  To date, records from AT&T reveal that between the dates of February 25, 2014, through March 17, 2014, there were 2027 phone calls, and 1941 text messages occurring to and from the **Target Device #2**.  Based upon the records obtained from AT&T, it has been determined that the **Target Device #2** contacted, or was contacted, by the following numbers:

56-C.  (832) 614-2152: According to the records of AT&T, this number is subscribed to by Delmen Smith, with no address, and believed to be used by **FNU LNU, aka "Lito."**  Based on a DEA GRO wire intercept over **Target Device #1**, **FNU LNU, aka "Lito,"** is a drug associate of **ROMERO**.  To date, telephone toll records and pen register records reveal that the **Target Device #2** has contacted or has been contacted by this number 33 times between the dates of February 26, 2014, through March 17, 2014. Of those communications, 5 of those communications were electronic communication messages.  The last known phone call between this number and the **Target Device #2** occurred on March 14, 2014.  The last known electronic communication message

between this number and the **Target Device #2** occurred on March 3, 2014.  See

paragraph 15 – 17, 32-32, and 40-41.

## NEED FOR INTERCEPTION

57.     The requested authorization for the continued wire intercept over **Target**

**Device #1**, and the wire intercept over **Target Device #2**, is necessary because normal

investigative procedures have been employed, but have failed in achieving the goals of

the investigation.  This narcotics organization is a large scale drug trafficking and money

laundering organization, based in Houston, Texas, and surrounding areas.     The

organization has numerous drug cells operating in cities throughout the United States,

many of which have yet to be determined.  It is this investigation's goal to identify the

distribution routes for this **DTO**, as well as other distribution points throughout the

United States, and to identify the ultimate source of supply located in the Republic of

Mexico.  Your Affiant also believes that further investigation of the organization will

assist law enforcement in discovering additional members of the organization, not only in

the Houston, Texas, and surrounding areas, but in other areas throughout the United

States, as well as the Republic of Mexico.

58.     As stated above, the immediate goal of this investigation is to dismantle the

Houston, Texas, and surrounding areas, cell of the organization, and to identify the

ultimate source of supply.   Information obtained from the seizures, as discussed in

paragraphs 13-14, have not yet permitted investigating agents to identify all the co-

conspirators involved in this organization, the locations where the drugs are stored, the

**Affidavit-Page 48**

drug proceeds, and records of illicit activities can be found, nor the exact manner and means by which drugs are imported, transported, concealed or delivered or money transported or stored. The full scope of the drug trafficking and money laundering activities of this large scale narcotics trafficking organization have not yet been revealed nor has court room quality evidence been found sufficient to charge the **Target Subjects**. It is your Affiant's belief that **A. ROMERO, Arturo LNU,** and other high ranking members of this **DTO,** are responsible for distributing shipments of cocaine, and marijuana transported from the Southwest Border into Houston, Texas, and surrounding areas. To successfully identify and ultimately dismantle the entire organization, and to identify the source of supply, it is essential to intercept the wire and electronic communications of the **Target Devices**.

59.     Your Affiant believes that the interception of conversations to and from the **Target Devices** are necessary to meet the goals of this investigation. Based upon your Affiant's training, experience, knowledge of this case, and conversations with other agents and investigators, your Affiant believes the information gleaned through court authorized intercepted conversations will demonstrate that the **Target Devices** have been used, are being used, and will likely to continue to be used to orchestrate the smuggling, transportation, and distribution of narcotics to various locations in the United States. Your Affiant believes that the interception of conversations will ultimately lead to the source of supply located in the Republic of Mexico. Your Affiant believes when these smuggling, transportation, and distribution ventures are successful, the **Target Devices**

will be utilized to arrange for the proceeds derived from the sale of the drugs, to be collected, concealed, and transported from the United States to the Republic of Mexico.

