IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | No. 1:17-CR-153 |
| v. | § | |
| | § | |
| JOSE RUBIO-VILLEGAS (6) | § | |
| INES RUBIO-VILLEGAS (7) | § | |
| ALEXANDER ALONSO- | § | |
| MASCORRO (8) | § | |
| SIDNEY WORRELL (10) | § | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S SUPPRESSION MOTION**

The United States responds to Worrell's motion to suppress.  (Doc 418).

Worrell lacks standing to challenge the admission of the cocaine seized from Jose Rubio-

Villegas (Rubio) and Worrell's note because they were not derived from Worrell's

intercepted calls.  Regardless, the cocaine and note are admissible because Rubio's text

messages were an independent source for the cocaine, and Rubio's confession was an

independent source for the search warrant that led to the note.  Both the cocaine and the

note were also inevitably discoverable.  Further, Rubio's confession after being arrested

with the cocaine attenuated any taint from the phone calls.  Thus, the Court should deny

the motion.

# I.      PROCEDURAL HISTORY AND RELEVANT FACTS

## A.  Procedural history.

This Court adopted a magistrate judge's recommendation to suppress wire

interception in this matter.  *See* Doc. Nos. 220 and 201.  The magistrate judge found the

wire interception orders facially insufficient because they did not provide the
names of the authorizing officials.  Doc. No. 201.  The Court later adopted a
separate report from the magistrate judge that found the intercepted text messages
were admissible, Docs. Nos. 400, 401, but required the government to show seized
physical evidence was attenuated from intercepted phone calls.  Doc. 400 at 9.

**B. Relevant facts regarding Worrell's intercepted calls, Rubio incriminating texts, the June 7, 2014 cocaine seizure, and the June 10, 2014, search warrant leading to the note**

*1.   Worrell's intercepted calls*

Initially, the government believed only Worrell's female associate was intercepted
over Rubio's wire.  But to establish standing in for his motion to suppress wire
communication, Worrell filed an affidavit claiming he was intercepted over Elizondo's
and Rubio's phone in the following sessions shown in Exhibit A.

The calls can be broken down into three narcotics transactions.  First in sessions
4336 and 4348, on April 28, 2014, Worrell and Elizondo discuss an unknown narcotics
amount involving an "Eddie."  Second, Worrell discusses Eddie again with Elizondo on
May 14, 2014, in session 5957 with Elizondo.  Third, from May 16 through May 20,
2014, Worrell and Romero discuss a sale of one kilogram of cocaine, negotiate over a
half kilogram of cocaine, and discuss payment in sessions 169, 328, 335, and 376.
Finally, Worrell and Rubio discuss Rubio's availability while Rubio was in Miami from
May 26 through May 28, 2014, in sessions 644 and 684.

2.   *Rubio's incriminating texts*

Before the initial authorization of Romero's phone, agents were well aware of his narcotics activities.  Before wire and electronic interception, a confidential source told agents that he/she had purchased approximately two hundred and fifty (250) pounds of marijuana and eight (8) kilograms of cocaine from Romero.  Agents then used the confidential source to make three purchases from Romero involving a total of six pound of marijuana.  Romero discussed an additional eleven pounds of cocaine HCL that he had accessible.  Based on this information, wire and electronic interception of Romero began, which led to wire and electronic interception of Elizondo and then Rubio.

But wire and electronic interception was not the only investigative means agents used to gather evidence against targets.  As each TIII affidavits lays out, in addition to interception, agents used a confidential source, did physical surveillance on targets including both Rubio and Elizondo, obtained pen register and trap and trace orders, obtain GPS ping orders on targets including both Rubio and Elizondo, interviewed an arrested courier, and did a financial investigation, among other techniques.

a)  Rubio texts intercepted over Elizondo's phone

During Elizondo's electronic interception, agents saw numerous incriminating texts from Rubio.  For example, on March 23, 2014, in session 181, Elizondo texted Rubio, "I need tua sppit (sic)."  Agents understood the "sppit" to be a "split," which is a half kilogram of cocaine.  In session 200, Rubio texted Elizondo, "On my way." Then in session 201, Elizondo texted Eddie LNU, "Scrap is on his way."  "Scrap refers to Rubio's

nickname "Scrappy."  Later, in session 210-212, the two communicated about Rubio arriving at the location.

On March 24, 2014, in session 288, Elizondo texted a third party, "did u c joe-joe (Joe 1) get in my car for anything?? I'm freakin out about $500 more of shit that just come up missing this morning."