60.     Your Affiant submits that the interception of wire and electronic communications to and from the **Target Devices** would permit agents to ascertain the more finite details concerning the illicit activities of this **DTO**. Based upon your Affiant's training and experience, your Affiant expects that the interception of wire and electronic communications to and from the **Target Devices** will reveal the methods and routes used by the **A. ROMERO** and **Arturo LNU**, when distributing drugs throughout the Houston, Texas and surrounding areas, as well as other cities in the United States. The interception of the conversations over the **Target Devices** will provide a more complete picture of the inner-workings of the **DTO**'s distribution and trafficking efforts and facilitate the gathering of evidence sufficient to prove, beyond a reasonable doubt, the illegal nature of **A. ROMERO**, and **Arturo LNU's** activities. Furthermore, the interception of conversations over the **Target Devices** will provide a more complete picture of the source of supply, believed to be located in the Republic of Mexico. Based upon your Affiant's training and experience, your Affiant expects that the interception of wire and electronic communications over the **Target Devices** will also enable agents to further identify the individuals who actually transport, store, and distribute the drugs and the cash proceeds, and also to locate the drugs, currency, and storage locations.

61.     Without authorization to intercept the wire the electronic communications to and from the **Target Devices**, your Affiant believes it is highly improbable that agents

would be able to make seizures, identify and arrest key members of this drug trafficking and money laundering enterprise, nor determine the respective roles and relationships of individuals in this enterprise. Also, it would be improbable that agents could identify all the individuals who oversee this operation and those who carry out the day to day activities for this **DTO,** and other coconspirators, to import, receive, conceal, buy, sell or otherwise deal in drugs and facilitate the laundering of drug proceeds. Without the requested authorization, it would also be improbable that agents would be able to identify all the methods employed by this enterprise to import, transport, and distribute its narcotics proceeds.

## UNAVAILABILITY OF ALTERNATIVE INVESTIGATIVE TECHNIQUES

62.     Numerous investigative techniques usually employed in an investigation of this nature have been tried and have failed, reasonably appear unlikely to succeed if they are tried, or are too dangerous to employ. These techniques are described below.

### Physical Surveillance

63.     During January through March 2014, DEA Galveston Resident Office Special Agents and Task Force Officers have conducted surveillance on members of this **DTO**, to include **ROMERO**, and/or **Arturo LNU**. On January 8, 2014, surveillance was initiated on **ROMERO**, based on a three (3) pound controlled marijuana buy (see paragraph 70) between **ROMERO** and **CS #1**. After the narcotic transaction, agents attempted to follow **ROMERO**, to identify other co-conspirators and/or locations utilized by the **DTO**. **ROMERO** was observed continuously changing speeds and changing

lanes of travel while looking in his mirrors for vehicles that may be following. Agents lost sight of **ROMERO** after he made an erratic turn, in what was believed to be a "heat run." A "heat run" is a method used by drug traffickers to drive erratically and unpredictably in an attempt to observe or identify any law enforcement officers.

64. On January 23, 2013, agents conducted surveillance on **ROMERO** prior to and after a controlled buy of marijuana (see paragraph 70) between **ROMERO** and **CS #1**. During surveillance, agents observed a Hispanic male arrive at **ROMERO**'s stash house, located at 558 Dale Street, Houston, Texas 77060. Agents observed the Hispanic male exit his vehicle and remain in the driveway of the stash house and did not appear to be using the phone. Agents observed the Hispanic male continue standing in the driveway, nervously looking up and down Dale Street, appearing to conduct counter surveillance. CS #1 later stated he/she was advised by **ROMERO** that the Hispanic male was one of his workers.

65. On February 25, 2014, surveillance was conducted on **Arturo LNU**, in connection with his supplying cocaine to **ROMERO**. Surveillance was difficult because **Arturo LNU** is believed to live in a gated community where entry and exit is with an access card. Furthermore, when the cocaine deal was taking place, intercepted calls indicated that **Arturo LNU** was not at the location when the cocaine was being distributed.