On April 2, 2014, in session 1499, Elizondo texted Rubio, "Make it a split .at my spot."  Again, a split refers to a half kilogram of cocaine.  In session 1510, Elizondo texted Rubio, "Cancel it bro."

On April 6, 2014, in sessions 1983 through 1989, the two tested back and forth about when Rubio would have "more," and Rubio told Elizondo he took what he had to Elizondo the day before and hoped to get "more" the next day. Agents interpret the "more" to mean cocaine.

Similarly, On April 9, 2014, in session 2291, Elizondo texted Rubio, "Okay I need two (2) splits. Let me know when you fixing to come 'cause I'm at the gym."  Again, "splits" are a half kilogram of cocaine HCL.  Shortly after, Rubio texted that he was "On d (sic) way."

b)  All texts intercepted over Rubio's phone

Elizondo's texts to Rubio led to the May 14, 2014, order for electronic interception of Rubio.  During the interception Rubio's phone, Rubio had the following texts captured as shown in Exhibit B.  Rubio also received a text every time his home's garage door or any exterior door opened.  These are numerous and not included in Exhibit B.

Of note are the repeated discussion of his shop and instructing others to bring money there.  See sessions 14, 164, 402, 1308.  Similarly, a customer repeatedly texts Rubio about his availability and prices.  See sessions 31, 804, 805, 806, 809, 810 and 815.

On April 15, 2014, Rubio texts with Aviles about amounts and holding product.  See sessions 22, 23.  Immediately after, others are requesting that Rubio contact them.  See sessions 30, 31, and 36.

On May 21, 2014, Rubio received a text telling him, "When you are ready just have it at the shop. Ok."  Immediately after, he texted repeatedly with Elizondo about Rubio's timing and location.  Elizondo insisted on not giving Rubio more time.   See sessions 422, 433, 434, 435, 436, 437, 438, 439, 441, 445, 446, 447, 448, 449, and 450.

The final text intercepted is from Worrell, and came after agents executed the search warrant at Rubio's residence.  See session 1531.

### 3.    Background behind the June 7 cocaine seizure

On June 7, 2014, at 10 a.m., agents began surveillance at DR Car Sales and DR Car Wash, a business owned by Ines Rubio.  Surveillance saw a red Dodge registered to the business parked there.

Surveillance stopped at 4 p.m. and then restarted based on wire session 1341, which indicated that the cocaine transaction would be taking place shortly. Neither Rubio nor the red Dodge Challenger was at the business.

At 8:50 p.m., based on wire session 1370, surveillance was moved to Ines Rubio's home because Rubio was en route to pick up a large sum of money from Ines Rubio.

While on the way to the home, agents saw a car registered to Ines Rubio and followed it to the home and saw the car park.  A short time later, Rubio, who was driving the red Dodge Challenger, arrived.

At 9:05 p.m., Rubio was followed away from Ines Rubio's residence.  In text session 1367, Aviles texted Rubio, "Brother called again que how long cuz he Gots other people waiting."  In wire session 1372 Rubio said he was on the way to meet Aviles to get the cocaine.  At 9:27 p.m., Rubio arrived at an address believed to be the home of "Churro."  Wire session 1375 confirmed that Rubio had arrived at Churro's residence.  In wire session 1375 Rubio told Aviles to get the cocaine ready.

At 10:30 p.m., Rubio was followed from Churro's home toward the car shop but turned on the street before.  Rubio did not stop at the shop but later was seen driving in front of it.  Wire session 1376 indicated that Rubio was on his way to deliver the cocaine to an unknown customer.  At 11:12 p.m., two Houston Police Department officers did a traffic stop on Rubio and seized 10 kilograms of cocaine from the trunk of the red Dodge Challenger.

On June 9, 2014, at approximately noon, agents began surveillance of Ines Rubio's shop.  HPD officers planned to execute a parole violation warrant on Jose Rubio.  At approximately 3 p.m., HPD officers found Rubio, who drove a car registered to the shop.  The officers did a traffic stop and arrested Rubio.

At 3:30 p.m., agents interviewed Rubio.  They asked him about an intercepted call where Rubio talked to an unknown male in Jamaica.  A DEA

agent told Rubio that he had information that Rubio and the Jamaican planned to find the officers who arrested him and kill one and torture the others.

Rubio said he met the Jamaican in prison eight years ago and that he brokered cocaine deals with another black male.  The 10 kilograms that officers seized were for the second black male.  Rubio confirmed that the Jamaican told him to find the officers and to kill one and torture the other until he tells him where the ten kilograms is at, then kill him, but Rubio said that he had no intention of following through with it.