66. On March 3, 2014, surveillance was established at a Houston, Texas, location known to be used by **ROMERO** to conduct narcotics business. As has been

**ROMERO**'s pattern, he would drive in a manner consisting of trying to elude and/or detect law enforcement. **ROMERO** would drive at slow speeds in which he appeared to be looking at vehicles. He was also observed driving around the block, in what is commonly referred to as "squaring the block," in an effort to observe law enforcement.

67. Based on your Affiant's training, experience, and knowledge your Affiant has of this investigation, your Affiant believes that attempts to conduct regular and/or frequent physical surveillance on **ROMERO, Arturo LNU**, and their co-conspirators is likely to result in possible detection of law enforcement through their own counter-surveillance efforts and would adversely affect the investigation. Physical surveillance, if not used in conjunction with other investigative techniques, including the interception of wire and electronic communications over targeted telephones, is of limited value. Even if highly successful, physical surveillance does not always succeed in gathering evidence of the criminal activity under investigation. It is an investigative technique used to confirm meetings between alleged co-conspirators and often only leaves investigators to speculate as to the purpose of the meetings. It is also a technique used to corroborate information obtained from cooperating individuals. Further, physical surveillance of alleged co-conspirators will not establish, conclusively, the elements of subjects' violations and has not, and most likely will not, establish conclusively the identities of various co-conspirators. Prolonged or regular physical surveillance of the targets would most likely be noticed causing the targets to become more cautious in their illegal activities, to flee to avoid further investigation and prosecution, to cause a threat to the safety of any potential

cooperating individuals and/or undercover agents, or otherwise to compromise the investigation.

### Undercover Police Officers And Agents

68.     Undercover police officers or agents have not been used in this investigation due to **ROMERO** advising CS #1 that he (**ROMERO**) does not want to meet anyone that he (**ROMERO**) does not know. Also, no undercover officers have been able to be introduced to **Arturo LNU**. Due to this **DTO** limiting outsiders into their inner circle, like most high level drug trafficking organizations, it is impossible for an undercover officer or agent to infiltrate the organization.   Based on your Affiant's training and experience, your Affiant knows that most high-level drug trafficking organizations are extremely selective in choosing the persons with whom they will conduct, or even discuss, illegal narcotics activities. Due to the close and secretive nature of narcotics trafficking organizations, it is both highly unlikely and very dangerous for an undercover officer or agent to attempt to infiltrate the upper echelons of such an organization. Your Affiant believes that the utilization of undercover officers or agents is, at best, of limited value.   Your Affiant reasonably believes that if an undercover officer or agent were successfully inserted within this **DTO**, they would only be privy to limited information because of the degree to which the organization maintains the division between and among its members and their respective duties and assignments. Undercover officers or agents would not obtain information regarding the full scope of the organization's illegal activities or names and identities of its members. Your Affiant

believes that **ROMERO**, **Arturo LNU**, and other members of this organization are unlikely to associate with individuals other than their long-time associates, and if contact occurred between and among the undercover agents, such contact will unlikely produce evidence of the full scope of the organization's criminal activity to the extent necessary to meet the objectives and goals of this investigation.

### Cooperating Informants

69.     Agents have been able to utilize two (1) cooperating sources to obtain information and to make controlled purchase of narcotics from **ROMERO**. CS #1 has been proven credible and reliable in providing information regarding this investigation's targets, methods of operation, and associates. CS #1's information has been verified based on recorded conversations, debriefings, pen register/toll record analysis, surveillance, and prior reports and intelligence. CS #1 is currently out on bond and is working with agents for consideration of a lesser sentence on his federal charge of Conspiracy to Possess with Intent to Distribute Cocaine. No future indictment of CS #1 is pending.

70.     CS #1 has been able to make two (2) controlled purchases for a total of six (6) pounds of marijuana from **ROMERO**. During each purchase, CS #1 has had to tell **ROMERO** that each purchase was only a sample for another customer. This is due to **ROMERO** typically not selling small quantities of marijuana, which in both circumstances, was three (3) pounds of marijuana. CS #1 advised **ROMERO** usually sells one-hundred (100) pound quantities of marijuana. While the controlled purchases

have helped extend this investigation, it has not allowed agents to fully identify the scope of this **DTO** and identify other co-conspirators or the source of supply.  While CS #1 still remains useful, your Affiant believes that further controlled purchases will not result in anymore evidentiary value against **ROMERO** or this **DTO**, nor will it fully accomplish the goals of this investigation which have already been stated.