A DEA agent told Rubio that the traffic stop was planned and that the officers were directed to conduct a traffic stop, write him tickets, and then let him go.  The agent told Rubio that he had information that Rubio had fifteen (15) kilos of cocaine in his car.  The agent told Rubio was a target of a narcotic investigation and that the officers did the traffic stop at his request.  The agents showed Rubio pictures of the traffic stop and the ten kilograms of cocaine found in the trunk of his car.  The agents also told Rubio that he had been followed before to the same location where the traffic stop happened.

Rubio said that he delivered five to ten kilograms of cocaine on five to ten occasions to the unknown black male who coordinated with the Jamaican.  Rubio said that he would leave the car and then the black male would take the car loaded with cocaine.  The black male then returned a short time later after he off-loaded the cocaine.

Rubio said Aviles told him to look up the officers on Facebook.  Rubio found both officers on Facebook.  Aviles told Rubio to find the officers and to get the officers on his team to work together in the drug business.  Rubio and Aviles believed the officers were

in the drug business.  Rubio said Aviles did not know the officers' names, and

Aviles had no intention in causing the officers harm.

Rubio said Churro was a leader of a cocaine organization, and Churro

supplied the ten kilograms of cocaine found during the traffic stop on June 7,

2014.  Rubio said he received two kilograms of cocaine the day before from

Churro and Aviles brokers the cocaine deals.  Rubio said Aviles lives on the same

street as the shop.  Rubio said that "Chappara" is a high level cocaine supplier that

he usually gets his cocaine from.

### 4.    Background behind the June 10 search warrant

On June 10, 2014, DEA located a possible address for Rubio that was

owned by Rubio's wife.  DEA surveillance saw an ADT alarm sign in the front

yard of the residence.  The electronic interception showed Rubio getting a text

message every time a door was opened at the home.[1]  The alarm permit was

registered in Harris County, Texas, and the emergency phone contact information

was (832) 727-2669, which was the number Rubio was intercepted over.  Rubio

had this phone in his possession at the time of his arrest.

On that same day, a DEA TFO called Vivian Rubio, she said she did not

reside at the address and had no personal belongings there.  Despite being the

owner, she does not have access to the residence or own a key to the residence.

---

[1] These texts are not included in Exhibit B.

She said that Rubio is the current resident and the belongings in the residence belong to him.

On that same day, at approximately 5:02 p.m., a DEA saw a 2013 gray Buick arrive at the residence and depart the residence at approximately 5:04 p.m. The Buick was registered to Anthony Worrell, who was later identified through law enforcement databases as Worrell. The registered address was the location agents observed Rubio travel to on a past surveillance on April 9 and was also the location Rubio gave during his post arrest debriefing.  Rubio said he was delivering the ten kilograms of cocaine to the address.

On that same day, agents and officers obtained a state search warrant for the residence.  Agents entered the residence at 10:48 p.m.  During the search, agents found and seized the hand written letter from Worrell.

## II.    LAW AND ARGUMENT

### A. Because the phone calls that Worrell were intercepted over have nothing to do with the seized cocaine or note, he lacks standing to challenge either.

The Supreme Court has consistently held that a person who claims the protection of the Fourth Amendment must have a "legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978).  In *Rakas*, the Supreme Court expressly rejected analysis of an expectation of privacy "under the rubric of 'standing' doctrine . . . ." *Id.* at at 139-40.  In reviewing its discussion of standing in prior cases, the court concluded that the standing requirement "is more properly subsumed under substantive Fourth Amendment doctrine." *Id.* at 139.  The court adopted the "better

9

analysis" that focuses on the extent of a particular defendant's rights under the Fourth Amendment.  The analysis posed two questions.  First, whether the challenged search or seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained during it.  Second, whether the disputed search and seizure has infringed an interest of the defendant that the Fourth Amendment was designed to protect.  *Id.* at 429.

Section 2518(10)(a) of Title III states that any "aggrieved person" may move to suppress the contents of any wire or oral communication intercepted pursuant to Title III, or any fruits derived therefrom, on the grounds that the communication was unlawfully intercepted or was not made in conformity with the authorizing order.  18 U.S.C. § 2518(10)(a)(i)-(iii).  An "aggrieved person" for Title III purposes is one who is either (1) a party to any intercepted communication, or (2) a person against whom the interception was directed.