71.    CS #2 has been proven credible and reliable in providing information regarding this investigation's targets, methods of operation, and associates.  CS #2's information has been verified based on debriefings, pen register/toll record analysis, surveillance, and prior reports and intelligence.  CS #2 does not have any pending charges or indictments.  CS #2 is working with agents for monetary purposes only.  CS #2 has only been able to provide information on **SMITH** and cannot actively infiltrate the **DTO**.

72.    During the interception period, no CS's have been able to be introduced to **Arturo LNU**.

73.    Given these circumstances, the need to employ alternative investigative techniques, such as the interception of wire and electronic communications to and from the **Target Devices**, becomes all the more imperative.  Without the requested authorization to intercept wire and electronic communications to and from the **Target Devices**, it is highly unlikely that agents and investigators will be able to identify additional co-conspirators, locations of stash houses, or other aspects of this organization's illicit operation, especially the Mexican source of supply.  Your Affiant

further believes that the present investigation would not, without the evidence available through the requested authorization for wire interception, result in a successful prosecution of all participants of this enterprise.

### Use Of Grand Jury Subpoenas

74.    Based on your Affiant's training and experience with Grand Jury Subpoena's, these types of records provide limited information concerning one of many facets of this investigation. Your Affiant believes the issuance of grand jury subpoenas to persons believed to be involved in this conspiracy and compelling them to testify before a federal grand jury would most likely be unsuccessful in achieving the stated goals of this investigation. If the targets of this investigation, their co-conspirators, and other participants be called to testify before a federal grand jury, they would likely be uncooperative and invoke their Fifth Amendment privilege not to testify. Further, granting such persons immunity from prosecution would likely prevent prosecution of the most culpable members of this organization and could not ensure that such immunized witnesses would provide truthful testimony before the grand jury. Additionally, the serving of grand jury subpoenas upon the targets and/or their co-conspirators would only further alert the targets and/or their co-conspirators to the existence of this investigation, thereby causing them to become even more cautious and circumspect in their activities, to flee to avoid further investigation or prosecution, or to otherwise compromise this investigation.

### Interviews Of Subjects And Associates

75.     On February 25, 2014, as discussed in paragraph 13, **Andre GOINS,** aka **"Fat Rat,"** was found with one half kilogram of cocaine that he received from **ROMERO.** GOINS denied that he was the owner of the cocaine, and did not provide any information in connection with the cocaine. **GOINS** was released, pending future indictment. On March 5, 2014, as discussed in paragraph 14, **Johnathan NORWOOD, aka "Snoop,"** was found with approximately $12,000.00 USC that was to be used to purchase marijuana. **NORWOOD** denied any knowledge of the cash. **NORWOOD** was arrested on state charges of money laundering. **NORWOOD** was released after he posted a bond, and is awaiting judicial proceedings. Based on your Affiant's training and experience, your Affiant believes that interviews of subjects or their known associates would produce insufficient information concerning the identities of individuals involved in the conspiracy, the source of the drugs, financing, the location of records, drugs, drug proceeds, or other pertinent information regarding the subject crimes under investigation. Your Affiant also believes that any responses to the interviews would contain a significant number of half-truths and untruths diverting the investigation with false leads or otherwise frustrating the investigation or be of limited value. Additionally, such interviews would likely result in non-targeted interviewees alerting the members of this **DTO,** thereby compromising the investigation and resulting in the possible concealment, movement or destruction of relevant documents, narcotics, drug proceeds and/or other evidence

### Pen Register/Toll Record Analysis

76.     The use of pen registers and toll record analysis have been of some assistance in this investigation to identify some co-conspirators and secure the telephone numbers and addresses of others believed to be associated with the **Target Subjects**. However, the mere fact that the **Target Subjects** and their associates are known to communicate over certain telephones provides neither complete evidence of the crimes under investigation nor the content and purpose of such communications.   Without authorization to intercept the wire and electronic communications to and from the **Target Devices**, strides toward obtaining evidence regarding the full scope and activities of **ROMERO,** and **Arturo LNU,** and this **DTO** cannot be made.   Interception of wire and electronic communications is necessary in this case to obtain the content of telephone conversations your Affiant believes are occurring, based on the volume of calls made to persons whose phones are not currently being intercepted.