Although Title III contains an express standing provision, courts have long recognized that the intent of Congress was to apply the existing law of Fourth Amendment standing to wiretap cases. *United States v. Martin*, 169 F.Supp.2d 558, 564 (E.D. La. 2001) (*citing United States v. Scasino*, 513 F.2d 47, 50 (5th Cir. 1975)) (*quoting Alderman v. United States*, 394 U.S. 165 (1969)).  Relying on this Congressional intent, courts have continued to review Title III standing the same as Fourth Amendment standing.  *Id.* (*citing e.g., United States v. Gallo*, 863 F.2d 185, 192 (2d Cir. 1988) (*citing Alderman*, 394 U.S. at 175–76, n. 9).  A defendant does not become an "aggrieved person" under Title III solely by the

introduction of damaging evidence. *Id.* (*citing United States v. Garcia*, 1991 WL 120239 (S.D.N.Y. June 21, 1991) (*citing Gallo*, 863 F.2d at 192; *Alderman*, 394 U.S. at 171–72). *But see United States v. Marcello*, 508 F.Supp. 586, 602 n. 6 (E.D. La. 1981)).

In *United States v. Scasino*, defendants sought to suppress Title III recordings that were the undisputed fruits of a prior illegal wiretap. 513 F.2d 47, 49 (5th Cir.1975).  The Fifth Circuit concluded that the defendants lacked standing to challenge the prior wiretap primarily because they were not directly implicated by the wiretap. *Id.*  The court adopted the standard from the Fourth Circuit in *United States v. Gibson*, where the court concluded that "[t]he clear implication of [Section 2518(10)(a) ] is that an 'aggrieved person' should not include one who is not implicated and against whom no one has made of proffer of information derived from the defectively authorized tap." 500 F.2d 854, 855 (4th Cir. 1974).

In *Martin*, the defendant moved for suppression of the fruits of conversations that were intercepted pursuant to Title III in an investigation into matters unrelated to the crimes charged against him. *Martin*, 169 F.Supp.2d at 560.  The government had received authorization to intercept communications from the phone of target. *Id.* at 561. Although none of the conversations intercepted, incriminated Martin, one of his social conversations was intercepted. *Id.*  These interceptions pursuant led to authorization to intercept communications on the phones of other targets of the investigation and, ultimately, in prosecuting Martin. *Id.*  The court noted that "none of the conversations captured on the [original] T-III are relevant to the criminal tax charges pending." *Id.*

In finding the defendant had no standing, the *Martin* court found:

11

> [T]he real inquiry would appear to be whether Title III would give
> Martin standing to suppress the specific [original] conversations
> which did in fact provide probable cause for the subsequent
> surveillance that captured the conversations under attack in this
> motion.  After all, the conversations Martin is trying to exclude in
> the instant motion are fruits of conversations to which Martin was
> not a party — they are not fruits of Martin's intercepted phone call.

*Id.*  Other courts have recognized that an interceptee might have standing

with respect to conversations in which he participates but lacks standing for other

conversations where he was not a party.  *See, e.g., United States v. Plescia*, 773

F.Supp. 1068, 1077 (N.D. Ill. 1991); *see also United States v. Holmes*, 521 F.2d

859 (1975), *vacated in part*, 537 F.2d 227 (5th Cir. 1976) (en banc).[2]

Ultimately, the court held that Martin lacked standing to challenge the prior

T–III interceptions because:

> Martin's argument, however, presupposes that Title III would treat
> every Brown T–III conversation equally for standing purposes such
> that one serendipitous phone call intercepted during months of
> surveillance would give him standing to challenge the fruits of
> hundreds of hours of communications in which he had no privacy
> interest whatsoever. This broad interpretation is contrary to Fourth
> Amendment standing law which has been held to govern motions to
> suppress under Title III.

169 F.Supp.2d at 565.

That logic applies with full force here.  Worrell seeks to suppress narcotics

seized based on intercepted phone calls that he was not a party to.  He does not

make a phone call to phone call challenge.  For Worrell to have standing to

---

[2] The *en banc* court affirmed the panel's ruling regarding standing.

12

challenge the cocaine seized from Rubio, that seizure must be a fruit or "derived therefrom" an intercepted phone call of Worrell.

No evidence supports such a claim. Worrell's last intercepted conversation was May 28. 2014, and was unrelated to the narcotics seized on June 7, 2014. Agents did not and could not have used information from Worrell to surveille Rubio from the shop to his home. They had no idea who Worrell even was despite having intercepted him. Even after Rubio's interview, where Rubio admitted to selling cocaine to a black male who lives at Worrell's address, agents still did not know Worrell's identity. They only learned it after the search warrant. Thus, he lacks standing to challenge to admission of the June 7, 2014, cocaine seizure.

Similarly, the note was seized during a search warrant. The search warrant was sought after information Rubio gave to agents. Worrell did not live at the place searched. He does not have any other privacy interest in Rubio's home and lacks standing to challenge the note seized from the search warrant of Rubio's home. As such, the motion can be denied on standing grounds alone.