## GPS CELLULAR TRACKING ORDERS

77.     Often times an investigation is hindered because agents are not able to locate members of the **DTO** while a drug transaction is taking place.  GPS tracking orders have been used throughout this investigation to locate the targets of this investigation during drug transactions, to identify co-conspirators, and to confirm the identity of the users of the **Target Devices**. However, often times, as was described in paragraph 13, the main target of the investigation, i.e., **Arturo LNU**, may not be at the location where the drug transaction is taking place.  While the tracking orders are helpful, often times they are unreliable.  For example, the exact locations of the cellular phones are not always provided.  Often times the result is a "failure" indicating no location is provided.  Other times, only the cell site/tower is provided.  As

with most large **DTO**'s, the higher level members of the organization rarely handle the narcotics or drug proceeds, leaving those functions to the lower level members of the **DTO**. While we may have a tracking orders on, for instance, **ROMERO**, or Arturo LNU, they may order a subordinate, who we do not have a tracking order on, to deliver the drugs or pick up the drug proceeds. A tracking order may not be installed on the cellular phone of the subordinate.

### Search Warrants

78.     The use of search warrants as an investigative tool often provides good evidence of the crimes being committed and enables agents to identify the perpetrators of the crime and obtain evidence to use in a prosecution. However, in this investigation, agents have not as yet been able to identify and locate all of the members of this organization in the Houston, Texas, and surrounding areas. Even if agents identified key locations or residences used by members of this organization, your Affiant believes that enforcement actions, such as the execution of search warrants, at the homes or businesses of one or more members of the organization will adversely affect the investigation's focus on other members of the organization. Specifically, your Affiant does not believe that executing a search warrant at the residence of **A. ROMERO, Arturo LNU**, or other locations that have been identified in this investigation, would result in the seizure of drugs or other evidence without specific information that evidence is being stored at that location at the specific time of the executing the search warrant. Based on your Affiant's training and experience, your Affiant knows that leaders of a narcotics organization rarely store narcotics at their residences or business, and seldom frequent the locations where narcotics are stored.

**Affidavit-Page 60**

79.    Additionally, the execution of a search warrant would jeopardize the goal of dismantling the entire cell of this organization including identifying the source of drugs distributed by this organization. Based on your Affiant's training and experience, your Affiant knows that once the residence or business location of one member of the organization is searched, other members of the organization are likely to destroy evidence located within their own residences or businesses or move evidence to unknown locations, or in an effort to avoid apprehension and prosecution, would flee the jurisdiction. Your Affiant believes that executing a search warrant at the suspected stash location at 558 Dale Street, Houston, Texas, would not lead to the arrest of key members of this **DTO**, nor dismantle this **DTO**, and would adversely affect the progress that has already been made in this investigation. Therefore, to successfully identify the members of and dismantle the organization, it is preferable to delay any search warrants until agents are prepared to arrest all of the key members of the organization. Moreover, while search warrants may be used in this investigation should circumstances require immediate action, the execution of search warrants alone are unlikely to provide evidence of the entire scope of this criminal enterprise.