## B. Texts messages, surveillance, and GPS tracking make the cocaine admissible under the independent source and inevitable discovery doctrines.

"The independent source doctrine is based 'upon the policy that, while the government should not profit from its [allegedly] illegal activity, neither should it be placed in a worse position than it would otherwise have occupied' had the [alleged] misconduct not occurred." *United States v. Restrepo*, 966 F.2d 964, 969 (5th Cir. 1992)(*quoting Murray v. United States*, 487 U.S. 533, 542 (1988)). Thus, even assuming

police engaged in an unconstitutional activity, this action does not require exclusion of evidence discovered through an independent source.  *See id.*

Closely related, "[T]he inevitable discovery doctrine ... renders the exclusionary rule inapplicable to otherwise suppressible evidence if that evidence would inevitably have been discovered by lawful means."  *United States v. Jackson*, 596 F.3d 236, 241 (5th Cir. 2010).  The government must establish by a preponderance of the evidence that "(1) there is a reasonable probability that the contested evidence would have been discovered by lawful means in the absence of police misconduct and (2) the Government was actively pursuing a substantial alternate line of investigation at the time of the constitutional violation." *Ibid.  But see id.* at 242 (the "'active-pursuit element' may no longer be necessary to invoke the inevitable discovery rule").

Context should resolve any dispute.  Agents had a confidential source into Romero.  They did surveillance of Romero, then Elizondo, and then Rubio.  They obtained pen register and GPS orders on all.  They did a financial investigation.  They intercepted text messages of all of them.  This is separate and apart from intercepting Rubio's phone.  With that non-wiretap information, they knew where Rubio was, the phone numbers he was calling and receiving phone calls from, and physically saw his locations.  Title III interception is not permitted without a necessity showing.  18 U.S.C. § 2518(c).  To show that, agents are required to do alternative investigative techniques, and they did so here.

The flaw in Worrell's argument is that he asks the Court to view the texts he cites without context.  Agents legally intercepted more than 70 texts to and from Rubio, starting with the interception of Elizondo's phone.  Those texts give context.  In session 1308, he texted "Bring me the money to my shop."  In session 1499, Elizondo texted Rubio, "Make it a split .at my spot."  These alone show Rubio was a drug dealer.  They give context to the June 6 and 7, 2014, texts that show a live action drug deal.  As such, there is an independent source.

Similarly, the evidence was going to inevitable discovered.  Agents had surveillance, pen registers, GPS pinging and a confidential source.  This cocaine was going to be discovered when agent surveilled Rubio for 6 hours the day of the seizure.  Therefore, the cocaine was going to be inevitably discovered.

## C. Rubio's confession provides an independent source for the note and attenuate any prior taint.

Not all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police.  Rather, the question is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."  *Wong Sun v. United States*, 371 U.S. 471, 487-88, (1963).  *See also* Senate Report 96 (stating that Congress had "no intention to change the attenuation rule" when it enacted Title III).

To determine whether the derivative evidence has been purged of the taint of the illegality, this Court considers several factors, including: (1) the amount of time between

15

the illegal action and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975).

Here, Rubio confessed to trafficking cocaine. Based on his confession, agents sought a search warrant. For the reasons above, this confession serves as an independent source for the search warrant that led to the discovery of the note. Additionally, while the seizure might have been close in time to calls over Rubio's phone, they were not close in time to Worrell's call.

The confession serves as an intervening circumstance to establish separate grounds for the warrant. As Worrell's attachment to his motion show, the affidavit for the search warrant does not reference the intercepted calls.

No evidence suggests purposeful and flagrant official misconduct. The error in not naming the authorizing official is a technical statutory defect, not a constitutional violation. At the time of interception, no court has suppressed a wiretap for the error in the order here. Thus, any violation of Title III was neither purposeful nor flagrant, and Rubio's confession purges any taint from the wire interception.

Respectfully submitted,

JOSEPH D. BROWN
UNITED STATES ATTORNEY

16

*/s/ Christopher T. Rapp*
CHRISTOPHER T. RAPP
Assistant U.S. Attorney
350 Magnolia Ave., Ste. 150
Beaumont, Texas 77701-2248
409-839-2538 Phone
Arizona Bar 025704
Christopher.T.Rapp@usdoj.gov

## CERTIFICATE OF SERVICE/CONFERENCE

I hereby certify that a copy of this motion was provided to defense counsels May 13, 2020, via electronic transmission.

*/s/ Christopher T. Rapp*
CHRISTOPHER T. RAPP
Assistant U.S. Attorney