### Examination Of Abandoned/Discarded Materials Or Refuse -- 'Trash Runs'

80.    No trash has been acquired from the residences of **ROMERO** because he has not left trash out on the scheduled trash pickup days and has burned his trash. During this interception period, no trash has been left out for pick-up. As discussed in **prior affidavit #1**, an older man was seen burning trash at **ROMERO**'s stash house. Your

Affiant believes **ROMERO** does not leave trash out at this location in an effort to thwart law enforcement detection. **Arturo LNU** is believed to reside in a gated community where entry and exit is through use of an access card. No trash has been able to be acquired at this location because agents have yet to determine the exact house, due to access difficulty. Acquiring and examining discarded trash from targets' and subjects' residences and/or businesses is frequently conducted by criminal investigators to develop corroborative information or investigative leads. At this point in the investigation, no evidence has been acquired that could be beneficial to the furtherance of this investigation. Further, based on your Affiant's training and experience, your Affiant believes the evidence gained from 'trash runs' is rarely of sufficient weight or significance by itself, i.e., if not used in conjunction with the interception of wire and electronic communications, to support a conviction for the commission of the violations under investigation.

### Financial Investigation

81.    A financial investigation is being conducted on this **DTO**, worked jointly with DEA Financial Investigation Team and the Internal Revenue Service (IRS) Criminal Investigations Division. During this period, multiple bank account numbers have been discovered via intercepted phone calls. This financial investigation is still on-going and while the identification of further assets is beneficial to this investigation, it is only one of many facets and does not achieve the overall goals of identifying the source of supply or dismantling this **DTO**.

## MAIL COVERS

82.     At this point, no mail covers have been used or attempted in this

investigation. Since there is no indication that the co-conspirators communicate through

the mail, the only other benefit from a mail cover would generally be to discover

financial information, including which financial institutions are being used to deposit the

drug proceeds. Multiple bank accounts have been identified via the interception over the

**Target Device #1**. Intercepts indicate that the targets of this investigation transport the

proceeds from their narcotics sales to Mexico by vehicle and may not totally use financial

institutions to deposit their proceeds. Moreover, the information gained from viewing

who the mail is going to or coming from, may not provide useful information which

could provide evidentiary value to the prosecution in this case.

## PRIOR TITLE III's

83.     During the past interception period, one half kilogram of cocaine was

seized in the vehicle that **GOINS** was using to travel back to Lake Charles, Louisiana

(see paragraph 13). Also, approximately $12,000.00 USC was seized in a vehicle that

**NORWOOD** was traveling from Lake Charles, Louisiana, to purchase marijuana from

**ROMERO** (see paragraph 14). Your Affiant was able to identify two co-conspirators

(**GOINS,** and **NORWOOD**) that were traveling from Louisiana, which is through the

Eastern District of Texas, to purchase cocaine and marijuana. Intercepted calls over the

**Target Device #1**indicated that **Arturo LNU** is a cocaine source of supply, and is using

the **Target Device #2** to conduct his (**Arturo LNU**) narcotics business. Your Affiant

believes Arturo LNU is the connection to the ultimate Mexican cocaine source (s) of supply for the **DTO**. Intercepted calls have confirmed that **ROMERO** and **Arturo LNU** are a large narcotics organization with a large network of unidentified distributors. During the next thirty (30) day interception period, agents expect to identify the ultimate Mexican source (s) of supply, as well as locations used by this **DTO** to store narcotics and drug proceeds. Agents also expect to identify additional co-conspirators, as well as methods used to hide drug proceeds.

## Minimization

84.  All interceptions will be minimized in accordance with the minimization requirements of Chapter 119 of Title 18, United States Code, and all interceptions conducted pursuant to this Court's Order will terminate upon attainment of the authorized objectives or, in any event, at the end of thirty (30) days beginning at the date of this Court's order for **Target Device #1**, or ten (10) days from the date of this Court's order for **Target Device #2**. Monitoring of communications will terminate immediately if it is determined that the conversation is unrelated to communications subject to interception under Chapter 119 of Title 18, United States Code. Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the **Target Subjects** or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. Spot monitoring of non-criminal conversations will be done to ensure that those conversations

have not turned criminal in nature. In the event conversations occur in a language other than English, it is expected that an expert or person otherwise fluent in that language will be available to monitor and to translate during the interception whenever possible. In the event the translator/expert is not a federal agent, the translator, whether a language trained support employee or someone under contract with the Government, will be under the direct supervision of a federal agent. If, however, such a translator is not reasonably available, the following after-the-fact minimization procedures have been established pursuant to Title 18, United States Code, Section 2518 (5): (1) All such foreign language conversations will be intercepted and recorded in their entirety; and (2) As soon as practicable after such interception, these conversations will be minimized by a translator under the guidance of a federal agent. I believe this procedure, which provides for after-the-fact minimization where codes or foreign languages are used by the **Target Subjects**, and when there is no expert reasonably available to translate the conversation, complies with Title 18, United States Code, Section 2518 (5), and its provisions for specialized minimization procedures, when intercepting foreign-language or coded conversations.

85.     It is anticipated that some of the communications will be spoken in the foreign language. Conversations will be minimized in accordance with Chapter 119 of Title 18, United States Code. These interceptions will also be minimized when it is determined, through voice identification, physical surveillance or otherwise, that neither the **Target Subjects**, nor their associates, when identified, are participants in the conversation unless it is determined during the portion of the conversation already

overheard that the conversation is criminal in nature. Even if one or more associates, when identified, is a participant in the conversation, monitoring will be minimized if the conversation is not criminal in nature or otherwise related to the offenses under investigation. It is understood that the agents will be permitted to spot check minimized conversations to determine whether the conversation has turned criminal in nature, and therefore, subject to interception.

86.　Each text message will be reviewed over a secure system, and based on the identities of the sender and recipient and the content of the message, monitoring personnel will determine as soon as practicable after interception whether the text message appears to be relevant to the investigation or otherwise criminal in nature. If the message is not criminal in nature, the message will be marked, "minimized," and not accessed by other members of the investigative team. If the message appears to be privileged, it will be marked, "privileged," and secured from access by other members of the investigative team. If a text message appears to be relevant to the investigation or otherwise criminal in nature, it will be marked "non-minimized" and may be shared with the other agents and monitors involved in the investigation. If a text message is marked, "minimized," or, "privileged," it will not be disseminated to members of the investigative team. All intercepted text messages will be sealed with the Court upon the expiration of the Court's Order authorizing the interception.

## PERIOD OF INTERCEPTION

87.　It is believed that the facts stated herein establish probable cause to believe

that the **Target Subjects**, and others yet unknown are engaged in an ongoing criminal enterprise, and that the evidence sought will be intercepted on a continuing basis following the first receipt of the particular communications that are the object of this request.   Therefore, it is requested that the Court order that the interception need not terminate when the communications described herein are first intercepted, but may continue until the full scope of the enterprise is developed, including the identities of all participants, their places and methods of operation, and the various activities in which they are engaged in furtherance of the enterprise, or for a period not to exceed thirty (30) days beginning at the date of this Court's order for **Target Device #1**, or ten (10) days from the date of this Court's order for **Target Device #2**.

## AUTHORIZATION REQUESTED

88.   Therefore, your Affiant submits that probable cause exists to believe that the **Target Devices** have been used, are currently being used, and will continue to be used in furtherance of the commission of the offenses enumerated in 18 U.S.C. § 2516, namely, the illegal importing, receiving, concealing, distributing, buying, selling, or otherwise dealing in controlled substances, attempts and conspiracy to do the same, use of a communication facility to facilitate the above offenses, in violation of 21 U.S.C. §§ 841, 843(b), 846, 952, 960, and 963, money laundering and attempts and conspiracies to do the same, in violation of 18 U.S.C. §§ 1956 and 1956(h), and engaging in monetary transactions in criminally derived property, and attempts and conspiracies to do the same, in violation of 18 U.S.C. §§ 1956(h) and 1957.

89.    IT IS HEREBY REQUESTED that the Order authorizing the continued interception of wire and electronic communications over **Target Device #1,** and the interception of wire and electronic communications over **Target Device #2,** is intended to apply not only to the target telephone numbers listed above, but also to any other telephone numbers or telephones accessed through the above-referenced IMSI numbers, and to any other IMSI numbers accessed through the target telephone numbers referenced above, within the thirty (30) day period. The authorization is also intended to apply to the target telephone numbers referenced above regardless of service provider, and to background conversations intercepted in the vicinity of the target telephones while the telephones are off the hook or otherwise in use.

90.    IT IS FURTHER REQUESTED that, in the event that the service provider changes during the course of the interception, interception may continue with the new service provider without further order of this Court. The United States will advise the Court of the change of service provider in the periodic progress reports submitted to this Court.

91.    IT IS FURTHER REQUESTED/ORDERED that based on the mobility of cellular telephones, in the event the target phone is used outside the territorial jurisdiction of this court, interceptions may continue in the Southern District of Texas where the **Target Devices** are physically located, and communications over the **Target Devices** will first be heard, read, and minimized.

92.    IT IS FURTHER REQUESTED that the court order the authorized

interception of pertinent background conversations intercepted in the vicinity of the **Target Devices** while the instrument(s) are off hook or are otherwise in use; and to communications transmitted via the two way radio feature, referred to as "push to talk", concerning the above described offices.

93.  IT IS FURTHER REQUESTED, pursuant to 18 U.S.C. §§ 2703(c)(1)(B), 2703(c)(2), 2703(d), and 3121-3124, that AT&T Wireless, Sprint/Nextel Communications, Boost Mobile, Cellco Partners dba Verizon Wireless, Cingular Wireless, Vonage, Voicestream Wireless, Vantage, T-Mobile, Southwestern Bell Telephone Company, General Telephone Equipment Company (GTE), American Telephone and Telegraph Company (AT&T), Metrocall, Western Wireless, STPCS Joint Venture, MCI (MCI ONE, MCI Worldcomm), GTE Wireless, Air Touch Mobile, Max Tel Communications, Pacific Bell, Bell Atlantic, Nevada Bell, Verizon Wireless, Verizon of Texas, Alltel Telephone Company, Cricket Communications, and any other person or entity providing electronic communications service in the United States whose assistance may facilitate the execution of the order, be ordered to supply the following subscriber information:

(A)  name;
(B)  address;
(C)  local and long distance telephone connection records, or records of session times and durations;
(D)  length of service (including start date) and types of service utilized;
(E)  telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address; and
(F)  means and source of payment for such service (including any credit card or bank account number) of a subscriber to or customer of a wire communications service or remote computing service,

for published, non published or unlisted dialing, routing, addressing or signaling information captured during the wire interception on the **Target Devices** upon oral or written demand by agents of DEA and also be ordered to disclose the location of a cell site/sector (physical address) at call origination (for outbound calling), call termination (for incoming calls), and, if reasonably available, during the process of a call for the **Target Devices**.

94.   IT IS FURTHER REQUESTED that the Court direct AT&T to provide Special Agents of the DEA a complete listing of all special calling features to the **Target Devices**, including, but not limited to:  Call Forwarding, Call Waiting, Caller ID, three-way Calling, Speed Dialing/Calling (with assigned numbers), Identa-Ring (with assigned numbers), Voice Mail or Call Notes, Return Call, Call Block, Call Trace, Priority Call (with assigned numbers), and, upon request, to further provide the unbilled detailed call records to include but not limited to international calls; and cell site information pertaining to the use of the **Target Devices**.

95.   IT IS FURTHER REQUESTED that the aforementioned service- providers and their agents and employees be directed not to disclose the existence of the investigation or the Court's Order to anyone.

96.    IT IS FURTHER REQUESTED that this affidavit along with the application and any related orders be **sealed** by the Clerk of the Court and remain **sealed** pending further orders by the Court.

_____
Affiant
Scott Wilkins
Special Agent
U.S. Drug Enforcement Administration

SUBSCRIBED AND SWORN TO BEFORE ME on the 21st day of March, 2014.

_____
HON. GREGG J. COSTA
United States District Judge
Southern District of Texas

Affidavit-Page 71